Frank Cronin, Bar No. 069840
fcronin@swlaw.com
Steve T. Graham, Bar No. 105510
sgraham@swlaw.com
Brian J. Mills, Bar No. 216078
bmills@swlaw.com
SNELL & WILMER L.L.P.
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689
Telephone: 714.427.7000
Facsimile: 714.427.7799

Attorneys for Defendant
CSI Electrical Contractors, Inc.

FILED

BY

2013 NOV 27 PM 12: 53

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| James Payton, an individual on behalf of himself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CSI Electrical Contractors, Inc., a California Corporation, and Does 1 through 100,<br><br>Defendants. | Case No. CV13-08795 JAK (AGRx)<br><br>**DEFENDANT CSI ELECTRICAL CONTRACTORS, INC.'S NOTICE OF REMOVAL OF ACTION**<br><br>**(Federal Question Jurisdiction Under § 301 of the LMRA)**<br><br>(Case removed from Superior Court of California, County of Los Angeles, Case No. BC525050, Complaint filed: October 21, 2013) |

**TO: THE HONORABLE JUDGES OF THE ABOVE-ENTITLED COURT:**

**PLEASE TAKE NOTICE** that pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, Petitioner CSI Electrical Contractors, Inc. ("CSI"), without waiving any defenses available to them and specifically preserving all such defenses, hereby petitions the Court for removal of the action described below from the State of California, County of Los Angeles to this Court, and in support thereof, respectfully

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

COPY

shows:

1.     Petitioner CSI is a defendant in the above entitled action.

2.     Plaintiff James Payton ("Plaintiff") filed a civil action against Defendant CSI in the State of California, County of Los Angeles, entitled *James Payton v. CSI Electrical Contractors, Inc.*, Case No. BC525050 on October 21, 2013 (the "State Action"). A true copy of the Complaint is attached hereto as **Exhibit A**.

3.     CSI filed an answer on November 26, 2013.  A copy of the answer is attached as **Exhibit B**.

4.     The first date upon which CSI received and accepted service of a copy the Summons and said Complaint was October 28, 2013. The thirty-day period for removal does not begin to run until a party has received a copy of the Summons and Complaint and been properly served. *See Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347-48 (1999). Therefore, this Notice of Removal is timely filed under 28 U.S.C. § 1446(b).  A copy of the Summons is attached as **Exhibit C**.

5.     CSI was also served with a Civil Case Cover Sheet, Civil Case Cover Sheet Addendum and Statement of Location, Notice of Case Assignment, Amended General Order re Personal Injury Court ("PI Court") Procedures and Amended General Order – Final Status Conference, Personal Injury ("PI") Courts, a copy of which is attached collectively as **Exhibit D**.

6.     Assignment to this Court is proper because the State Action was pending in the State of California, County of Los Angeles.

7.     This is a civil action of which this Court has original jurisdiction pursuant to 28 U.S.C. § 1331, and is one which CSI may remove to this Court pursuant to the provisions of 28 U.S.C. § 1441 in that it is a federal question brought under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Section 301(a) of the LMRA confers upon federal courts exclusive

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

- 2 -

NOTICE OF REMOVAL

1    jurisdiction by complete preemption to hear "[s]uits for violation of contracts
2    between an employer and a labor organization." 29 U.S.C. § 185(a). *see Franchise*
3    *Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1,
4    23 (1983) ("The preemptive force of § 301 is so powerful as to displace entirely any
5    state cause of action 'for violation of contracts between an employer and a labor
6    organization.' Any such suit is purely a creature of federal law, notwithstanding the
7    fact that state law would provide a cause of action in the absence of § 301."). The
8    Supreme Court has also expanded the preemptive force under section 301 to
9    include cases to which the resolution "is substantially dependent upon analysis of
10   the terms of [a collective bargaining agreement]." *Allis-Chalmers Corp. v. Lueck*,
11   471 U.S. 202, 220 (1985).

12         8.    In the present action, complete preemption applies and federal courts
13   have exclusive jurisdiction over this suit because Plaintiff alleges various claims
14   which all (with the exception of the 7th Cause of Action for wrongful discharge) are
15   based on one set of facts:  he claims that he was required to be transported on a
16   company bus to travel from his personal vehicle to/from his worksite and was not
17   paid for that travel time.  He alleges this mandatory transportation added up to three
18   hours to his work day which impacted his regular pay, overtime pay and the timing
19   of his meal and rest periods. Complaint, paras. 20-23. As shown below, collective
20   bargaining agreements in effect include contractual terms which directly address
21   these issues and which must be interpreted in order to resolve the matter.

22         9.    Plaintiff fails to plead that there are collective bargaining agreements
23   ("CBAs") in effect between the defendant CSI and a labor organization which
24   represents Plaintiff (and all other non-exempt electricians he purports to represent)
25   which specifically addresses these "travel to the worksite" issues, provides pay in
26   defined circumstances and also provides a grievance and arbitration process for
27   resolution of any issues arising from implementing the negotiated provisions.  His
28   claim, therefore, requires interpretation of collective bargaining agreements and is

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

NOTICE OF REMOVAL

1  preempted by federal law.

2      10.   There are three collective bargaining agreements ("CBAs") which

3  were in effect when plaintiff was employed by CSI and during the period covered

4  by this putative class action.   Each of the CBAs has amendments, interpretive

5  understandings and related memoranda of understanding which must be considered

6  to interpret the full scope of the collectively bargained agreements regarding "travel

7  to the worksite" and related pay issues.   The agreements were between CSI and the

8  electrical workers union, of which plaintiff and all non-exempt electrical workers

9  were members.   Each of the CBAs are attached to the Declaration of Frank Cronin

10  in Support of Defendant CSI's Notice of Removal ("Cronin Decl."), **Exhibit E**, and

11  are numbered thereon as shown below:

12      a)   **Inside Agreement** between Local Union 639 of the International

13  Brotherhood of Electrical Workers, San Luis Obispo, CA ("IBEW") and the

14  California Central Coast Chapter, National Electrical Contractors Association

15  ("NECA")—**Amended June 1, 2009**, attached as Exhibit 1 to Cronin Decl.

16  This agreement was in effect from June 1, 2009 through May 31, 2012.

17      b)   **Inside Agreement—Amended June 1, 2012**, between the same parties

18  as above, attached as Exhibit 2 to Cronin Decl. This agreement was in effect

19  from June 1, 2012 to the present.

20      c)   The **Topaz Solar Farm Work Site Agreement** between IBEW Local

21  639 and First Solar Electric (California), effective June 2, 2011 and

22  continuing to the present, with its numerous attachments and additional

23  MOUs incorporated therein, attached as Exhibit 3 to Cronin Decl.

24      11.   Defendant CSI is an electrical contractor performing work on the

25  Topaz project.   That project is within the jurisdiction of IBEW Local 639.   CSI

26  became bound by and agreed to each of these three agreements, either by its assent

27  to authorize NECA to bargain with the IBEW on its behalf or by directly executing

28  them.

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

18289307

- 4 -

12.    Plaintiff asserts in his Complaint that his employment with CSI was from May 22 through June 14, 2012 (three weeks) and that the location of his work was at the Topaz Solar Farm project.  Complaint, para. 6.  Thus, he is governed by these agreements which were negotiated on his behalf by the IBEW union, his sole and exclusive representative on all matters relating to wages, hours, or working conditions.

13.    The Work Site Agreement expressly modified some terms of the CBA[1] (which is referred to as the "Master Agreement" in the Work Site Agreement) but leaves other CBA terms in effect. In general, the Work Site Agreement is declared to "take precedence over conflicting provisions" of the CBA but affirms that the CBA terms remain in effect unless they are specifically denoted as being superseded or are determined to be conflicting.  In addition to this general carve-out, certain specific sections of the CBA are deemed to "not apply" and certain other CBA terms are modified by inclusion of replacement language on subjects also addressed in the CBA.  See Exhibit 3 to Cronin Decl., ¶¶ 10.3 and 10.4 (at pages 13-14).  The work Site Agreement also contains conditional clauses which only become effective if certain governmental determinations are made, such as U.S. Department of Energy loan guarantee approvals being received or certain County ordinances modified.   This amalgam of general clauses (such as "precedence if conflicting,"), nullification of certain specific CBA, clauses that are conditional upon extrinsic events and other clauses that appear on their face to be conflicting (either with the CBA or within themselves) requires considerable analysis in order to come to a conclusion as to its meaning.  In addition, the parties to these agreements have attached their own interpretation to the various words of art (or jargon of the trade) and reached informal understanding of many terms, and

---

[1] The two "Inside Agreements" were in effect for successive time periods and contain the same language on travel-related issues, except as noted below.  The will be referred to as herein as "the CBA" for convenience and in contrast to the "Work Site Agreement"—which is also a collectively bargained agreement.

NOTICE OF REMOVAL

18289307

1  the application of those terms to a variety of particular situations that arise in the
2  day-to-day implementation of these agreements.  The parties have created a process
3  for resolving differences of interpretation and application of the agreement terms
4  through grievance and arbitration wherein "any question arising out of …this
5  Agreement involving interpretation and application of their Agreement…" shall
6  proceed through three levels of meetings to "attempt to resolve" the dispute,
7  culminating in arbitration in which the arbitrator may "utilize any equitable or legal
8  remedy" to decide the matter at issue.  Work Site Agreement, Exhibit 3 to Cronin
9  Decl., Sections 7.1 through 7.10.

10      14.    The statutes and the Wage Order cited by Plaintiff as the basis for his
11  claims (again excluding his individual wrongful termination claim) permit the
12  parties to a collectively bargaining to adjust and modify the provisions for pay and
13  other incidents to travel to the work site.  The parties here have done so.  Plaintiff is
14  bound by those agreements.  He was also required to institute a timely grievance as
15  to any dispute he had regarding the application of those negotiated terms.  Cronin
16  decl., Exhibit 1, ¶ 1.10; Exhibit 2, ¶ 1.10, Exhibit 3, ¶ 7.3.  He filed no grievance
17  and therefore has waived his right to complain about the implementation of those
18  collectively bargained terms.

19      15.    The CBA, the Work Site Agreement and the mutually agreed
20  interpretation and application of their terms to the "travel to the work site" situation
21  have been the subject of substantial bargaining between the IBEW and CSI
22  (through its representative, NECA).  The resolution of Plaintiff's claim depends of
23  the analysis of both the express and implied terms of those agreements, as
24  evidenced by the agreements' language, the bargaining history between the parties,
25  past practices and industry practice.  Resolution of these issues in this action,
26  therefore, requires close analysis of collectively bargained terms, not mere
27  reference to them. The fact that those terms may be unclear or even appear
28  contradictory or conditional on their face further demonstrates the need for

SNELL & WILMER
L.L.P.
600 ANTON BLVD., SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

18289307

- 6 -

NOTICE OF REMOVAL

interpretation of the collectively bargained agreements.  Thus the federal courts have exclusive jurisdiction over this matter since federal courts have the exclusive power to interpret disputed terms in such collective bargaining agreements.

16.    An illustration of the interrelationship and possible conflicting interpretations of the CBA and the Work Site Agreement is found in the "Travel" sections of each.  In the CBA, three different calculations of travel pay are set forth. The Employer is given the option to select any one of the three options. The first at Section 3.19 (A) defines pay within a geographic "free zone and states that all work outside that area "shall be paid at full subsistence" under certain conditions.  "Full subsistence" is not defined.  The second option at Section 3.29 (B) states that employers (outside the free zone) may require workers to report to a job site in their own transportation and will be paid at $50.00 per day flat rate[2] (or on a mileage basis).  There is no explanation of how this flat rate scheme relates to the "full subsistence" pay provision in 3.19 (A), although both appear to apply to work sites outside the "free zone."  The third option at Section 3.19 (C) requires the employer to "pay for travelling time and furnish transportation from shop to job, job to job and job to shop."  This type of travel time is to be paid at "the appropriate rate of pay for that day of the week."  None of the terms used in these three sections are defined and all are subject to a wide range of interpretation.

17.    The Work Site Agreement appears to modify some of these CBA terms, but leaves others intact.  The lines of delineation are simply unclear, however.  The Work Site Agreement at para. 10.4 cites CBA Sec. 3.19 as one of the provisions that "shall not apply to this Worksite Agreement."  But it then proceeds to, 1) point out that the "transportation requirements" are conditional on modification of a County ordinance, 2) states a pledge by the Union to "work

---

[2] The current CBA, Exhibit 2 to the Cronin Decl., provides for $50.00 per day.  The prior CBA, Exhibit 1 to Cronin Decl., provides for $38.00 per day.  Plaintiff worked under both successive agreements during his brief tenure.

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

1   aggressively" with the Company to encourage workers to use the "free
2   transportation" to the worksite to alleviate traffic congestion and ensure safety; 3)
3   upon yet another condition (DOE loan guarantees), it states that travel pay (if
4   required) will be paid in either of two ways--either, 1) at "at the wage determination
5   levels that existed when the bids for that block were let" (none of these terms are
6   defined, but they appear to refer to another document which is not part of the Work
7   Site Agreement), or 2)  at the Master Agreement level as stated in CBA Sec. 3.19
8   (whichever is less).  In sum, this extremely convoluted section first says the Master
9   Agreement is inapplicable, then says that pay will be consistent with that very
10   agreement (which itself provides three options with dozens of undefined terms).
11   Reading just this section of the CBA and the Work Site Agreement's terms
12   demonstrates that pay related to travel to the Topaz work site (which may or may
13   not include voluntary use of transport provided by an unnamed party) is
14   extraordinarily complex, convoluted and conditional on extrinsic events.  It
15   understates the matter to say that nothing about these overlapping, undefined and
16   conflicting terms is obvious on the face of the agreement.

17       18.     Another section of the Work Site Agreement, Sec. 10.5, does nothing
18   to reduce confusion; rather, it adds another layer of uncertainty.  It states that
19   "covered employees" (undefined) must be at their "work station" (undefined, but
20   possibly different from the term "job site" which is used repeatedly in other
21   sections) at the designated starting times.  It then states that "the parties support a
22   pay arrangement" that provides for the workers to be at their work stations "without
23   compensation for the time travelled **to** his or her workstation."  But the parties
24   agree that they workers will be paid "at the regular hourly rate of pay for travel time
25   **back** to their vehicles from the workstation" (emphasis added).  In effect, this says
26   there will be one-way only pay from workstation (undefined) to "their vehicles."
27   Since other provisions discuss "busing" and "free transportation", one question that
28   comes to mind is whether this one-way pay provision applies to workers who left

18289307                                  - 8 -

NOTICE OF REMOVAL

1  their "vehicles" miles away and took a fee bus to their workstation. And since the

2  bus riders were apparently eligible for a $50/day payment, does this mean that they

3  get additional pay on top of that? There is no explanation of how this Sec. 10.5

4  provision is harmonized with the others cited above which refer alternately to "full

5  subsistence," "$50.00 per day" flat rate or merely "the appropriate rate of pay."

6  Questions abound from a simple perusal of these agreements and the only way to

7  understand them requires close analysis, probably combined with testimony or

8  affidavits explaining how—in the real world of the Topaz Solar Project—all these

9  variables have been worked out between the union and the contractors on the job.

10      19.    As noted, the 7th Cause of Action for wrongful discharge is apparently

11  unrelated to the claims for wage-hour violations and does not require analysis of the

12  collectively bargained terms (other than the "good cause for termination" language

13  of the CBA).  Defendant requests that the court exercise supplemental jurisdiction

14  over this claim pursuant to 28 U.S.C. sec 1367.

15      20.    All Defendants served in this action have consented to removal of this

16  action.

17      21.    A copy of this Notice of Removal is being served upon Plaintiff

18  through its attorneys of record and upon the Clerk of the Superior Court of

19  California, Los Angeles County, as provided by 28 U.S.C. § 1446(d). A copy of the

20  Notice of Removed Action that will be timely filed with the Clerk of the Superior

21  Court of California, Los Angeles County, is attached hereto as **Exhibit F**.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

18289307

NOTICE OF REMOVAL

1    **WHEREFORE**, Defendant CSI requests that this Court accept and approve

2  this Notice of Removal, and that said action be removed to the United States

3  District Court for the Central District of California.

4

5  Dated: November 27, 2013                SNELL & WILMER L.L.P.

6

7                                          By: _____

8                                             Frank Cronin
                                              Steve T. Graham
9                                             Brian J. Mills

10                                         Attorneys for Defendant
                                           CSI Electrical Contractors, Inc.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

OCT 21 2013

John A. Clarke, Executive Officer/Clerk
By Amber Hayes, Deputy

1  LONNIE C. BLANCHARD, III (SBN 93530)
JEFFREY D. HOLMES (SBN 100891)
2  THE BLANCHARD LAW GROUP, APC
3311 East Pico Boulevard
3  Los Angeles, CA 90023
Telephone:    (213) 599-8255
4  Fax:          (213) 402-3949
5  Email:        lonnieblanchard@gmail.com

6  **DK**  PETER R. DION-KINDEM (SBN 95267)
THE DION-KINDEM LAW FIRM
7  PETER R. DION-KINDEM, P. C.
8  21550 Oxnard Street, Suite 900
Woodland Hills, California 91367
9  Telephone:    (818) 883-4900
Fax:          (818) 883-4902
10  Email:        peter@dion-kindemlaw.com

11  Attorneys for Plaintiff James Payton

12

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                        COUNTY OF LOS ANGELES

15                                              B C 5 2 5 0 5 0

16  James Payton, an individual, on behalf of himself    | Case No.
and all others similarly situated,                   | **CLASS ACTION**

17          Plaintiff,                                   | **Complaint for:**

18          vs.

19                                                       | 1.  **Failure to Pay Compensation Due for**
**Hours Worked**
20  CSI Electrical Contractors, Inc., a California       | 2.  **Failure to Pay Compensation Due**
Corporation; and Does 1 through 100,                 | **Pursuant to Labor Code Section 226.7**
21          Defendants.                                  | **(Meal Period Wages)**
| 3.  **Failure to Pay Compensation Due**
22                                                       | **Pursuant to Labor Code Section 226.7**
| **(Rest Period Wages)**
23                                                       | 4.  **Failure to Pay Waiting Time Wages**
| **Pursuant to Labor Code Section 203**
24                                                       | 5.  **Violation of Labor Code Section 226**
| 6.  **Violation of Business and Professions**
25                                                       | **Code Section 17203**
26                                                       | 7.  **Wrongful Termination in Violation of**
| **Public Policy (individual claim)**

27

28
                              Complaint
                                 1

Plaintiff James Payton ("Plaintiff") alleges:

## INTRODUCTION

1. This case arises out of Defendants' failure to comply with the California Labor Code and applicable Wage Order in the treatment of its electrical workers and construction workers, including failure to pay wages for regular and overtime hours, failure to provide lawful meal and rest periods, failure to pay meal period and rest period wages, failure to pay waiting time wages, and failure to provide lawful itemized wage statements, *inter alia*.

2. Plaintiff brings this action on behalf of himself and similarly situated persons who, during the four years prior to the filing of this action through the date of trial, or other applicable statute of limitations ("Class Period"), were damaged by Defendants' wrongful conduct or as to whom Defendants were unjustly enriched and who have not released all of their claims for the Defendants' wrongful conduct.

3. The Plaintiff Sub-Class includes those Class Members that ended their employment with the Defendant during the Class Period, but who were not timely paid the accrued and unpaid wages owed to them as required by Labor Code Sections 201 or 202. Such Plaintiff Sub-Class Members are additionally entitled to waiting time wages pursuant to Labor Code Section 203.

4. Plaintiff seeks all compensation and relief due Plaintiff and the Class Members during the Class Period based upon information and belief that Defendants are continuing, and will continue, their unlawful and unfair practices as described herein.

5. As used herein, the term "Plaintiff" includes James Payton, who is the named Plaintiff Class representative. The term "Plaintiff Class" or "Class Members" includes the Plaintiff and all Class Members.

## PLAINTIFF AND THE PLAINTIFF CLASS

6. Plaintiff is a resident of California and was hired as an electrical and construction worker by Defendant CSI Electrical Contractors, Inc. ("CSI") on or about May 22, 2012. Through CSI,

Plaintiff worked at the Topaz Solar Farm. Plaintiff was effectively terminated on or about June 14, 2012.

7.   During at least a portion of the Class Period, Plaintiff and each Class Member were employed by CSI in California and were covered under one or more regulations or Industrial Welfare Commission (IWC) Wage Orders, including but not limited to Wage Order 16-2001.

8.   Each of the Class Members is identifiable and similarly situated, and Plaintiff reserves the right to seek leave to amend this Complaint to add as named Plaintiffs some or all of the persons who are members of the Plaintiff Class.

## DEFENDANTS

9.   Defendant CSI is a California corporation doing business in California and across the United States with its principal place of business located at 10623 Fulton Wells Ave., Santa Fe Springs in Los Angeles County, California. CSI works with some of the largest commercial constructors in the nation providing, among other services, electrical engineering, pre-fabrication, structured cabling, system integration, and alternative energy services.

10.   Plaintiff does not presently know the true names and capacities of the defendants named as Does 1 through 100 and therefore sues such defendants by these fictitious names. Plaintiff believes that the Doe Defendants are persons or entities who are involved in the acts set forth below, either as independent contractors, suppliers, agents, servants or employees of the known defendants, or through entering into a conspiracy and agreement with the known Defendants to perform these acts, for financial gain and profit, in violation of Plaintiff's and Class Members' rights. Plaintiff will request leave of Court to amend this Complaint to set forth their true names, identities and capacities when Plaintiff ascertains them.

11.   Each of the Defendants has been or is the principal, officer, director, agent, employee, representative and/or co-conspirator of each of the other defendants and in such capacity or capacities participated in the acts or conduct alleged herein and incurred liability therefor. At an unknown time, some or all of the Defendants entered into a conspiracy with other of the

Complaint

3

1    Defendants to commit the wrongful acts described herein. These wrongful acts were committed

2    in furtherance of such conspiracy, and Defendants aided and abetted each other in their

3    execution. Each of the Defendants acted for personal gain or in furtherance of their own financial

4    advantage in effecting the acts alleged herein.

5                              **CLASS ACTION ALLEGATIONS**

6

7    12.    Plaintiff brings this action for himself and on behalf of a class and sub-class initially defined as

8           follows:

9           **Plaintiff Class**

10          All persons employed by CSI in the State of California as electrical and/or construction

11          workers whose primary duty is or was the construction and/or installation of energy
            systems (4) years prior to the filing of this action, or shorter statute of limitations as
            determined by the Court, through the date of trial who have not settled all of the claims

12          asserted herein.

13          **Plaintiff Termination Pay Sub-Class**

14          All Class Members who were not promptly paid all wages due upon termination of their

15          employment, and are entitled to additional waiting time wages pursuant to Labor Code
            Section 203.

16

17   13.    The class action causes of action have been brought and may be maintained because there is a

18          well-defined common interest of many persons and it is impractical to bring them all before the

19          court.

20   14.    **Numerosity.** The number of class members is so numerous that joinder of all members is

21          impractical. The names and addresses of the Class Members are identifiable through documents

22          maintained by the Defendants, and the Classes' members may be notified of the pendency of this

23          action by published and/or mailed notice. Plaintiff believes there are more than 100 Class

24          Members.

25   15.    **Existence and Predominance of Common Questions of Law and Fact.** Common questions of

26          law and fact exist as to all Class Members. These questions predominate over the questions

27          affecting only individual members. These common legal and factual questions include, among

28
                                        **Complaint**
                                             4

other things:

    A.  Whether the Plaintiff and each Class Member is entitled to compensation under the applicable IWC Wage Order(s), regulations or statutes;

    B.  Whether Defendants failed to provide Class Members with the required meal periods;

    C.  Whether Defendant failed to provide Class Members with the required rest periods;

    D.  The appropriateness and nature of relief to the Class Members;

    E.  The effect upon and the extent of any damages sustained by the Class Members and the appropriate type and/or measure of damages; and

    F.  The extent of Defendants' liability to the Class Members.

16.  **Typicality.** Plaintiff's claims are typical of the claims of the Class Members. Plaintiff and all Class Members sustained damages arising out of Defendants' common course of conduct in violation of the law as alleged herein. Plaintiff is entitled to the same relief under the class action causes of action as the other Class Members.

17.  **Adequacy.** Plaintiff will adequately and fairly protect the interests of the Class Members. Plaintiff was employed by CSI at times during the Class Period and is an adequate representative for the Plaintiff Class because Plaintiff has no interest adverse to the interests of the absent Class Members. Plaintiff has retained legal counsel with substantial experience in civil litigation, employment law and class action litigation. The interests of the Class Members will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

18.  **Superiority.** A class action is superior to other available means of fair and efficient adjudication of the claims of the Class Members because joinder of all Class Members is impractical. Class action treatment will allow a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would cause to such persons or to the court system. Further, the damages of many individual Class Members may be relatively small, and the burden and expenses of individual litigation would make it difficult or impossible for individual members of the class to seek and obtain relief, while a class action will

serve an important public interest. Furthermore, questions of law and fact common to the Class Members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Individual litigation would present the potential for inconsistent or contradictory judgments. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

**Cause of Action No. 1**
**Failure to Pay Compensation Due for Hours Worked**
**(Against All Defendants)**

19.   Plaintiff realleges Paragraphs 1 through 20.

20.   Defendants required that Plaintiff and Class Members arrive on workdays by 5:30 a.m. at an employee parking lot. From there, Plaintiff and the Class Members were required to board buses operated or contracted by Defendants. These buses then transported Plaintiff and Class Members to the jobsite, approximately an hour away.

21.   Once they arrived at the gated parking lot of the jobsite around 6:30 a.m., Plaintiff and Class Members were required to pass through an additional security gate at around 6:45 a.m. where they were scanned and allowed to pass on to an assembly point where they were supposed to be by 6:50 a.m.

22.   Similarly, at the end of the day, Plaintiff and Class Members were required to meet at the assembly point by 3:15 p.m. and then walk through the security gate to be scanned by 3:30 p.m. From there they again boarded buses operated or contracted by Defendants that transported them back to the employee parking lot, approximately one hour away. Generally they arrived at this parking lot around 5:00 p.m.

23.   The above described steps were mandatory and controlled portions of Plaintiff's and Class Members' daily schedules. Thus, their work days started at approximately 5:30 a.m. and ended at approximately 5:00 p.m. or thereafter. Defendants, however, failed to pay Plaintiff and Class

**Complaint**
6

1    Members for the time worked before 7:00 a.m. and after 3:30 p.m. This amounts to

2    approximately three hours of unpaid overtime per worker, per work day.

3    **Failure to Pay at Least Minimum Wage for Each Hour Worked**

4

5    24.    Labor Code Section 1182.12 in relevant part provides:

6           Notwithstanding any other provision of this part, on and after January 1, 2007, the
           minimum wage for all industries shall be not less than seven dollars and fifty cents
7           ($7.50) per hour, and on and after January 1, 2008, the minimum wage for all industries
           shall be not less than eight dollars ($8.00) per hour.
8

9    25.    Labor Code Section 1197 in relevant part provides:

10          The minimum wage for employees fixed by the commission is the minimum wage to be
            paid to employees, and the payment of a less wage than the minimum so fixed is
11          unlawful.

12

13   26.    Paragraph 4 of the applicable Wage Order provides in relevant part:

14               (A) Every employer shall pay to each employee wages not less than seven dollars
            and fifty cents ($7.50) per hour for all hours worked, effective January 1, 2007, and not
15          less than eight dollars ($8.00) per hour *for all hours* worked, effective January 1, 2008 . .

16

17               (B) Every employer shall pay to each employee, on the established payday for the
            period involved, not less than the applicable minimum wage *for all hours worked* in the
18          payroll period, whether the remuneration is measured by time, piece, commission, or
            otherwise. (Emphasis added.)

19

20   27.    In violation of Section 1197 and paragraph 4 of the applicable Wage Order, Defendants did not

21   pay Plaintiff and Class Members at least the minimum wages and/or regular time wages for all

22   hours worked.

23   28.    Labor Code Section 1194.2 in relevant part provides:

24          In any action under Section 1193.6 or Section 1194 to recover wages because of the
            payment of a wage less than the minimum wage fixed by an order of the commission, an
25          employee shall be entitled to recover liquidated damages in an amount equal to the wages
            unlawfully unpaid and interest thereon. Nothing in this subdivision shall be construed to
26          authorize the recovery of liquidated damages for failure to pay overtime compensation.

27

28
                                      **Complaint**

**Failure to Pay for Overtime Hours Worked**

29.     Labor Code Section 510 provides in relevant part:

(a) Eight hours of labor constitutes a day's work. Any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee. Any work in excess of 12 hours in one day shall be compensated at the rate of no less than twice the regular rate of pay for an employee. In addition, any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular rate of pay of an employee.

30.     Paragraph 3 of the applicable Wage Order provides in relevant part:

3. HOURS AND DAYS OF WORK

(A) Daily Overtime - General Provisions

(1) The following overtime provisions are applicable to employees 18 years of age or over and to employees 16 or 17 years of age who are not required by law to attend school and are not otherwise prohibited by law from engaging in the subject work. Such employees shall not be employed more than eight (8) hours in any workday or more than 40 hours in any workweek unless the employee receives one and one-half (11/2) times such employee's regular rate of pay for all hours worked over 40 hours in the workweek. Eight (8) hours of labor constitutes a day's work. Employment beyond eight (8) hours in any workday or more than six (6) days in any workweek is permissible provided the employee is compensated for such overtime at not less than:

(a) One and one-half (11/2) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours up to and including 12 hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and

(b) Double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek.

31.     Plaintiff and Class Members worked more than eight hours in a single workday or more than 40 hours in a single workweek. Defendants failed to compensate Plaintiff and Class Members for the overtime wages due them.

32.     Labor Code Section 1194 in relevant part provides:

1   Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the

2   employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable

3   attorney's fees, and costs of suit.

4

5   33.   Labor Code Section 218.6 in relevant part provides:

6   In any action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289

7   of the Civil Code, which shall accrue from the date that the wages were due and payable as provided in Part 1 (commencing with Section 200) of Division 2.

8

9   34.   Plaintiff has incurred and is entitled to attorney's fees and costs for pursuing this claim.

10   **Cause of Action No. 2**
**Failure to Pay Compensation Due**

11   **Pursuant to Labor Code Section 226.7 for Meal Period Wages**
**(Against All Defendants)**

12

13   35.   Plaintiff realleges paragraphs 1 through 34.

14   36.   Labor Code Section 512 provides in relevant part:

15   (a) An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30

16   minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and

17   employee. An employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than

18   30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if

19   the first meal period was not waived.

20

21   37.   Labor Code Section 226.7 provides:

22   (a) No employer shall require any employee to work during any meal or rest

23   period mandated by an applicable order of the Industrial Welfare Commission.

24   (b) If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer

25   shall pay the employee one additional hour of pay at the employee's regular rate of

26   compensation for each work day that the meal or rest period is not provided.

27   38.   Paragraph 11 of the applicable Wage Order provides in relevant part:

28   **Complaint**

9

11. MEAL PERIODS

(A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee. Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

(B) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not Defendant failed to provide Plaintiff with the required meal periods for numerous days worked.

39. Defendants failed to provide Plaintiff and Class Members with the meal periods required to be provided. Specifically, despite the fact that their workday started at around 5:30 a.m. Plaintiff and Class Members were not relieved to take a lunch break until noon. Therefore, they regularly worked more than six hours before receiving their first meal period and therefore were not provided a legally required meal break. In addition, Plaintiff and Class Members regularly worked more than 10 hours per day and did not receive a second meal break.

40. Pursuant to Labor Code Section 226.7, Plaintiff and the Class Members were entitled to one additional hour of pay at the employee's regular rate of compensation for each workday that the required meal period(s) were not provided.

41. Defendants have not paid Plaintiff and the Class Members the additional pay due them under Section 226.7 and Paragraph 11 of the applicable Wage Order.

42. Labor Code Section 218.6 in relevant part provides:

In any action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289 of the Civil Code, which shall accrue from the date that the wages were due and payable as provided in Part 1 (commencing with Section 200) of Division 2.

**Cause of Action No. 3**

**Complaint**

10

**Failure to Pay Compensation Due
Pursuant to Labor Code Section 226.7 for Rest Period Wages
(Against All Defendants)**

43.  Plaintiff realleges paragraphs 1 through 42.

44.  Labor Code Section 226.7 provides:

>    (a) No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission.

>    (b) If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided.

45.  Paragraph 12 of the applicable Wage Order provides in relevant part:

>    12. REST PERIODS

>    (A) Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (31/2) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

>    (B) If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

46.  Defendants failed to provide Plaintiff and Class Members with the rest periods required to be provided and/or required them to work during rest periods. Specifically, as was the case with respect to meal periods, because Defendants failed to acknowledge the approximately one and one-half hours of work at the beginning and at the end of the work days, they failed to provide the proper number of rest breaks within the proper time frame.

47.  Pursuant to Labor Code Section 226.7, Plaintiff and Class Members were entitled to one additional hour of pay at the employee's regular rate of compensation for each workday that the required rest periods were not provided.

48. Defendants have not paid Plaintiff and Class Members the additional pay due them under Section 226.7.

49. Labor Code Section 218.6 in relevant part provides:

In any action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289 of the Civil Code, which shall accrue from the date that the wages were due and payable as provided in Part 1 (commencing with Section 200) of Division 2.

**Cause of Action No. 4**
**Failure to Pay Waiting Time Wages Pursuant to Labor Code Section 203**
**(Against All Defendants)**

50. Plaintiff realleges paragraphs 1 through 49.

51. Labor Code Section 201 in relevant part provides:

(a) If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately...

52. Labor Code Section 202 in relevant part provides:

(a) If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting....

53. Labor Code Section 203 provides in relevant part:

(a) If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days. . . .

(b) Suit may be filed for these penalties at any time before the expiration of the statute of limitations on an action for the wages from which the penalties arise.

54. The employment of Plaintiff and Termination Pay Class Members with Defendants terminated.

55. Defendants were aware that Plaintiff and Termination Pay Class Members had not been paid the regular time, overtime, meal period, and/or rest period wages earned and unpaid at the time their

employment terminated.

56. When the employment of Plaintiff and the Termination Pay Class Members terminated, Defendants violated Labor Code Sections 201 or 202 by willfully failing to pay the wages earned and unpaid that were due them, including wages due for regular hours worked, wages for overtime hours worked, meal period wages and/or rest period wages in the time required by Sections 201 or 202.

57. Labor Code Section 218.5 provides in relevant part:

> (a) In any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action.

58. Labor Code Section 218.6 in relevant part provides:

> In any action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289 of the Civil Code, which shall accrue from the date that the wages were due and payable as provided in Part 1 (commencing with Section 200) of Division 2.

59. Plaintiff has incurred attorney's fees and costs in pursuing this claim.

### Cause of Action No. 5
### Violation of Labor Code Section 226
### (Against All Defendants)

60. Plaintiff realleges paragraphs 1 through 59.

61. Defendants knowingly and intentionally, as a matter of uniform policy and practice, failed to furnish Plaintiff and Class Members with accurate and complete wage statements regarding their regular rates of pay, accurate rates of overtime pay, total gross wages earned, rest period premiums, meal period premiums, and total net wages earned in violation of Labor Code Section 226.

62. Defendants' failure to furnish Plaintiff and Class Members of the Wage Statement Class with complete and accurate itemized wage statements resulted in actual injury because such failure

Complaint
13

led to, among other things, the non-payment of all their regular and overtime wages and rest and meal period premiums and deprived them of the information necessary to identify the discrepancies in Defendants' reported data.

63.   Plaintiff and Class Members are entitled to damages and/or penalties pursuant to Labor Code Section 226, including statutory penalties, civil penalties, reasonable attorney's fees, and costs of suit pursuant to California Labor Code Section 226 and 226.3.

## Cause of Action No. 6
## Violation of California Business and Professions Code Section 17200, *et seq.*
## (Against All Defendants)

64.   Plaintiff realleges paragraphs 1 through 63.

65.   Business & Professions Code Section 17200 provides:

> As used in this chapter, unfair competition shall mean and include any *unlawful, unfair* or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.) (Emphasis added.)

66.   Defendants' violations of the Labor Code and Wage Order provisions set forth above constitute unlawful business acts and/or practices.

67.   Specifically, as alleged above, Defendants violated Paragraphs 3, 4, 11 and 12 of the applicable Wage Order and Labor Code Sections 201, 202, 203, 226, 226.7, 510, 512, and 1197, *inter alia*. Such violations constitute "unlawful business acts or practices" under Section 17200.

68.   The acts and practices of depriving Plaintiff and Class Members of all wages due for regular hours and/or overtime hours worked, failing to provide the requisite meal and/or rest periods, and failing to pay the meal and/or rest period wages due are also acts or practices that are "unfair."

69.   Business & Professions Code Section 17203 provides:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any

money or property, real or personal, which may have been acquired by means of such unfair competition.

70.   Defendants have been unjustly enriched as a result of Defendants' unlawful and/or unfair business acts and/or practices.

71.   Plaintiffs and all Class Members seek restitution of money and/or property by which Defendants were unjustly enriched during the Class Period.

**Cause of Action No. 7**
**Wrongful Termination in Violation of Public Policy**
**(Against All Defendants)**

72.   Plaintiff realleges Paragraphs 1 through 71.

73.   During Plaintiff's third or fourth week working for Defendants, Plaintiff suffered a work related injury -- a deep gash in his wrist that exposed a fault in the safety gear provided by Defendants. Plaintiff reported the injury to his supervisor immediately and that same day the faulty gear was replaced by better gear that they had previously failed to pass out to workers.

74.   The onsite medic was unable to properly attend to Plaintiff's wound and recommended that Plaintiff go to a clinic in town. Due to the difficulty of transporting Plaintiff, however, the medic and others encouraged Plaintiff to wait to go until the end of his shift. Plaintiff continued to bleed and by the time he reached town, the clinics were closed.

75.   The following day, Plaintiff returned to work and attempted to fulfill his duties with only the bandages provided by the medic the previous day. The cut soon opened again and Plaintiff again reported the injury. This time Defendants had Plaintiff wait for a short time in an office and then transported him off site to a driveway along the side of a public road where he waited for a paramedic employed by Defendants to arrive. Rather than stitch the wound, the paramedic glued it with cyanoacrylate and put a bandage over it, and told Plaintiff to keep it dry.

76.   This was impossible, however, because Defendants then required Plaintiff to return to work immediately after the treatment. At work Plaintiff had to wear forearm safety guards in the heat of the sun and could not help but sweat, thus moistening the bandage. At the end of the workday,

Plaintiff returned to his home, sweaty and dirty as normal. Once he arrived at his home, he had to clean up. His bandage was coming off so he replaced it himself.

77. The following day at work Plaintiff's poorly treated wound again opened up and he again went to the medic. The medic asked what happened to the first bandage and Plaintiff told him that he had to change it out. Defendants then told Plaintiff that he was "insubordinate" for having changed his bandage and immediately terminated him.

78. Despite the actual occurrences at the jobsite, Defendants falsely claimed in Plaintiff's Termination Information document that the reason for Plaintiff's termination was "reduction of workforce."

79. Though Defendants had a "New Employee Safety Checklist" that was supposed to be checked off as the supervisor covered safety topics with Plaintiff, no boxes on that list were checked and yet it does contain the supervisor's signature. Plaintiff did not sign this document.

80. Prior to his termination, Plaintiff complained to Defendants about their failure to initially provide him with proper safety equipment and about their failure to provide adequate care to his on-the-job injury.

81. Defendant CSI states the following about itself on its website regarding workplace safety:

> We have created a culture of safety. Above all, CSI Electrical Contractors values the **safety and well-being of our employees**. We have deployed **the necessary resources** to eliminate potential hazards, prevent accidents and injuries, and implement safe work practices.
>
> Our commitment to safety starts at the top. CSI's entire senior-management team, our highly experiences safety director and an OSHA-certified trainer work together to educate our employees on safe practices and ensure their compliance.
>
> Everyone is a safety director. But our approach to safety runs even deeper; it's an attitude that is ingrained in CSI's culture. Everyone, from the apprentice on up, is a safety advocate and is responsible for maintaining a safe work environment.
>
> This approach works! CSI's Dedication to safety shows in key occupational safety metrics such as our experience modification rating (EMR), which is well below the industry EMR baseline of 1.00. Put another way, in the last two years we've worked more than 1.2 million hours in the field, with less than 10 recordable injuries.

82. Despite the self-serving and self-promoting statements set forth on their websites, Defendants made the conscious and intentional decisions to conceal Plaintiff's injury in an effort to maintain their hyperbolic claims regarding industry safety metrics. They did so with clear disregard for Plaintiff's health and well-being in an effort to make their labor costs and tax burdens smaller and to make their profitability and personal earnings larger.

83. In effect, Defendants labeled Payton a "troublemaker" because he would no longer allow Defendants to violate his statutory rights and Defendants wrongfully terminated him in violation of public policy as defined under California law.

WHEREFORE, Plaintiff requests that judgment be entered against all Defendants as follows:

1. For damages for wages not paid according to proof.

2. For compensatory damages according to proof.

3. For restitution and disgorgement for all unlawful and/or unfair business acts and/or practices according to proof.

4. For attorney's fees and costs as allowed by law.

5. For penalties as allowed by law.

6. For prejudgment interest.

7. For such other and further relief as the Court deems proper.

Dated: October 17, 2013                    BLANCHARD LAW GROUP, APC

                                           BY:_____
                                              LONNIE C. BLANCHARD, III
                                              *Attorney for Plaintiff James Payton*

Exhibit B

COPY

CONFORMED COPY
ORIGINAL FILED
Superior Court Of California
County Of Los Angeles

NOV 2 6 2013

Sherri R. Carter, Executive Officer/Clerk
By: Kristina Vargas, Deputy

1   Frank Cronin, Bar No. 069840
    fcronin@swlaw.com
2   Steve T. Graham, Bar No. 105710
    sgraham@swlaw.com
3   Brian J. Mills, Bar No. 216078
    bmills@swlaw.com
4   SNELL & WILMER L.L.P.
    600 Anton Blvd, Suite 1400
5   Costa Mesa, California 92626-7689
    Telephone:   714.427.7000
6   Facsimile:   714.427.7799

7   Attorneys for Defendant
    CSI Electrical Contractors, Inc.

8

9               SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                        COUNTY OF LOS ANGELES

11

12  JAMES PAYTON, an individual on behalf of        Case No. BC525050
    himself and others similarly situated,
13                                                   Hon. Amy D. Hogue
                   Plaintiff,
14                                                   Dept. 92
            v.
15                                                   DEFENDANT CSI ELECTRICAL
    CSI ELECTRICAL CONTRACTORS, INC., a              CONTRACTORS, INC.'S ANSWER TO
16  California corporation, and DOES 1 through       CLASS ACTION COMPLAINT
    100,
17                                                   Date of filing: October 21, 2013
                   Defendant.
18                                                   Trial date: No date set

19

20

21

22       Defendant CSI Electrical Contractors, Inc. ("Defendant") hereby answers Plaintiff James

23  Payton's ("Plaintiff") Class Action Complaint ("Complaint") as follows:

24       Under the provisions of § 431.30(d) of the California Code of Civil Procedure, Defendant

25  denies each and every allegation, both specifically and generally, of each cause of action

26  contained in Plaintiff's Complaint on file herein and the whole thereof, and denies that Plaintiff

27  was damaged in any sum or sums, at all.

28  ///

DEFENDANT'S ANSWER TO CLASS ACTION COMPLAINT

18294929

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The Complaint and each of its purported causes of action fail to state facts sufficient to constitute a cause or causes of action against Defendant.

### SECOND DEFENSE

As a further and separate defense, the Complaint, as well as each purported cause of action therein, is barred by the applicable statute of limitations, including California Code of Civil Procedure §§ 338(a) & (c) and 340(a) & (b), and California Business and Professions Code § 17208.

### THIRD DEFENSE

As a further and separate defense, Plaintiff and members of the purported class are subject to collective bargaining agreements in which they agreed to a grievance and arbitration process which results in a final and binding decision regarding all claims made in this action.  Hence, this action is barred in its entirety by this pre-existing agreement to arbitrate.

### FOURTH DEFENSE

As a further and separate defense, Defendant alleges that Plaintiff is barred from pursuing the Complaint and each of its purported causes of action because any recovery from Defendant would result in Plaintiff's unjust enrichment.

### FIFTH DEFENSE

As a further and separate defense, and without admission that any damage has been sustained, Defendant alleges that it is entitled to an offset against any relief claimed by Plaintiff for wages Defendant has paid Plaintiff and purported class members for time not worked or that otherwise is not required under state and/or federal law.

### SIXTH DEFENSE

As a further and separate defense, Defendant alleges that Plaintiff's damages, if any, were proximately caused or contributed to by the acts, omissions or wrongful conduct of persons or entities over whom/which Defendant had no control and over whom/which Defendant can have no responsibility or liability.

- 2 -

DEFENDANT'S ANSWER TO CLASS ACTION COMPLAINT

18294929

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

SNELL & WILMER
L.L.P.
600 ANTON BLVD., SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

### SEVENTH DEFENSE

As a further and separate defense, the Complaint and each of its purported causes of action are barred by Plaintiff's failure to take reasonable steps to avoid or otherwise mitigate the claimed damages.

### EIGHTH DEFENSE

As a further and separate defense, Plaintiff acknowledged, ratified, consented to, and acquiesced in the alleged acts or omissions, if any, of Defendant, thus barring Plaintiffs from any relief as prayed for herein.

### NINTH DEFENSE

As a further and separate defense, and merely for purposes of stating this defense without admission that any damage has been sustained, Defendant alleges that Plaintiff has an adequate remedy at law, so that equitable, declaratory, or injunctive relief would not be appropriate.

### TENTH DEFENSE

As a further and separate defense, Plaintiff's Complaint fails to state a claim upon which relief can be granted because Plaintiff received proper payment for all time worked and/or all compensable time from Defendant.

### ELEVENTH DEFENSE

As a further and separate defense, Plaintiff has failed to set forth a prima facie case that Defendant violated any of the statutes or wage orders upon which Plaintiff relies.

### TWELFTH DEFENSE

As a further and separate defense, the practices of which Plaintiff complains were and are not unlawful, retaliatory, unfair, or fraudulent.

### THIRTEENTH DEFENSE

As a further and separate defense, Defendant alleges that its conduct with Plaintiff was at all times justified and/or privileged under state or federal law.

### FOURTEENTH DEFENSE

As a further and separate defense, Defendant alleges that Plaintiff's Complaint fails to state facts sufficient to constitute a cause of action because the hours claimed are not "hours

- 3 -

worked" within the meaning of the applicable Industrial Welfare Commission orders.

## FIFTEENTH DEFENSE

As a further and separate defense, and without admission of any violation of law, Defendant alleges that any failure to pay wages or overtime was not willful and therefore the Complaint fails to state a claim for penalties under the California Labor Code.

## SIXTEENTH DEFENSE

As a further and separate defense, Defendant alleges that Plaintiff is not entitled to recover damages, the existence of which is specifically denied, as Defendant acted in good faith and had reasonable grounds to believe it was not violating applicable state and/or federal law.

## SEVENTEENTH DEFENSE

As a further and separate affirmative defense, Defendant's actions with respect to Plaintiff were non-retaliatory and were based on legitimate reasons and carried out in the good faith exercise of Defendant's reasonable business judgment.

## EIGHTEENTH DEFENSE

As a further and separate affirmative defense, Defendant promulgated and disseminated appropriate company policies promoting workplace safety and prohibiting retaliation.

## NINETEENTH DEFENSE

As a further and separate affirmative defense, to the extent any employee, including any managerial agent, of defendant CSI Electrical, Inc. retaliated against Plaintiff, which Defendant denies, Defendant is not vicariously liable for such acts/decisions because such acts are contrary to Defendant's good-faith efforts to comply with anti-retaliation laws.

## TWENTIETH DEFENSE

As a further and separate affirmative defense, Defendant states that to the extent any employees retaliated against Plaintiff, which Defendant denies, Defendant is not vicariously liable for such acts because any such employees did not have substantial discretionary authority over significant aspects of defendant CSI Electrical, Inc.'s business and/or the ability to set or modify corporate policy.

/ / /

- 4 -

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

18294929

### TWENTY-FIRST DEFENSE

As a further and separate affirmative defense, Defendant is not liable for any alleged retaliation because Defendant had measures in place to prevent and/or correct retaliation, Plaintiff unreasonably failed to avail himself of such measures, and the reasonable use of such procedures would have prevented some or all of Plaintiff's alleged harm.

### TWENTY-SECOND DEFENSE

If any loss, injury, damage or detriment occurred as alleged in the complaint, the loss, injury, damage or detriment was caused and contributed to by the actions of Plaintiff. Furthermore, as Plaintiff did not exercise ordinary care on his own behalf, his own acts and omissions proximately caused and contributed to the loss, injury, damage or detriment alleged by Plaintiff, and Plaintiff's recovery from Defendant, if any, should be reduced in proportion to the percentage of Plaintiff's negligence or fault.

### TWENTY-THIRD DEFENSE

As a further and separate affirmative defense, the acts complained of by Plaintiff in the Complaint, to the extent such acts occurred, were provoked by Plaintiff's conduct and statements to Defendant.

### TWENTY-FOURTH DEFENSE

As a further and separate defense, Plaintiff has failed to satisfy the prerequisites for class certification and, therefore, cannot represent the interests of others.

### TWENTY-FIFTH DEFENSE

As a further and separate defense, certain of the interests of the proposed class members are in conflict with interests of all or certain sub-groups of the members of the alleged class of persons which Plaintiff purports to represent, the existence of which is expressly denied.

### TWENTY-SIXTH DEFENSE

As a further and separate defense, Defendant alleges Plaintiff is not a representative member of the alleged class.

///

///

- 5 -

DEFENDANT'S ANSWER TO CLASS ACTION COMPLAINT

18294929

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

### TWENTY-SEVENTH DEFENSE

As a further and separate defense, Defendant alleges Plaintiff's claims are not common or typical of the putative class Plaintiff seeks to represent.

### TWENTY-EIGHTH DEFENSE

As a further and separate defense, Defendant alleges the types of claims alleged by the named Plaintiff on behalf of himself and the putative class are matters to which individual questions predominate and, accordingly, are not appropriate for class treatment.

### TWENTY-NINTH DEFENSE

As a further and separate affirmative defense, Defendant alleges that the action cannot proceed as a class action because of the inadequacy of representation.

### THIRTIETH DEFENSE

As a further and separate defense, Defendant alleges the class of persons that the named Plaintiff purports to represent is not so numerous that joinder is impracticable.

### THIRTY-FIRST DEFENSE

As a further and separate defense, Defendant alleges there is not a community of interest among the alleged class members.

### THIRTY-SECOND DEFENSE

As a further and separate defense, Defendant alleges there is not a risk of substantial prejudice from separate actions.

### THIRTY-THIRD DEFENSE

As a further and separate defense, Defendant alleges Plaintiff lacks standing to assert some or all of the causes of action against the Defendant.

### THIRTY-FOURTH DEFENSE

Discovery in this matter may reveal additional basis for an avoidance or affirmative defense. Defendant reserves the right to amend this answer to plead such affirmative defenses should they be discovered.

/ / /

/ / /

- 6 -

18294929

**WHEREFORE,** Defendant prays as follows:

1. That class certification be denied;

2. That Plaintiff take nothing by his Complaint for damages;

3. That Plaintiff's Complaint herein be dismissed in its entirety with prejudice;

4. That Defendant recovers its costs of suit herein, including its reasonable attorneys' fees; and

5. That the Court award such other and further relief as it deems appropriate.

Dated: November 26, 2013

SNELL & WILMER L.L.P.

By: _____
Frank Cronin
Steve T. Graham
Brian J. Mills

Attorneys for Defendant
CSI Electrical Contractors, Inc.

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA, 92626-7689

- 7 -

DEFENDANT'S ANSWER TO CLASS ACTION COMPLAINT

18294929

**PROOF OF SERVICE**

*James Pyaton v. CSI Electrical Contractors, Inc.*
Los Angeles Superior Court, Case No. BC525050

   I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 600 Anton Boulevard, Suite 1400, Costa Mesa, CA  92626-7689.

   On November 26, 2013, I served, in the manner indicated below, the foregoing document described as **DEFENDANT CSI ELECTRICAL CONTRACTORS, INC.'S ANSWER TO CLASS ACTION COMPLAINT** on the interested parties in this action by placing true copies thereof, enclosed in sealed envelopes, at Costa Mesa, addressed as follows:

*Please See Attached Service List*

☒　BY REGULAR MAIL:  I caused such envelopes to be deposited in the United States mail at Costa Mesa, California, with postage thereon fully prepaid.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the United States Postal Service each day and that practice was followed in the ordinary course of business for the service herein attested to  (C.C.P. § 1013(a)).

☐　BY FACSIMILE: (C.C.P. § 1013(e)(f)).

☐　BY FEDERAL EXPRESS:  I caused such envelopes to be delivered by air courier, with next day service, to the offices of the addressees. (C.C.P. § 1013(c)(d)).

☐　BY PERSONAL SERVICE:  I caused such envelopes to be delivered by hand to the offices of the addressees. (C.C.P. § 1011(a)(b)).

☐　BY ELECTRONIC SERVICE: I caused such documents to be electronically served to all parties via LexisNexi File & Serve (C.C.P. §1010.6)

\*\*\*\*\*\*\*\*

   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

   Executed on November 26, 2013, at Costa Mesa, California.


_____
Antonia Martin

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

PROOF OF SERVICE

18309834

1

2                              **SERVICE LIST**

3    *James Pyaton v. CSI Electrical Contractors, Inc.*
     Los Angeles Superior Court, Case No. BC525050
4
     Lonnie C. Blanchard, III                    Attorneys for Plaintiff
5    Jeffrey D. Holmes
     The Blanchard Law Group, APC
6    3311 East Pico Boulevard                    Tel:        (213) 599-8255
     Los Angeles, CA 90023                       Fax:        (213) 402-3949
7                                                Email: lonnieblanchard@gmail.com

8
     Peter R. Dion-Kindem                        Attorneys for Plaintiff
9    The Dion-Kindem Law Firm
     Peter R. Dion-Kindem, P.C.
10   21550 Oxnard Street, Suite 900              Tel:        (818) 883-4900
     Woodland Hills, CA 91367                    Fax:        (818) 883-4902
11                                               Email: peter@dion-kindemlaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

- 2 -

18309834

Exhibit C

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br><br>CSI Electrical Contractors, Inc., a California Corporation; and Does 1<br>through 100<br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br><br>James Payton, an individual, on behalf of himself and all others similarly<br>situated | *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)*<br><br>**CONFORMED COPY**<br>**ORIGINAL FILED**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES<br><br>OCT 21 2013<br><br>John A. Clarke, Executive Officer/Clerk<br>By Amber Hayes, Deputy |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*  Los Angeles Superior Court<br><br>Central - Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles CA 90012 | **CASE NUMBER:**<br>*(Número del Caso):*  BC525050 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Lonnie C. Blanchard III; Blanchard Law Group, 3311 E. Pico Blvd., Los Angeles CA 90023; 213-599-8255

| DATE:<br>*(Fecha)* | John A. Clarke Clerk, by<br>(Secretario) | Amber Hayes | , Deputy<br>*(Adjunto)* |
|---|---|---|---|

(For proof of service of this summons, use Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**[SEAL]**

OCT 21 2013

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* CSI Electrical Contractors, INC A CALIFORNIA CORPORATION
   under: ☒ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|

Exhibit D

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
⌐ Lonnie C. Blanchard III - 93530
Blanchard Law Group, APC
3311 East Pico Boulevard
Los Angeles, CA 90023
TELEPHONE NO.: (213) 599-8255    FAX NO.: (213) 402-3949
ATTORNEY FOR *(Name):* Plaintiff James Payton

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: same
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central - Stanley Mosk Courthouse

**CASE NAME:**
James Payton v. CSI Electrical Contractors, Inc. et al.

FOR COURT USE ONLY
CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

OCT 21 2013

John A. Clarke, Executive Officer/Clerk
By Amber Hayes, Deputy

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: BC525050 |
|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: |
| | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[✓] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [✓] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [✓] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [✓] punitive
4. Number of causes of action *(specify):* 7
5. This case [✓] is  [ ] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 17, 2013
Lonnie C. Blanchard III, Esq.
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one box** for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
      or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

| SHORT TITLE: James Payton v. CSI Electrical Contractors, Inc., et al. | CASE NUMBER |
|---|---|
| | B C 5 2 5 0 5 0 |

# CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☐ YES   CLASS ACTION? ☑ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL 8   ☐ HOURS/ ☑ DAYS

**Item II. Indicate** the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

### Applicable Reasons for Choosing Courthouse Location (see Column C below)

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons –<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 3. |
| | | ☑ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4. |

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

| SHORT TITLE: James Payton v. CSI Electrical Contractors, Inc., et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☑ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☑ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☑ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☑ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation     Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: | CASE NUMBER |
|---|---|
| James Payton v. CSI Electrical Contractors, Inc., et al. | |

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus<br>☐ A6152  Writ - Mandamus on Limited Court Case Matter<br>☐ A6153  Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment<br>☐ A6160  Abstract of Judgment<br>☐ A6107  Confession of Judgment (non-domestic relations)<br>☐ A6140  Administrative Agency Award (not unpaid taxes)<br>☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112  Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only<br>☐ A6040  Injunctive Relief Only (not domestic/harassment)<br>☐ A6011  Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment<br>☐ A6123  Workplace Harassment<br>☐ A6124  Elder/Dependent Adult Abuse Case<br>☐ A6190  Election Contest<br>☐ A6110  Petition for Change of Name<br>☐ A6170  Petition for Relief from Late Claim Law<br>☐ A6100  Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

| SHORT TITLE: James Payton v. CSI Electrical Contractors, Inc., et al. | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3 on Page 1,** as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☑1. ☑2. ☑3. ☑4. ☑5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>111 North Hill Street |
|---|---|
| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>90012 |

**Item IV.** *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the Stanley Mosk courthouse in the Central District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: October 17, 2013

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet, Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).
5. Payment in full of the filing fee, unless fees have been waived.
6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 4 of 4

SUPERIOR COURT OF CALIFORNIA, COUNTY     LOS ANGELES
NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL PERSONAL INJURY CASE
Case Number _____     BC525050

THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

Your case is assigned for all purposes to the judicial officer indicated below (Local Rule 3.3(c)).

| ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|
| Hon. Rafael Ongkeko | 91 | 635 | | | |
| Hon. Amy D Hogue | 92 | 633 | | | |
| Hon. Samantha P. Jessner | 93 | 631 | | | |

FSC: 04/06/2015 TRIAL: 04/21/2015 OSC: 10/21/2014

Given to the Plaintiff/Cross-Complainant/Attorney of Record on _____ OCT 21 2013     SHERRI R. CARTER, Executive Officer/Clerk

By _____, Deputy Clerk

LACIV PI 190 (Rev09/13)
LASC Approved 05-06
For Optical Use

NOTICE OF CASE ASSIGNMENT –
UNLIMITED CIVIL CASE

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

**JUL 1 5 2013**

John A. Clarke, Executive Officer/Clerk

By _E. Regina Collura_, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| In re Personal Injury Cases Assigned to the Personal Injury Courts (Departments 91, 92 and 93) | Case No.: |
| | AMENDED GENERAL ORDER RE PERSONAL INJURY COURT ("PI Court") PROCEDURES (Effective as of July 10, 2013) |

---

**DEPARTMENT:**        91        92        93

**FINAL STATUS CONFERENCE ("FSC"):**

- Date: _____ at 10:00 a.m.

**TRIAL:**

- Date: _____ at 8:30 a.m.

**OSC re DISMISSAL (Code Civ. Proc., § 583.210):**

- Date: _____ at 8:30 a.m.

---

TO EACH PARTY AND TO THE ATTORNEY OF RECORD FOR EACH PARTY:

Pursuant to the California Code of Civil Procedure ("C.C.P."), the California Rules of Court, and the Los Angeles County Court Rules ("Local Rules"), the Los Angeles Superior Court ("LASC" or "Court") HEREBY AMENDS AND SUPERSEDES ITS March 12, 2013 GENERAL ORDER AND GENERALLY

1

7/12/13

1  ORDERS AS FOLLOWS IN THIS AND ALL OTHER GENERAL JURISDICTION

2  PERSONAL INJURY ACTIONS:

3      Effective March 18, 2013, the Court responded to systemic budget reductions by

4  centralizing the management of more than 18,000 general jurisdiction personal injury cases

5  in the Stanley Mosk Courthouse.  LASC opened three Personal Injury Courts ("PI Courts")

6  (Departments 91, 92 and 93) to adjudicate all pretrial matters for these cases.  It also

7  established a Master Calendar Court (Department One), to manage the assignment of trials to

8  31 dedicated Trial Courts located countywide.  This Amended General Order lays out the

9  basic procedures for the PI Courts' management of pretrial matters.  The parties will find

10  additional information about the PI Courts on the court's website, *www.lasuperiorcourt.org.*

11  1.    To ensure proper assignment to a PI Court, Plaintiff(s) must carefully fill out the Civil

12  Case Cover Sheet Addendum (form LACIV 109).  The Court defines "personal injury" as:

13      "an unlimited civil case described on the Civil Case Cover Sheet Addendum and

14  Statement of Location (LACIV 109) as Motor Vehicle-Personal Injury/Property

15  Damage/Wrongful Death; Personal Injury/Property Damage/Wrongful Death-

16  Uninsured Motorist; Product Liability (other than asbestos or

17  toxic/environmental); Medical Malpractice-Physicians & Surgeons; Other

18  Professional Health Care Malpractice; Premises Liability; Intentional Bodily

19  Injury/Property Damage/Wrongful Death; or Other Personal Injury/Property

20  Damage/Wrongful Death. An action for intentional infliction of emotional

21  distress, defamation, civil rights/discrimination, or malpractice (other than

22  medical malpractice), is not included in this definition. An action for injury to

23  real property is not included in this definition."   Local Rule 2.3(a)(1)(A).

7/12/13

The Court will assign a case to the PI Courts if plaintiff(s) check any of the following boxes in the Civil Case Cover Sheet Addendum:

A7100 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death

A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist

A7260 Product Liability (not asbestos or toxic/environmental)

A7210 Medical Malpractice – Physicians & Surgeons

A7240 Medical Malpractice – Other Professional Health Care Malpractice

A7250 Premises Liability (e.g., slip and fall)

A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism etc.)

A7220 Other Personal Injury/Property Damage/Wrongful Death

The Court will not assign cases to the PI Courts if plaintiff(s) check any boxes elsewhere in the Civil Case Cover Sheet Addendum (any boxes on pages two and three of that form).

2.     The Court sets the above dates in this action in the PI Court circled above (Department 91, 92 or 93) at the Stanley Mosk Courthouse, 111 North Hill Street, Los Angeles, CA 90012. Cal. Rules of Court, Rules 3.714(b)(3), 3.729.

## SERVICE OF SUMMONS AND COMPLAINT

3.     Plaintiff(s) shall serve the summons and complaint in this action upon defendant(s) within three years of the date when the complaint is filed. C. C. P. § 583.210, subd. (a). On the OSC re Dismissal date noted above, the PI Court will dismiss the action and/or all

3

7/12/13

1  unserved parties unless the plaintiff(s) show cause why the action or the unserved parties

2  should not be dismissed. C.C.P. §§ 583.250; 581, subd. (b)(4).

3  4.      The Court sets the above trial and FSC dates on condition that plaintiff(s) effectuate

4  service on defendant(s) of the summons and complaint within six months of filing the

5  complaint.  Upon a showing that the plaintiff(s) failed to effect service within six months, the

6  PI Court will vacate the trial and FSC date noted above.

7  **STIPULATIONS TO CONTINUE TRIAL**

8

9  5.      Provided that all parties agree (and there is no violation of the "five-year rule," C.C.P.

10  § 583.310), the parties may advance or continue any trial date in the PI Courts without

11  showing good cause or articulating any reason or justification for the change.  To continue or

12  advance a trial date, the parties (or their counsel of record) should jointly execute and file (in

13  Room 102 of the Stanley Mosk Courthouse; fee required) a Stipulation to Continue Trial,

14  FSC and Related Motion/Discovery Dates (form available on the court's website, Personal

15  Injury Court link).  The PI Courts schedule FSCs for 10:00 a.m., eight (8) court days before

16  the trial date.  Parties seeking to continue the trial and FSC dates shall file the Stipulation at

17

18  least eight court days before the FSC date.  Parties seeking to advance the trial and FSC

19  dates shall file the Stipulation at least eight court days before the proposed advanced FSC

20  date.  Code Civ. Proc., § 595.2;   Govt. Code § 70617, subd. (c)(2).

21  **NO CASE MANAGEMENT CONFERENCES**

22  6.      The PI Courts do not conduct Case Management Conferences.  The parties need not

23  file a Case Management Statement.

24  **LAW AND MOTION**

25  **Chambers Copies Required**

26

27

4

7/12/13

7.     In addition to filing original motion papers in Room 102 of the Stanley Mosk Courthouse, the parties must deliver, directly to the PI Court courtrooms, an extra copy (marked "Chambers Copy") of reply briefs and all other motion papers filed less than seven (7) court days before a hearing calendared in the PI Courts.  The PI Courts also strongly encourage the parties filing and opposing lengthy motions, such as motions for summary judgment/adjudication, to submit one or more three-ring binders organizing the Chambers Copies behind tabs.

**Reservation of Hearing Date**

8.     Parties are directed to reserve hearing dates for motions in the PI Courts using the Court Reservation System available online at *www.lasuperiorcourt.org* (link on homepage). Parties or counsel who are unable to utilize the online Court Reservation System may reserve a motion hearing date by telephoning the PI Court courtroom, Monday through Friday, between 3:00 p.m. and 4:00 p.m.

**Withdrawal of Motion**

9.     California Rules of Court, Rule 3.1304(b) requires a moving party to notify the court immediately if a matter will not be heard on the scheduled date. In keeping with that rule, the PI Courts urge parties who amend pleadings in response to demurrers to file amended pleadings before the date when opposition to the demurrer is due so that the PI Courts do not needlessly prepare tentative rulings on demurrers.

**Discovery Motions**

10.    Informal Discovery Conferences ("IDCs").  On a daily basis, the PI Court judges are available to conduct 30-minute, in-person IDCs with lead trial counsel on each side (or another attorney who has full authority to make binding agreements in discovery disputes).

7/12/13

1   The PI Court judges will not make rulings in an IDC.  The purpose of the IDC is to help the

2   parties resolve discovery disputes by agreement rather than by motion practice. To that end,

3   an IDC judge may refer the parties to applicable code sections or other legal authorities.  The

4   IDC judge may also promote compromise by suggesting agreements to narrow the scope of

5   the requests, to provide amended responses that better explain the responding party's

6   compliance, or to use an alternative, more efficient means of discovery.  The PI Court judges

7   find that, in nearly every case, the parties amicably resolve their discovery disputes at, or as a

8   

9   result of, the IDCs.

10   11.     Scheduling IDCs.    Parties should reserve (and, if necessary, promptly cancel)

11   appointments for IDCs via email to *PISMC@lasuperiorcourt.org*.  Parties should schedule an

12   IDC as soon as a discovery dispute arises, and before any party files a discovery motion.  The

13   PI Court judges expect the parties to make every effort to resolve discovery disputes by

14   conferring in person or on the telephone before the PI Court judge invests time in the IDC.

15   Scheduling or participating in an IDC does not extend any deadlines imposed by the Code of

16   Civil Procedure for noticing and filing motions to compel or motions to compel further

17   discovery.  In order to avoid unnecessary *ex parte* applications, the PI Courts recommend

18   that the parties extend deadlines for filing discovery motions and for serving discovery

19   

20   responses pending their participation in the IDC.

21   12.     Motions to Compel Further Responses.  The PI Courts will not hear motions to

22   compel further discovery unless and until (a) the parties participate in an IDC; or (b) the

23   moving party submits evidence, by way of declaration, that the opposing party has failed or

24   refused to participate in an IDC.  To allow time for an IDC at least 16 court days before the

25   motion hearing, parties must reserve a hearing on any motion to compel further discovery at

26   

27   

7/12/13

1 10:00 a.m. on a date at least 60 days after the date when the reservation is made.   Parties

2 must reserve an IDC with the same judge who is scheduled to hear any discovery motion

3 involving the same discovery.   Likewise, a party who participates in an IDC regarding certain

4 discovery requests, and then files a motion to compel further responses to the same discovery

5 requests, must calendar the motion for a hearing before the same judge who conducted the

6 IDC.   After participating in an IDC, a moving party may advance the hearing on a motion to

7 compel further discovery to 10:00 a.m. on any available hearing date that complies with the

8 notice requirements of the Code of Civil Procedure.   The PI Courts may consider a party's

9 failure or refusal to participate in an IDC as a factor in deciding whether or not to award

10 sanctions on a motion to compel further discovery.

**Ex Parte Applications**

13. Under the California Rules of Court, courts may only grant *ex parte* relief upon a

showing, by admissible evidence, that the moving party will suffer "irreparable harm,"

"immediate danger," or where the moving party identifies "a statutory basis for granting

relief ex parte." Cal. Rules of Court, Rule 3.1202(c).   With over 6,000 cases in each docket,

the three PI Courts have no capacity to hear multiple *ex parte* applications or to shorten time

to add hearings to their fully booked motion calendars.   The PI Courts do not regard the

Court's unavailability for timely motion hearings as an "immediate danger" or threat of

"irreparable harm" justifying *ex parte* relief.   Instead of seeking *ex parte* relief, counsel

should reserve the earliest available motion hearing date, and stipulate with all parties to

continue the trial to a date thereafter using the Stipulation to Continue Trial, FSC and Related

Motion/Discovery Dates (form available on the court's website, PI Court Tab).   Counsel

1    should also check the Court Reservation System from time to time because earlier hearing

2    dates may become available as cases settle or counsel otherwise take hearings off calendar.

3    **REQUEST FOR TRANSFER TO INDEPENDENT CALENDAR DEPARTMENT**

4    14.    Parties seeking to transfer a case from a PI Court to an Independent Calendar ("I/C")

5    Court shall file (in Room 102 of the Stanley Mosk Courthouse) and serve the Court's

6    "Motion to Transfer Complicated Personal Injury Case to Independent Calendar Court"

7    (form available on the Court's website, PI Courts link).   The PI Courts will transfer a matter

8    to an I/C Court if the case is not a "Personal Injury" case as defined in the General Order re

9

10   General Jurisdiction PI Cases, or if it is "complicated."  In determining whether a personal

11   injury case is too "complicated" for the PI Courts to manage, the PI Courts will consider,

12   among other things, whether the case will involve numerous parties, cross-complaints,

13   witnesses (including expert witnesses), and/or pretrial hearings.

14   15.    Parties opposing a motion to transfer have five days to file (in Room 102) an

15
     Opposition (using the same Motion to Transfer form).
16

17   16.    The PI Courts will not conduct a hearing on any Motion to Transfer to I/C Court.

18   Although the parties may stipulate to transfer a case to an Independent Calendar Department,

19   the PI Courts will make an independent determination whether to transfer the case or not.

20   **GENERAL ORDER – FINAL STATUS CONFERENCE**

21   17.    Parties shall comply with the requirements of the PI Courts' "Amended General

22   Order – Final Status Conference," which shall be served with the summons and complaint.

23   **JURY FEES**

24
     18.    Parties must pay jury fees no later than 365 calendar days after the filing of the initial
25

26   complaint. (Code Civ. Proc., § 631, subds. (b) and (c).)

27

**JURY TRIALS**

19.      The PI Courts do not conduct jury trials.  On the trial date, a PI Court will transfer the case to the Master Calendar Court in Department One in the Stanley Mosk Courthouse. Department One assigns the case out for trial to one of 31 dedicated Trial Courts located in the Stanley Mosk, Chatsworth, Van Nuys, Santa Monica, Torrance, Long Beach, Pomona, and Pasadena courthouses.

**SANCTIONS**

20.      The Court has discretion to impose sanctions for any violation of this general order. (C.C.P. §§ 128.7, 187 and Gov. Code, § 68608, subd. (b).)


Dated: July 15, 2013


Daniel J. Buckley
Supervising Judge, Civil
Los Angeles Superior Court

9                                          7/12/13

1

2

3

4

5

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

**JUL 19 2013**

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
Regina Collura

6          SUPERIOR COURT OF THE STATE OF CALIFORNIA

7          FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT

8

9   In re Personal Injury Cases Assigned to the      )   Case No.: _____
    Personal Injury Courts (Departments 91, 92       )
10  and 93),                                          )   AMENDED GENERAL ORDER - FINAL
                                                      )   STATUS CONFERENCE, PERSONAL
11                                                    )   INJURY ("PI") COURTS (Effective as of July
                                                      )   19, 2013)
12  _____ )

13  The dates for Trial and Final Status Conference ("FSC") having been set in this matter, the Court

14  **HEREBY AMENDS AND SUPERSEDES ITS March 12, 2013 GENERAL ORDER –**

15  **FINAL STATUS CONFERENCE AND GENERALLY ORDERS AS FOLLOWS IN THIS**

16  **AND ALL OTHER GENERAL JURISDICTION PERSONAL INJURY ACTIONS:**

17     **1. PURPOSE OF THE FSC**

18          The purpose of the FSC is to verify that the parties/counsel are completely ready to

19  proceed with trial continuously and efficiently, from day to day, until verdict.  The PI Courts

20  will verify at the FSC that all parties/counsel have (1) prepared the Exhibit binders and Trial

21  Document binders and (2) met and conferred in an effort to stipulate to ultimate facts, legal

22  issues, motions *in limine*, and the authentication and admissibility of exhibits.

23  /

24  /

25

## 2. TRIAL DOCUMENTS TO BE FILED

At least five calendar days prior to the Final Status Conference, the parties/counsel shall serve and file (in Room 102 of the Stanley Mosk Courthouse) the following Trial Readiness Documents:

### A.     TRIAL BRIEFS (OPTIONAL)

Each party/counsel may file, but is not required to file, a trial brief succinctly identifying:

      (1) the claims and defenses subject to litigation;

      (2) the major legal issues (with supporting points and authorities);

      (3) the relief claimed and calculation of damages sought; and

      (4) any other information that may assist the court at trial.

### B.     MOTIONS *IN LIMINE*

Before filing motions *in limine*, the parties/counsel shall comply with the statutory notice provisions of Code of Civil Procedure ("C.C.P.") Section 1005 and the requirements of Los Angeles County Court Rule ("Local Rule") 3.57(a). The caption of each motion *in limine* shall concisely identify the evidence that the moving party seeks to preclude. Parties filing more than one motion *in limine* shall number them consecutively. Parties filing opposition and reply papers shall identify the corresponding motion number in the caption of their papers.

### C.     JOINT STATEMENT TO BE READ TO THE JURY

For jury trials, the parties/counsel shall work together to prepare and file a joint written statement of the case for the court to read to the jury. Local Rule 3.25(i)(4).

### D.     JOINT WITNESS LIST

The parties/counsel shall work together to prepare and file a joint list of all witnesses that each party intends to call (excluding impeachment and rebuttal witnesses). Local Rule 3.25(i)(5).

The joint witness list shall identify each witness by name, specify which witnesses are experts, and estimate the length of the direct, cross examination re-direct examination (if any) of each witness.  The parties/counsel shall identify and all potential witness scheduling issues and special requirements.  Any party/counsel who seeks to elicit testimony from a witness not identified on the witness list must first make a showing of good cause.

**E.      LIST OF PROPOSED JURY INSTRUCTIONS (JOINT AND CONTESTED)**

The parties/counsel shall jointly prepare and file a list of proposed jury instructions, organized in numerical order, specifying the instructions upon which all sides agree and the contested instructions, if any.

**F.      JURY INSTRUCTIONS (JOINT AND CONTESTED)**

The parties/counsel shall prepare a complete set of full-text proposed jury instructions, editing all proposed California Civil Jury Instructions for Judges and Attorneys ("CACI") instructions to insert party names and eliminate blanks and irrelevant material. The parties shall prepare special instructions in a format ready for submission to the jury (placing citations of authority and the identity of the requesting party above the text in compliance with Local Rules 3.170 and 3.171).

**G.      JOINT VERDICT FORM(S)**

The parties/counsel shall prepare and jointly file a proposed general verdict form or special verdict form (with interrogatories) acceptable to all sides.  If the parties/counsel cannot agree on a joint verdict form, each party must separately file a proposed verdict form.  Local Rule 3.25(i)(7) and (8).

/

### H.   JOINT EXHIBIT LIST

The parties/counsel shall prepare and file a joint exhibit list organized with columns identifying each exhibit and specifying each party's evidentiary objections, if any, to admission of each exhibit.  To comply with Local Rules 3.52(i)(5) and 3.53, the parties shall meet and confer in an effort to resolve objections to the admissibility of each exhibit.

### 3.   EVIDENTIARY EXHIBITS

The parties/counsel shall jointly prepare (and be ready to temporarily lodge for inspection at the FSC), three sets of tabbed, internally paginated and properly-marked exhibits, organized numerically in three-ring binders (a set for the Court, the Judicial Assistant and the witnesses). The parties/counsel shall mark all non-documentary exhibits and insert a simple written description of the exhibit behind the corresponding numerical tab in the exhibit binder.

### 4.   TRIAL BINDERS REQUIRED IN THE PI COURTS

The parties/counsel shall jointly prepare (and be ready to temporarily lodge for inspection at the FSC) the Trial Documents, tabbed and organized into three-ring binders as  follows:

Tab A: Trial Briefs

Tab B: Motions *in limine*

Tab C: Joint Statement to Be Read to the Jury

Tab D: Joint Witness List

Tab E: Joint List of Jury Instructions (identifying the agreed upon and contested instructions)

Tab F: Joint and Contested Jury Instructions

Tab G: Joint and/or Contested Verdict Forms

The parties shall organize motions *in limine* (tabbed in numerical order) behind tab B with the opposition papers and reply papers for each motion placed directly behind the moving papers.  The parties shall organize proposed jury instructions behind tab F, with the agreed upon instructions first in order followed by the contested instructions (including special instructions) submitted by each side.

## 5.  FAILURE TO COMPLY WITH FSC OBLIGATIONS

The court has discretion to require any party/counsel who fails or refuses to comply with this General Order to Show Cause why the court should not impose monetary, evidentiary and/or issue sanctions (including the entry of a default or the striking of an answer).

Dated this 19th day of July, 2013

Daniel J. Buckley
Supervising Judge, Civil
Los Angeles Superior Court

Exhibit E

Frank Cronin, Bar No. 069840
fcronin@swlaw.com
Steve T. Graham, Bar No. 105710
sgraham@swlaw.com
Brian J. Mills, Bar No. 216078
bmills@swlaw.com
SNELL & WILMER L.L.P.
600 Anton Blvd, Suite 1400
Costa Mesa, California  92626-7689
Telephone:  714.427.7000
Facsimile:  714.427.7799

Attorneys for Defendant
CSI Electrical Contractors, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| James Payton, an individual on behalf of himself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CSI Electrical Contractors, Inc., a California Corporation, and Does 1 through 100,<br><br>Defendants. | Case No.<br><br>**DECLARATION OF FRANK CRONIN IN SUPPORT OF DEFENDANT CSI ELECTRICAL CONTRACTORS, INC.'S NOTICE OF REMOVAL**<br><br>**(Federal Question Jurisdiction Under § 301 of the LMRA)** |

I, FRANK CRONIN, declare as follows:

1.      I am a member in good standing of the State Bar of California and am licensed to practice before all courts in the state.  I am an attorney with the law firm of Snell & Wilmer L.L.P., and am one of the attorneys primarily responsible for representing CSI Electrical Contractors, Inc. ("CSI") in the above-captioned action. I state the following of my own personal knowledge, and unless otherwise indicated, I could and would testify competently thereto.

DECLARATION OF FRANK CRONIN IN
SUPPORT OF NOTICE OF REMOVAL

2.     Plaintiff James Payton ("Plaintiff") filed a civil action against Defendant CSI in the State of California, County of Los Angeles, entitled *James Payton v. CSI Electrical Contractors, Inc.*, Case No. BC525050 on October 21, 2013 (the "State Action"). A true and correct copy of Plaintiff's complaint is attached to the Notice of Removal as Exhibit A.

3.     There are three collective bargaining agreements ("CBAs") which are or were in effect and which govern the employment of Plaintiff and all other non-exempt CSI employees on the project at issue is this litigation:

a) Inside Agreement between Local Union 639 of the International Brotherhood of Electrical Workers, San Luis Obispo, CA ("IBEW") and the California Central Coast Chapter, National Electrical Contractors Association ("NECA")—Amended June 1, 2009, attached hereto as **Exhibit "1"**. This agreement was in effect from June 1, 2009 through May 31, 2012.

b) Inside Agreement—Amended June 1, 2012, between the same parties as above, attached hereto as **Exhibit "2"**. This agreement was in effect from June 1, 2012 to the present.

c) The Topaz Solar Farm Work Site Agreement between IBEW Local 639 and First Solar Electric (California), effective June 2, 2011 and continuing to the present, with its numerous attachments and additional MOUs incorporated therein, attached hereto as **Exhibit "3"**. CSI assented to and is bound by this agreement as a condition of providing on-site services on the project at issue.  Exhibit 3, Sec. 1.4.

4.     Plaintiff James Payton was employed by CSI as a non-exempt construction wireman performing work on the Topaz Solar Farm project within the geographic area and in a job classification that is covered by the collective bargaining agreements cited above.  Pursuant to those agreements, CSI recognized IBEW Local 639 as "the sole and exclusive representative" of Payton and all other

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

- 2 -

DECLARATION OF FRANK CRONIN IN
SUPPORT OF NOTICE OF REMOVAL

1   CSI employees working within the jurisdiction of the Union "for the purpose of

2   Collective Bargaining in respect to rates of pay, wages, hours of employment, and

3   other conditions of employment." Exhibits 1 and 2, Sec. 2.08. Plaintiff, therefore,

4   is bound by the terms of those agreements which were negotiated on his behalf by

5   his sole and exclusive representative, IBEW Local 639.

6       5.    These CBAs address compensation for the type of travel time claimed

7   to be owed in this action and resolution of the claims requires interpretation and

8   analysis of the terms of those agreements.

9

10       I declare under penalty of perjury that the foregoing is true and correct.

11   Executed on this 27th day of November, 2013.

12

13       _____

14       Frank Cronin

SNELL & WILMER
L.L.P.
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

Exhibit 1

# INSIDE AGREEMENT

Between

## LOCAL UNION 639

of the

## INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, SAN LUIS OBISPO, CALIFORNIA

and

## CALIFORNIA CENTRAL COAST CHAPTER

## NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION

### AMENDED JUNE 1, 2009

## TABLE OF CONTENTS

| ARTICLE | | SECTION | PAGE | CATEGORY |
|---|---|---|---|---|
| **ASSENT LANGUAGE** | | | 1 | Category 1 |
| **ARTICLE I** | | | | |
| | CIR Language | 1.01-1.10 | 1 | Category 1 |
| **ARTICLE II** | | | | |
| | Employer Qualifications | 2.01 | 3 | |
| | Management Rights Clause | 2.02 | 3 | Category 1 |
| | Foreman Call Out | 2.03 | 3 | |
| | Workers' Compensation | 2.04 | 3 | |
| | Surety Bond | 2.05 | 3 | |
| | Joint Venture Clause | 2.06 | 4 | |
| | Favored Nations Clause | 2.07 | 4 | Category 1 |
| | Recognition | 2.08 | 4 | |
| | Work Preservation | 2.09 | 4 | Category 2 |
| | Traveling Employer | 2.10 | 5 | Category 1 |
| | Working Member | 2.11 | 5 | |
| | Transfer of Employees | 2.12 | 5 | |
| | Employee Contractor | 2.13 | 5 | |
| | Workmanship | 2.14 | 5 | |
| | Improper Workmanship | 2.15 | 5 | |
| | Appointment of Steward | 2.16 | 6 | |
| | Union Right to Discipline Members | 2.17 | 6 | |
| | Access to Job or Shop | 2.18 | 6 | |
| | Picket Language | 2.19 | 6 | |
| | Proper Tools | 2.20 | 6 | |
| | Tool List | 2.21 | 7 | |
| | Storage of Tools | 2.22 | 7 | |
| | Union Label | 2.23 | 8 | |
| | Union Security | 2.24 | 8 | |
| | Annulment Subcontract Clause | 2.25 | 8 | Category 1 |
| | Union Recognition/Authorization | 2.26 | 8 | |
| | JW Training | 2.27 | 8 | |
| **ARTICLE III** | | | | |
| | Hours (Workday/Workweek) | 3.01 | 9 | |
| | Overtime and Penalty Clauses | 3.02 | 9 | |
| | Labor Day | 3.03 | 9 | |
| | Wages Withheld | 3.04 | 9 | |
| | Classifications/Wages/Fringes | 3.05 | 10 | Category 1 |
| | Union Working Dues Deduction | 3.06 | 11 | Category 2 |
| | Higher Classification | 3.07 | 11 | |
| | High Time and Hazard Area | 3.08 | 11 | |
| | Cable Splicing | 3.09 | 12 | |
| | Weather Conditions | 3.10 | 12 | |
| | Bomb Threats | 3.11 | 12 | |
| | Work Outside Jurisdiction | 3.12 | 12 | |
| | Shift Work | 3.13 | 12 | Category 1 |
| | Tools and Materials | 3.14 | 13 | |
| | Radioactive Materials and Exposure | 3.15 | 13 | |
| | Scope of Work | 3.16 | 13 | |
| | Cutting and Threading | 3.17 | 13 | |

| | | | | |
|---|---|---|---|---|
| Ratio of Foreman to Journeymen | 3.18 | 14 | | |
| Travel | 3.19 | 14 | | |
| Overtime Scope | 3.20 | 15 | | |
| Rebates of Wages | 3.21 | 15 | | |
| Underground Work | 3.22 | 15 | | |
| Tunnels | 3.23 | 15 | | |
| Off Shore Work | 3.24 | 16 | | |
| Make up Time | 3.25 | 16 | | |
| **ARTICLE IV** | | | | |
| Referral Procedures | 4.01-4.20 | 17 | Category 1 | |
| **ARTICLE V** | | | | |
| Apprenticeship Training | 5.01-5.16 | 20 | Category 1 | |
| **ARTICLE VI** | | | | |
| NEBF (Monthly) | 6.01 | 23 | Category 1 | |
| Health and Welfare | 6.02 | 23 | | |
| Apprenticeship | 6.03 | 23 | | |
| Pension | 6.04 | 23 | | |
| Labor Management Fund | 6.05 | 23 | | |
| Withholdings | 6.06 | 23 | | |
| Termination | 6.07 | 24 | | |
| Fringe Benefit Remedies | 6.08 | 24 | | |
| COPE | 6.09 | 24 | | |
| **ARTICLE VII** | | | | |
| National Electrical Industry Fund (NEIF) | 7.01 | 25 | Category 1 | |
| **ARTICLE VIII** | | | | |
| Safety | 8.01-8.10 | 25 | | |
| **ARTICLE IX** | | | | |
| SLO Labor Management Coop Fund | 9.01-9.04 | 26 | Category 1 | |
| **ARTICLE X** | | | | |
| National Labor Management Coop Fund | 10.01-10.05 | 27 | Category 1 | |
| **ARTICLE XI** | | | Category 1 | |
| Substance Abuse | 11.01 | 29 | | |
| **ARTICLE XII** | | | | |
| Code of Excellence | 12.01 | 29 | Category 1 | |
| **ARTICLE XIII** | | | | |
| Administrative Maintenance Fund | 13.01 | 29 | | |
| **SEPARABILITY CLAUSE** | | 30 | Category 1 | |
| **SIGNATURE PAGE** | | 30 | | |

## INSIDE AGREEMENT

Agreement by and between the San Luis Obispo Division of the California Central Coast Chapter, National Electrical Contractors Association, Inc., and Local Union No. 639, International Brotherhood of Electrical Workers.

It shall apply to all firms who sign a Letter of Assent to be bound by the terms of this agreement.

As used hereinafter in the Agreement, the term "Chapter" shall mean the California Central Coast Chapter, National Electrical Contractors Association and the term "Union" shall mean Local Union No. 639, International Brotherhood of Electrical Workers.

The term "Employer" shall mean an individual firm who has been recognized by an Assent to this Agreement.

## BASIC PRINCIPLES

The Employer and the Union have a common and sympathetic interest in the Electrical Industry. Therefore, a working system and harmonious relations are necessary to improve the relationship between the Employer, the Union, and the Public.   Progress in Industry demands a mutuality of confidence between the Employer and the Union.   All will benefit by continuous peace and by adjusting any differences by rational, common sense methods.   Now, therefore, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I

## EFFECTIVE DATE – CHANGES – GRIEVANCES – DISPUTES

**SECTION 1.01** This agreement shall take effect June 1, 2009 and shall remain in effect until May 31, 2012, unless otherwise specifically provided for herein.   It shall continue in effect from year to year thereafter, from June 1 through May 31 of each year, unless changed or terminated in the way later provided herein.

**SECTION 1.02**

    A.  Either party or an Employer withdrawing representation from the Chapter or not represented by the Chapter, desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of the Agreement of any anniversary date occurring thereafter.

    B.  Whenever notice is given for changes, the nature of the changes desired must be specified in the notice, or no later than the first negotiating meeting unless mutually agreed otherwise.

    C.  The existing provisions of the Agreement, including this Article, shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

    D.  Unresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement that remain on the 20th of month preceding the next regular meeting of the Council on Industrial Relations may be submitted jointly or unilaterally to the Council for adjudication.   Such unresolved issues of disputes shall be submitted not later than the next regular meeting of the Council following the expiration date of this agreement or any subsequent anniversary date.   The Council's decision shall be final and binding.

1

E.   When a case has been submitted to the Council, it shall be the responsibility of the Negotiating Committee to continue to meet weekly in an effort to reach a settlement on the local level prior to the meeting of the Council.

F.   Notice by either party of a desire to terminate this Agreement shall be handled in the same manner as a proposed change.

**SECTION 1.03** This agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto. Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, the same as this Agreement.

**SECTION 1.04** There shall be no stoppage of work by strike or lockout because of any proposed changes in this Agreement or dispute over matters relating to this Agreement. All such matters must be handled as stated herein.

**SECTION 1.05** There shall be a Labor-Management Committee of three representing the Union and three representing the Employers. It shall meet regularly at such stated time as it may decide. However, it shall also meet within forty-eight (48) hours when notice is given by either party. It shall select its own Chairman and Secretary. The Local Union shall select the Union representatives and the Chapter shall select the management representatives.

**SECTION 1.06** All grievances or questions in dispute shall be adjusted by the duly authorized representative of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within forty-eight (48) hours, they shall refer the same to the Labor-Management Committee.

**SECTION 1.07** All matters coming before the Labor-Management Committee shall be decided by a majority vote. Four members of the Committee, two from each of the parties hereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.

**SECTION 1.08** Should the Labor-Management Committee fail to agree or to adjust any matter, such shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication. The Council's decisions shall be final and binding.

**SECTION 1.09** When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matters arose shall not be changed or abrogated until agreement has been reached or a ruling has been made.

**SECTION 1.10** No complaint, dispute, or grievance shall be considered unless written notice is delivered by the aggrieved party to the Union and Chapter within thirty (30) consecutive days from the date on which the alleged complaint, dispute, or grievance first occurred, except in cases involving fringe benefit payments.

2

## ARTICLE II

## EMPLOYER RIGHTS – UNION RIGHTS

**SECTION 2.01** Certain qualifications, knowledge, experience, and proof of financial responsibility are required of everyone desiring to be an Employer in the Electrical Industry. Therefore, "Employer" as used is defined to mean a person, firm, or corporation having these qualifications: A licensed Electrical Contractor maintaining a place of business for the conducting of an electrical construction and/or maintenance business with a business telephone, open to the public during normal business hours. A place of business shall mean an established location, the address of which is affixed to the Letter of Assent accompanying this Agreement, where the Employer or his representative can be reached by personal call, where he transacts his business with the public and solicits electrical work.

The Employer shall display a sign announcing the name and character of his business and shall maintain on said premises proper books, accounts, and records incidental to the conduct of said business. The Employer shall provide a place where the workmen under this Agreement may change their clothing, wash up, and store their belongings (tools and work clothes) for which the Employer is responsible. Trailers, portable buildings, or an answering service shall not meet these requirements. All Employers shall display permanent Company signs on both sides of their trucks in letters three (3) inches high.

All recognized Electrical Employers not having a place of business in San Luis Obispo shall be considered as having their temporary headquarters in the City of San Luis Obispo and they shall have the same privileges (same working conditions and wages) as Employers in the City of San Luis Obispo. This same condition shall apply to Joint Venture Contractors.

**SECTION 2.02** The Union understands the Employer is responsible to perform the work required by the owner. The Employer shall, therefore, have no restrictions except those specifically provided for in the Collective Bargaining Agreement, in planning, directing, and controlling the operation of all his work, in deciding the number and kind of Employees to properly perform the work, in hiring and laying off Employees, in transferring Employees from job to job within the Local Union's geographical jurisdiction, in determining the need and number as well as the person who will act as Foreman, in requiring all Employees to observe the Employer's and/or owner's rules and regulations not inconsistent with this Agreement, in requiring all Employees to observe all safety regulations and in discharging Employees for proper cause.

**SECTION 2.03** The Employer shall be permitted to request, by name, any applicant the Employer desires to employ as Foreman. The Union shall refer such applicant to the Employer if the applicants name appears on the referral register, provided all other eligible applicants in higher referral groups have first been referred. The Employer shall immediately, upon employment of said applicant, classify said applicant (Employee) as Foreman and pay said applicant (Employee) Foreman wages as established in this Agreement for the duration of employment.

**SECTION 2.04** For all Employees covered by this agreement, the Employer shall carry Workmen's Compensation Insurance with a company authorized to do business in the State, social security, and other such insurance as may be required by the laws of the State in which the work is performed. He shall also make voluntary contributions to the State Unemployment Compensation Commission regardless of the number of Employees.

**SECTION 2.05**

    A. Each Employer shall furnish a surety bond in the amount to secure payment of all amounts due on account of payroll and fund deduction, contribution, and reporting obligations of the Employer required by this agreement. The bond shall provide that it may not be terminated without fifteen (15) days prior written notice to the Employer and the Local Union. Any employer who has had twelve (12) months of good standing without a default in the payment

3

of fringe benefits will not have to post a surety bond unless he defaults in his payments. Any defaulting Employer and all others who do not meet these requirements will have to post a surety bond as follows: Any shop or project employing zero to five (0-5) employees will have to post a $5,000.00 bond or cash; any shop or project employing five (5-10) employees will have to post a $7,500.00 bond or cash; any shop or project employing ten to fifteen (10-15) employees will have to post a $10,000.00 bond or cash; any shop or project employing fifteen to twenty (15-20) employees will have to post a $12,500.00 ...etc bond or cash for employees covered by this agreement. Any Employer required to post a bond shall maintain the bond until the Employer has established performance satisfactory to the parties, but in no case for more than twelve (12) months nor longer than the Employer employs Employees under this Agreement. Said bond shall be in a form acceptable to the parties and guarantee payment of fringe benefits provided for in this agreement.

B. The Labor-Management Committee and/or the Council on Industrial Relations, as the case may be, shall have full power to determine the amount of money due, if any, and shall direct payments of delinquent wages from the bond directly to the affected Employees and direct payments of delinquent fund contributions from the bond directly to the Trustees of the affected funds or to their designated agents.

C. It is agreed that the Union retains the right to withhold the services of its members from a contractor who fails to make timely payments to the Union's benefits plans, or fails to pay its weekly payroll, in accordance with its agreements with the Union; provided however that the Union shall give three days written notice to NECA prior to withholding the services of its members.

**SECTION 2.06** Employers engaged in joint-venture jobs shall be considered as a new and separate individual Employer, with all rights herein as apply to an individual participating Employer. There shall be no transfer of workmen between a joint-venture and any or all of the Employers comprising the joint-venture.

**SECTION 2.07** The Union agrees that if, during the life of this Agreement, it grants to any other Employer in the Electrical Contracting Industry on work covered by this Agreement, any better terms or conditions than those set forth in this Agreement, such better terms or conditions shall be made available to the Employer under this Agreement and the Union shall immediately notify the Employer of any such concession.

**SECTION 2.08**

A. The Employer recognizes the Union as the sole and exclusive representative of all its Employees performing work within the jurisdiction of the Union for the purpose of Collective Bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment.

B. The Employer understands that the Local Union's Jurisdiction, both trade and territorial, is not a subject for negotiations, but rather is determined solely within the IBEW by the International President and, therefore, agrees to recognize and be bound by such determinations.

**SECTION 2.09**

A. In order to protect and preserve, for the Employees covered by this Agreement, all work heretofore performed by them and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any on-site construction work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint-venture, wherein the Employer, through its

4

officers, directors, partners, or stockholders, exercises either directly or indirectly, management, control, or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work. All charges of violations of this Section shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

B. As a remedy for violations of this Section, the Labor-Management Committee, the Council on Industrial Relations for the Electrical Contracting Industry, and/or an independent arbitrator, as the case may be, are empowered, in their discretion and at the request of the Union, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations; and (2) pay into the affected joint trust funds established under this Agreement any delinquent contributions to such funds which have resulted from the violations. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section; nor does it make the same or other remedies unavailable to the Union for violations of other Sections or other Articles of this Agreement.

C. If, as a result of violations of this Section, it is necessary for the Union and/or the trustees of the joint trust funds to institute court action to enforce an award in accordance with subsection (b) above, or to defend an action which seeks to vacate such award, the Employer shall pay and accountants' and attorneys' fees incurred by the Union and/or fund trustees, plus the cost of the litigation, which have resulted from the bringing of such court action.

**SECTION 2.10** An Employer signatory to a Collective Bargaining Agreements or to a Letter of Assent to an agreement with another IBEW Local Union, who signs an assent to this Agreement, may bring up to four (4) bargaining unit employees employed in the Local Union's jurisdiction into this Local's jurisdiction and up to two (2) bargaining unit employees per job from that Local's jurisdiction to this Local's jurisdiction for specialty or service and maintenance work. All charges of violations of this section shall be considered as a dispute and shall be processed in accordance with the provisions of this agreement for the handling of grievances with the exception than any decision of a local labor-management committee that may be contrary to the intent of the parties to the National Agreement on Employee Portability, upon recommendation of either or both the appropriate IBEW International Vice President or NECA Regional Executive Director, is subject to review, modification, or rescission by the Council on Industrial Relations.

**SECTION 2.11** Only two (2) members of a firm (Employer) shall be permitted to work with the tools on work covered by this Agreement.

**SECTION 2.12** Employers shall not loan their Employees to another Employer without first securing the permission of the Business Manager.

**SECTION 2.13** No applicant or Employee while he remains subject to employment by Employers operating under this Agreement shall be recognized as a contractor for the performance of any electrical work.

**SECTION 2.14** Journeyman Wireman shall install all electrical work in a safe and workmanlike manner and in accordance with applicable code and contract specifications. When necessary to use temporary light and/or power on any foundation or building work, such temporary work shall be installed in a safe manner under the terms of this Agreement.

**SECTION 2.15** A Journeyman Wireman shall be required to make corrections on improper workmanship, for which he is responsible, on his own time and during regular working hours, unless errors were made

5

by orders of the Employer or the Employer's representative. Correction of workmanship to be made only after a fair investigation by the employer and the Business Manager of the Union.

If the Journeyman is no longer employed, employer may assign a Journeyman to make corrections on employer's time and during regular working hours. The Employer may submit a "claim" to the LMCC for reimbursement of the cost of labor to make the correction. Reimbursement is to be made only after a fair investigation by the LMCC.

**SECTION 2.16** The Union shall have the right to appoint a Steward at any shop or any job where workmen are employed under the terms of this Agreement. Such Steward shall comply with the recognized duties of a Steward. He shall be allowed sufficient time to perform these duties during regular working hours.

Under no circumstances shall the Employer dismiss or otherwise discriminate against an Employee for making a complaint or giving evidence with respect to an alleged violation of any provision of this Agreement.

The Steward shall have the following duties: to insure that the Agreement, IBEW Constitution, and IBEW Local Union No. 639 By-laws are adhered to; to work cooperatively with the Contractor, resolve any perceived problem by either the Employee or Employer; to insure harmonious relations between the Employer and Employees.

The Business Manager shall notify the Employer in writing of the appointment of a Steward.

Whenever an Employer wishes to layoff or discharge a Steward, he shall contact the Business Manager of the Local Union not less than forty-eight (48) hours previous to taking such action. However, the Steward shall not be terminated except for just cause, and in such case, shall be handled as a grievance under Article I of this Agreement.

The Steward shall be allowed to work when overtime is worked when more than one (1) man works. Stewards shall be notified not less than four (4) hours in advance of all changes, layoffs, discharges, reductions in force, and referrals to the job.

**SECTION 2.17** The Union reserves the right to discipline its members for violation of its laws, rules, and agreements.

**SECTION 2.18** The Representative of the Union shall be allowed access to any shop or job at any reasonable time where workmen are employed under the terms of this Agreement.

**SECTION 2.19**

    A. It shall not be a violation of this Agreement, and it shall not be a cause for discharge or any other disciplinary action by the Employer against any Employee, for an Employee to refuse to cross a lawfully established primary picket line, whether at the premises of another Employer or the Employee's own Employer.

    B. Any Employee exercising such right shall carefully put away all tools, materials, equipment, or any other property of the Employer in a safe manner. Each Employee will be responsible for any loss to the Employer for neglect in carrying out this provision, but only when a safe place is provided for by the Employer.

**SECTION 2.20** There shall be no limit on production of workmen or restriction on the safe use of proper tools or equipment and there shall not be any task or piece work.

**SECTION 2.21** Journeyman shall provide themselves with the following tools:

Tool Box – 20" x 8 ½ "x 9" minimum with lock
Pliers:

| | | |
|---|---|---|
| Wire Strippers | Diagonal Cutters (2 allowed) | Long Nose |
| Side cutters, 8" or 9" Klein Type | Pump (Channel Lock) (2 allowed) | Stake-On |

Combination Wrench-Set, 3/8 – 3/4
Crescent Wrenches – 6" and 12" (one of each)
Box Wrench – For knock-out punch set
Allen Wrenches – Small set not over 7/16"
Spin-Tite Wrench Set – Up to ½ "
Tap Wrench – Up to ¼ "
Chisels: Wood, 1" maximum, Cold ½ "maximum
Center Punch
Awl
Plumb Bob, 8 ounce
Tri-Square
Level – (1) 18" maximum
Chalk Line Box
Tin Snips – (1) 10" Airplane Shears
Knife
Rules – 30" maximum
Screwdrivers:

| | | |
|---|---|---|
| Stubby (2), 1 Blade and 1 Phillips | Offset (2), 1 Blade and 1 Phillips | Blade (3), 6", 8" and 12" |

Phillips (2), 6" and 8"
Hacksaw Frame
Keyhole Saw
Hammer – Claw
Tester – Voltage Square "D", Knopf, or equal
Tool Pouch (Optional)
One-Piece Flashlight (1)
Current NEC Code Book
Cordless Screwdriver, Charger, and Batteries (Optional) (not a battery operated drill motor) [Note: see
        Section 2.22 for further reference]

Journeyman may provide themselves with additional personal hand tools necessary to perform the normal classification of work, not requiring the use of what are generally classified as "shop tools".

IBEW Local 639 will not tolerate the theft of any tools that are furnished by the employer and will aid the employer in recovering such items from any employee not returning company tools.

The Employer will furnish necessary locked storage to reasonably protect tools from the weather and vandalism and will replace such tools as listed above when tools are damaged on the job or stolen from the locked storage.

**SECTION 2.22** The Employer shall furnish all other necessary tools or equipment.  Workmen will be held responsible for tools or equipment issued to them provided the Employer furnishes the necessary lockers, tool boxes, or other safe place of storage.  Tools must be taken out and put away during work hours.

The Employer shall provide hard hats.  Employees will sign out hard hats from Employers; if hard hat is lost, Employee shall be responsible for replacement.

If the Contractor provides cordless screwdriver (including charger and batteries), Employer will sign out tools; if lost or damaged, Employee shall be responsible for replacement.

**SECTION 2.23**  The refusal by an individual Employee to install, service, or perform work on any sign, fixture, or other equipment which does not bear an IBEW Local Union Label, will not be cause for discipline or discharge of such Employee by his Employer, nor shall the Union be deemed to have breached this Agreement thereby.

**SECTION 2.24**  All Employees covered by the terms of this Agreement shall be required to become and remain members of the Union as a condition of employment from and after the eighth day following the date of their employment or the effective date of this agreement, whichever is later.

**SECTION 2.25**  The Local Union is a part of the International Brotherhood of Electrical Workers and any violation or annulment by an individual Employer of the approved Agreement of this or any other Local Union of the IBEW, other than violations of Paragraph 2 of this section, will be sufficient cause for the cancellation of his Agreement by the Local Union, after a finding has been made by the International President of the Union that such a violation or annulment has occurred.

The subletting, assigning, or transfer by an individual Employer of any work in connection with electrical work to any person, firm, or corporation not recognizing the IBEW or one of its Local Unions as the Collective Bargaining Representative of his Employees on any electrical work in the jurisdiction of this or any other Local Union to be performed at the site of the construction, alteration, painting, or repair of a building, structure, or other work, will be deemed a material breach of this Agreement.

The charges of violations of Paragraph 2 of this Section shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

**SECTION 2.26**  The Employer agrees that, if it has not previously done so, it will recognize the Union as the exclusive bargaining agent for all Employees performing electrical work within the jurisdiction of the Union on all present and future jobsites, if and when a majority of the Employer's Employees authorizes the Union to represent them in Collective Bargaining.

**SECTION 2.27**  Journeyman shall comply with the State of California requirement of 32 hours of continuing education in a three (3) year period.  The employer shall not be required to pay wages and benefits for journeyman to obtain such training.

## ARTICLE III

### WAGES – HOURS – WORKING CONDITIONS

**SECTION 3.01** Eight (8) hours work between the hours of 8:00 a.m. and 4:30 p.m., with thirty (30) minutes for lunch period (between Noon and 12:30 p.m.) shall constitute a workday.

By mutual agreement between the Employer and the Union, the starting and quitting time may be varied by not more than two (2) hours. Five (5) such work days, Monday through Friday inclusive, shall constitute a work week. A workman required to work during his regular lunch period shall receive the established overtime rate for lunch period and shall thereafter be allowed a reasonable opportunity to eat his lunch on the Employer's time. He shall not be required to work for more than six (6) consecutive hours without at least a thirty (30) minute lunch period on the Employer's time. A four ten-hour work day shall be permissible when mutually agreed upon between the Employer and the Union.

When time clocks, brass etc. are required by the employer, employees shall punch such time clocks, brass etc. on the employer's time.

If the Employer does not provide employment for five (5) consecutive regular working days, unless on approved leave, the Employee shall be terminated.

There shall be two (2) ten-minute (10) rest and nutrition breaks in each work day.

**SECTION 3.02** All work performed in excess of a regular eight (8) hour day, Monday through Friday, shall be paid at 1½ times the regular straight time rate of pay, and the first eight (8) hours on Saturday shall be paid at 1½ times the regular straight time rate of pay. All work performed in excess of ten (10) hours a day, Monday through Friday, and all work performed on Saturday in excess of eight (8) hours a day or on Sunday or on any of the following holidays – New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Veteran's Day, Thanksgiving Day, the day following Thanksgiving Day, Christmas Day, or days celebrated as such Holidays – shall be paid at double (2) times the regular straight time rate of pay, subject to the following exceptions: Holidays falling on Saturday will be observed the previous Friday in lieu thereof. Holidays falling on Sunday will be observed the following Monday in lieu thereof.

When workmen are called out for maintenance work outside of regular scheduled working hours, as defined in this Article, they shall be paid from the time they leave home until they return at one and one half (1½) times the regular straight time rate of pay, with a minimum of one (1) hour's time. This shall be in addition to regular, established mileage payments when the workman uses his own transportation. Sunday and legal holidays shall be paid at double (2) times the straight time rate of pay.

The above time-and-a-half (1½) clause shall not apply on the construction projects where there is a regular maintenance crew performing maintenance work on temporary facilities until after completion of said project.

**SECTION 3.03** No work shall be performed on Labor Day, except in case of emergency to save life or property. Such work shall be reported within twenty-four (24) hours to the Business Manager by men and Contractors performing work.

**SECTION 3.04** Wages shall be paid weekly in cash or by check on or before quitting time on the payday of each week. Employees may voluntarily allow for direct electronic deposit of wages on a weekly basis to the bank or credit union of the employee's choice. This manner of payment, once adopted, may not be changed except upon 30-day advance written notification between the employee and Employer with notification copied to the Union. Employees using direct electronic deposit shall receive an accounting of payroll and deductions no later than five (5) days of deposit. This option shall be voluntary on the part of the Employer and Employee".

In the event an Employer fails (a) to pay a worker his wages, either in the form of cash, check draft or direct electronic deposit by quitting time on pay day; (b) in the event a worker does not receive his pay on the established pay day, waiting time at the regular straight time rate of pay shall be charged until payment is made. However, waiting time shall not exceed eight (8) hours in any one twenty-four (24) hour period. When an Employee's paycheck is short by ten (10) percent or less, the Employer has until their next established pay day to correct the error in full or the previous penalty will be enforced from that next established payday.

In the event unusual circumstances cause payroll not to be met, the Labor-Management Committee shall rule.

The Employer shall pay a workman 20% of the amount of any payroll check that is returned to the bank for lack of funds, as an inconvenience payment to the Employee. This amount must be paid on or before the next regular payroll period. This shall not apply if evidence can be shown that it was not the fault of the Employer.

Any workman laid off or discharged by the Employer shall be paid for all of his wages immediately. Any workman laid off in the afternoon shall be paid the full day. Any time spent waiting for pay after 4:30 p.m. shall be charged at the straight time rate of pay per hour until payment is made. The workman shall continue working if so directed by the Employer. Any workman laid off shall have one (1) hour notice at any time in order to gather his tools and personal belongings. Any workman discharged for cause shall have sufficient time to gather his belongings, not to exceed thirty (30) minutes. Such wages shall include applicable travel time and mileage.

Any workman being terminated for any reason will be given a "termination slip" clearly setting forth the reason for termination and eligibility for rehire. Termination slips will be furnished to the employer by the union.

**SECTION 3.05** Effective June 1, 2009, the minimum rate of wages shall be as follows (fringes are not included in base rate). It is mutually agreed, upon sixty (60) days written notification to the Employer, any portion of the agreed wage settlement may be applied to any fringe benefit that exists, as stipulated by the membership of IBEW Local Union 639:

**Effective June 1, 2009**

Wages:

| | | | | | |
|---|---|---|---|---|---|
| Journeyman Wireman | | $32.20 | 1st Period Apprentice | (40%) | $12.88 |
| Foreman | 110% of JW Rate | $35.42 | 2nd Period Apprentice | (45%) | $14.49 |
| General Foreman | 120% of JW Rate | $38.64 | 3rd Period Apprentice | (55%) | $17.71 |
| JW Splicing | 110% of JW Rate | $35.42 | 4th Period Apprentice | (65%) | $20.93 |
| JW Welding | 105% of JW Rate | $33.81 | 5th Period Apprentice | (75%) | $24.15 |
| JW Welding-Certified | 110% of JW Rate | $35.42 | 6th Period Apprentice | (90%) | $28.98 |
| JW Technician | 100% of JW Rate | $32.20 | | | |

| Fringes: | | Deductions: | |
|---|---|---|---|
| Health & Welfare (Plan B) | $9.65 | Working Assessment | 6% |
| Health & Welfare (Plan A) | $3.25 | Labor/Mgmt Co-op | $0.10 |
| Local Pension | $4.90 | COPE (Optional) | $0.05 |
| Apprenticeship Fund | $0.70 | 401K (Optional) $0.00, $1.50, $3.00, $5.00, $6.00 | |
| NEBF | 3% | | |
| NEIF | 1% | | |
| Labor/Mgt Co-op Fund | $0.10 | | |
| Administrative Maintenance Fund | .9% | | |

**Effective June 1, 2010**

> The Journeyman Wireman hourly rate shall be increased an additional fifty cents ($0.50)
> The Pension Contribution shall be increased an additional twenty-five cents ($0.25)

**Effective January 1, 2011**

> The Journeyman Wireman hourly rate shall be increased an additional one dollar ($1.00)
> The Health and Welfare contribution shall be increased an additional fifty cents ($0.25)

**Effective June 1, 2011**

> The Pension Contribution shall be increased an additional fifty cents ($0.50)
> The Health and Welfare contribution shall be increased an additional fifty cents ($0.25)

**Effective January 1, 2011**

> The Journeyman Wireman hourly rate shall be increased an additional one dollar ($1.00)
> The Health and Welfare contribution shall be increased an additional twenty-five cents ($0.25)

**Effective Midnight, May 31, 2012**

> The Journeyman Wireman hourly rate shall be increased an additional fifty cents ($0.50)

**NOTE!!!!!**
All starting Apprentices indentured and employed under the terms of this Agreement on or after July 1, 1980 shall have Pension Contributions made in their behalf directly proportionate to the percentage of the Journeyman rate they receive. Said percentage payment shall increase with each incremental raise and be directly proportionate thereto, until the 100% contribution level is attained.

All Apprentices indentured and employed under the terms of this Agreement on or after June 1, 2006 shall have:

> 1. Pension A only Contributions made in their behalf directly proportionate to the percentage of the Journeyman rate they receive. Said percentage payment shall increase with each incremental raise and be directly proportionate thereto, until the 100% contribution level is attained.

> 2. Plan A only Health and Welfare Contributions made in their behalf at the listed rate.

The only benefit plans in which first year Apprentice and unindentured must participate are local health and welfare plans and the National Electrical Benefit Fund.

**SECTION 3.06** The Employer agrees to deduct and forward to the Financial Secretary of the Local Union, upon receipt of voluntary written authorization, the additional working dues from the pay of each IBEW member.
The amount to be deducted shall be the amount specified in the approved Local Union Bylaws. Such amount shall be certified to the Employer by the Local Union upon request by the Employer.

**SECTION 3.07** Any workman at a higher classification shall receive the higher rate of pay for a minimum of four (4) hours. If he works beyond the four (4) hours, he shall receive the higher rate of pay for the entire day.

**SECTION 3.08** On jobs where workmen are required to work from trusses, swinging scaffolds, open ladders, scaffolds, bosun chairs, stacks, or towers where subject to a direct fall from the ground floor or support structure from a distance of fifty (50) feet to ninety (90) feet, the rate shall be time-and-a-half (1½). Over ninety (90) feet, the rate shall be double (2) the regular straight time rate of pay.

11

Where workmen are required to work under compressed air or in areas where injurious gases, dust, or fumes are present in amounts necessitating use of gas masks or self-contained breathing apparatus (particle masks are not considered self-contained breathing apparatus) or where workmen work on poles at a distance of seventy-five (75) feet or more from the ground, they shall be paid a bonus of straight time pay. This shall be at a minimum of one hour, and thereafter, each succeeding hour or fraction thereof shall constitute an hour at the bonus rate. Foreman to receive bonus pay calculated by the same formula.

**SECTION 3.09** Journeyman Wireman when splicing cable: All work of joining, splicing, and insulating and placing flameproof covering, where wiped lead joints are necessary, shall be performed by Journeyman Wireman only. Journeyman Wireman when splicing cable shall not be required to work on wires or cables when the difference in potentials is over 300 volts between any two conductors or between any conductor and ground unless assisted by another Journeyman. In no case shall Journeyman Wiremen when splicing cable be required to work on energized cables in excess of 480 volts. When using stress cones and shields with all synthetic cables regardless of voltage when shielded and when certification is required by the owner or general contractor, splicing and connecting thereto will be done at the Cable Splicer's rate set forth in this Agreement only when splicing.

Journeyman Wireman when splicing cables shall furnish hand tools, but shall be permitted to rent splicing tools, other than hand tools, to the Employer at a minimum rate of $25.00 per day worked.

**SECTION 3.10** When workmen are directed to report to a job and do not start work on the job due to weather conditions, lack of material or other causes beyond their control, they shall receive two (2) hours pay plus the applicable travel time and mileage unless notified at least one-half (½) hour before show-up time that morning, if workmen can be reached by telephone.

Workmen shall remain available for work, under shelter during this two (2) hour period. If the men are put to work during this two (2) hour period and work beyond their show-up time, they shall receive four (4) hours pay. If they start to work after lunch, they shall receive eight (8) hours pay, plus all applicable travel time and mileage.

Employers directing workmen to work in the rain or under other adverse conditions shall furnish the appropriate protective clothing.

**SECTION 3.11** In the event there is a bomb threat on any job or project before the regular starting time, all workmen shall receive two (2) hours pay at the straight time rate and applicable travel time and mileage or subsistence. If any workman chooses to leave the job or project prior to the end of the two (2) hour period, he shall receive pay at the straight time rate only for the time he remained on the job or project plus the applicable time and mileage or subsistence.

If there is a bomb threat after the start of the regular work shift and after the first two (2) hour period, all workmen shall be paid actual time worked plus applicable travel time, and mileage or subsistence. Time spent in holding areas as directed by the Employer shall be considered as time worked and paid accordingly.

**SECTION 3.12** When workmen are required to perform work outside the jurisdiction of the Union, where a higher wage rate prevails, they shall be paid the higher scale.

**SECTION 3.13** SHIFT WORK

When so elected by the Contractor, multiple shifts of at least five (5) days duration may be worked. When two (2) or three (3) shifts are worked:

The first shift (day shift) shall be worked between the hours of 8:00 a.m. and 4:30 p.m. Workmen on the "day shift" shall receive eight (8) hours pay at the regular hourly rate for eight (8) hours work.

The second shift (swing shift) shall be worked between the hours of 4:30 p.m. and 12:30 a.m. Workmen on the "swing shift" shall receive eight (8) hours pay at the regular hourly rate plus 10% for seven-and-one-half (7½) hours work.

The third shift (graveyard shift) shall be worked between the hours of 12:30 a.m. and 8:00 a.m. Workmen on the "graveyard shift" shall receive eight (8) hours pay at the regular rate plus 15% for seven (7) hours work.

A lunch period of thirty (30) minutes shall be allowed on each shift. All overtime work required after the completion of a regular shift shall be paid at one-and-one-half times the "shift" hourly rate.

There shall be no pyramiding of overtime rates and double the straight time rate shall be the maximum compensation for any hour worked.

There shall be no requirement for a day shift when either the second or the third shift is worked.

**SECTION 3.14** Carrying tools or materials to and from the job is considered working. No workman shall carry tools or material outside of working hours except when using Employer's vehicle for Employee's own convenience.

**SECTION 3.15** On any job where workmen are exposed to radioactive materials and/or radiation in excess of one-tenth of the maximum possible limits (MPL), as established by the International Commission on Radiation Protection, the Employer shall employ a qualified Journeyman Radiation Monitor working under the terms of this Agreement.

Such radiation monitors shall determine the location of hazardous zones and shall be responsible for the radiation hazards therein. He shall maintain permanent and accurate time checks on all workmen entering and leaving such zones, including radiation dosages of all personnel emerging from the radiation zone. He shall also be in charge of a decontamination of personnel, their tools, material, or equipment. The radiation monitor shall report to and be subject to the Steward and the supervising electrician on the job. Film badges and test equipment to be supplied by the Employer.

**SECTION 3.16** Workmen employed under the terms of this Agreement shall do all electrical construction and installation of electrical and electronic work and all electrical maintenance thereon. This shall include the setting, processing, welding, cutting, burning, handling, and moving of all electrical materials, electrical equipment, and electrical apparatus, and the making of the final running test and the installation of all underground raceways. This shall also include the installation of all electrical lighting, heating and power equipment, photovoltaic systems, solar systems, fuel cells, all power generating green technology systems, electronic equipment, telemetering equipment, or any other electrical instrumental equipment, with the installation of all related wiring, control wiring, fixtures, instruments, and devices. All conduit shall be cut, threaded, and bent, other than 6" and less nipples and factory 45-degree and 90-degree bends. The drilling, chasing, and channeling necessary to complete electrical installation shall be performed by workmen employed under the terms of this Agreement. After material used in electrical work has reached a job site, it shall from thereon, be handled only by workmen employed under the terms of this Agreement. This shall not preclude the Union from furnishing workmen to other Employers for completion of electrical installation which are not included by the electrical contract.

It shall be understood that the scope of work covered by this Agreement does include the installation of telephone or communication work and the installation of all electronics or instrumentation equipment and related wiring.

**SECTION 3.17** The cutting and threading of all conduit and nipples shall be performed by workmen under the terms of this Agreement.

**SECTION 3.18** A Foreman shall be designated on all jobs having five (5) or more workmen of any classification covered by this Agreement and shall be paid per hour worked in this classification. No job Forman shall be allowed to supervise more than one (1) project at a time where workmen are in continuous employment on these projects. A job Foreman may work with the tools until seven (7) workmen exclusive of Foreman who is on the job, then he shall act in a supervisory capacity only and then for not more than ten (10) workmen. He shall be permitted to drive a vehicle containing workmen and/or material. Foreman or General Foremen will be allowed and shall not be precluded from incidental handling of materials or accessing enclosures for inspection.

In cases where workmen are not readily available to handle and transport hand tools, the Foreman shall be permitted to perform this work. On all jobs requiring three (3) or more Foremen or in excess of twenty (20) workmen, a General Foreman shall be required. A General Foreman shall not supervise more than four (4) Foremen and shall be of the same classification as the Foreman.

On all jobs having Foremen, workmen, except in an emergency, are not to take orders or accept the layout of work from anyone except their assigned Foreman. Likewise, on a job having a General Foreman. Foremen are not to accept orders, except in an emergency, from anyone but their assigned General Foreman. General Foreman shall give orders only to his assigned Foreman, except in case of an emergency.

On all jobs requiring more than four (4) Cable Splicers, a Cable Splicer Foreman shall be placed in charge of this work and receive General Foreman pay.

In any shop where the owner is acting as shop Foreman, he shall not act as job Foreman on jobs normally requiring such, under the terms of the Agreement, unless he employs only one (1) Journeyman Electrician in his shop.

Also, a working partner (as defined) under the terms of this Agreement shall not act as the shop Foreman in any shop employing less than eight (8) Journeymen. In all shops where the working partner is shop Foreman, he shall not, in any instance, act as job Foreman. Non-working Foreman does not apply to Residential work.

**SECTION 3.19** TRAVEL

The Union will refer to all Electrical Employers at their recognized place of business as shown on their Letter of Assent at no expense to the Employer. Therefore, the Employer has the following options:

A. All Employers may request workmen to report direct to a job within a free zone to include everything west of ten (10) miles east of Highway 101, as the crow flies, and ten (10) miles north and south of Highway 46, as the crow flies, to the junction of Highway 41 and Highway 46. Everything outside this area shall be paid at full subsistence provided said job is of five (5) days duration or more and provided there is storage on the job for the Employ0ee's tools. The Employer will be responsible for loss of tools under such circumstances. (Road: The most direct route on a surfaced road.)

B. On all jobs or projects outside the free zone, as stated in "A" above, Employees may be required to report to the job site in their own transportation at the regular starting time and remain on the job site until the regular quitting time and these shall be paid at thirty-eight dollars ($38.00) per day or thirty-eight cents ($0.38) per mile for each road mile from shop to job and job to shop (round trip). (Day worked shall mean at least four (4) hours on the job unless sent home on account of weather, emergency, sickness, or injury.)

C. The Employer shall pay for traveling time and furnish transportation from shop to job, job to job, and job to shop. Travel time shall be at the appropriate rate of pay for that day of the week. (Monday through Friday, straight time; Saturday and Sunday, double time.)

14

**SECTION 3.20** Overtime is to be worked only in an emergency or for short durations, or on jobs of unusual circumstances, which make sustained overtime appropriate.   The Employer and workmen contemplating scheduled overtime work shall first notify the Business Manager.  In cases of emergency, such as the preservation of life or property, or to complete a job or project, such work shall be reported to the Business Manager not later that the next regular working day.

Insofar as practical, all overtime in a shop or on the job shall be divided equally among the workmen regularly employed there.  Under no circumstances shall the workman not employed on the job during regular working hours be placed on overtime work while any of the regular crew is not working, if they desire to work on such overtime.

**SECTION 3.21** The Employer of workmen, or their agents, shall not give or accept directly or indirectly any rebate on wages.  The Employer shall not directly or indirectly, or by any subterfuge, sublet or contract with any workman, any or all of the labor services required by such contract of the Employer.  If the Employer is found violating this provision, he shall be subject to having this Agreement terminated upon written notice being given by the Union after the facts have been determined by the International Office.

**SECTION 3.22** UNDERGROUND DUCT WORK

Shall include the installation of all types of underground ducts or raceways used as enclosure for electrical conductors (either power, control, communication).  It shall include all cutting and rodding of same and the installation of "Fish or Pull" wires and accompanying ground wires.  The handling of all material from the first point of delivery on the job site to the final installation of the ducts shall be covered under the Agreement, as well as the supervision of pouring the concrete envelope.

**SECTION 3.23** TUNNELS

    A.  The minimum rate of pay for tunnel work shall be paid at the time-and-one-quarter (1¼) hourly rate.  Whenever there is electrical construction, maintenance, or temporary work of either power, lighting, or communication to be performed in or about a tunnel shaft or adit, it shall be done by workmen employed under the terms of this Agreement.  This shall also be interpreted to include all electrical maintenance or repair work and battery charging and charging on battery-operated electrical motors.

    B.  Whenever a shift crew, or a major portion thereof, or two (2) other crafts, one (1) working in a tunnel where there is electrical light or power, at least one Journeyman Wireman shall be employed to maintain and perform the electrical installation for that crew.

    C.  When more than one (1) heading is worked from one (1) adit or shaft, a wireman shall be assigned to each crew or shift, and one (1) to each heading unless both headings are readily available to that one (1) wireman.

    D.  Workmen shall not be required to enter the heading after a blast until all the requirements of the State Safety Codes have been fully complied with.

    E.  All electrical work being performed under the terms of this supplement shall be governed by Tunnel Safety Orders issued by Industrial Safety; Electrical Safety Orders issued by the Division of Industrial Safety; and, when applicable, General Order No. 95, issued by the State Public Utilities Commission.

    F.  The daily reporting, or starting, point shall be the electrical shop of tunnel entrance, if adjacent to a suitable, available parking lot, otherwise from such parking lot.  The workmen's daily pay shall start and end at this reporting place.  However, workmen shall receive a daily

compensation for clothing change time and for travel time in and out of tunnel with regular tunnel crew, before and after regular shift hour as follows.

G.  Workmen shall not be required to work more than five (5) hours without a meal, and if workmen do, they will receive one-half (½) hour bonus at the tunnel rate of pay.

H.  The Employer shall furnish workmen with rubber boots, raincoats, protective helmets, and clothing without charge where required and needed in and about tunnel.  The Employee shall be responsible for these items and shall return them to the Employer at the time of termination.


## SECTION 3.24 OFF-SHORES WORK

An additional 18% per hour in pay shall be paid to all Employees for work on all off-shore installations away from the mainland when the Employees are required to remain away from home overnight, plus room and board.  The Contractor shall also furnish towels, soap, and linens daily.  Clean, sterilized blankets shall be furnished at the beginning of each job and every thirty (30) days thereafter.  All Employees will be furnished with a locker, lock, and at least one-hundred (100) square feet of living quarters, which shall comply with the California State Housing Code.

When practical, Employees working under the terms of the Agreement shall be housed together.  When working under the terms of this Agreement, Employees shall eat their meals in the facilities provided them by a civilian catering service when available.

Also, when working on off-shore installations and the workmen are required to remain overnight, no workman shall receive less than eight (8) hours pay each day. The point of embarkation for all off-shore facilities shall be considered job site for the purpose of establishing working hours and/or daily travel expense. The Employer is to be responsible for belongings left at the point of embarkation.

## SECTION 3.25 MAKE-UP TIME

If an employer approves a written request of an employee to make up work time that is or would be lost as a result of a personal obligation of the employee, the hours of that makeup work time, if performed in the same workweek which the work time was lost, will not be counted toward computing the total number of hours worked in a day for purposes of the overtime requirements, except for hours in excess of 8 hours worked in one day or 40 hours worked in one workweek. An employee shall provide a signed written request for each occasion that the employee makes a request to makeup work time pursuant to this section.  The Employer shall forward a copy of the request to the union hall. If an employee knows in advance that he will be requesting makeup time for a personal obligation that will recur at a fixed time over a succession of weeks, the employee may request to makeup work time for up to four weeks in advance; provided, however, the makeup work must be performed in the same week that the work time was lost.

## ARTICLE IV

### REFERRAL PROCEDURE

**SECTION 4.01** In the interest of maintaining an efficient system of production in the industry, providing for an orderly procedure of referral of applicants for employment, preserving the legitimate interest of Employees in their employment status within the area and of eliminating discrimination in employment because of membership or non-membership in the Union, the parties hereto agree to the following system of referral of applicants for employment.

**SECTION 4.02** The Union shall be the sole and exclusive source of referral of applicants for employment.

**SECTION 4.03** The Employer shall have the right to reject any applicant for employment.

**SECTION 4.04** The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions, or any other aspect or obligation of Union membership policies or requirements. All such selection and referral shall be in accord with the following procedure.

**SECTION 4.05** The Union shall maintain a register of applicants for employment established on the basis of the Groups listed below. Each applicant for employment shall be registered in the highest priority group for which he qualifies.

### JOURNEYMAN WIREMAN – JOURNEYMAN TECHNICIAN

**GROUP I** All applicants for employment who have four or more years experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee and who have been employed in the trade for a period of at least one year in the last four years in the geographical area covered by the collective bargaining agreement. Group I status shall be limited to one Local Union at a time. An applicant who qualifies for Group I in a local union shall be so registered electronically and remain on Group I in that local union unless and until the applicant designates another local union as his or her Group I local union. If an applicant qualifies for Group I status in a local union other than his or her home local union and designates that as his or her Group I local union, the business manager of the new Group I status local union shall by electronic means notify the business manager of the applicant's former Group I status local union.

**GROUP II** All applicants for employment who have four or more years experience in the trade and who have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee.

**GROUP III** All applicants for employment who have two or more years experience in the trade are residents of the geographical area constituting the normal construction labor market and who have been employed in the trade for at least six months in the last three years in the geographical area covered by the collective bargaining agreement.

**GROUP IV** All applicants for employment who have worked at the trade for more than one year.

**SECTION 4.06** If the registration list is exhausted and the Local Union is unable to refer applicants for employment to the Employer within forty-eight (48) hours from the time of receiving the Employer's request, Saturdays, Sundays, and Holidays excepted, the Employer shall be free to secure applicants

without using the Referral Procedure, but such applicants, if hired, shall have the status of "Temporary Employees."

**SECTION 4.07** The Employer shall notify the Business Manager promptly of the names and Social Security numbers of such "Temporary Employees" and shall replace such "Temporary Employees" as soon as registered applicants for employment are available under the Referral Procedure.

**SECTION 4.08** "Normal construction labor market" is defined to mean the following geographical area plus the commuting distance adjacent hereto which includes the area from which the normal labor market is secured:

SAN LUIS OBISPO COUNTY, CALIFORNIA

The above geographical area is agreed upon by the parties to include the areas defined by the Secretary of Labor to be the appropriate prevailing wage areas under the Davis-Bacon Act to which this Agreement applies.

**SECTION 4.09** "Resident" means a person who has maintained his permanent home in the above-defined geographical area for a period of not less than one year or who, having had a permanent home in this area, has temporarily left with the intention of returning to this area as his permanent home.

**SECTION 4.10** An "examination" shall include experience rating tests if such examinations shall have been given prior to the date of this procedure, but from and after the date of this procedure, shall include only written and/or practical examinations given by a duly constituted Inside Construction Local Union of the I.B.E.W.  Reasonable intervals of time for examinations are specified as ninety days.  An applicant shall be eligible for examination if he has had four years experience in the trade.

**SECTION 4.11** The Union shall maintain an "Out of Work List" which shall list the applicants within each Group in chronological order of the dates they register their availability for employment.

**SECTION 4.13** An applicant who is hired and who receives, through no fault of his own, work of forty (40) hours or less shall, upon re-registration, be restored to his appropriate place within his Group.

**SECTION 4.14(a).** Employers shall advise Business Manager of the Local Union of the number of applicants needed.  The Business Manager shall refer applicants to the Employer by first referring applicants in Group I in the order of their place on the "Out of Work List" and then referring applicants in the same manner successively from the "Out of Work List" in Group II, then Group III, and then Group IV. Any applicant who is rejected by the Employer shall be returned to his appropriate place within his Group and shall be referred to other employment in accordance with the position of his Group and his place within his Group.

**SECTION 4.14(b).**  An applicant who is discharged for cause two times within a 12-month period shall be referred to the neutral member of the Appeals Committee for a determination as to the applicant's continued eligibility for referral.  The neutral member of the Appeals Committee shall, within three business days, review the qualifications of the applicant and the reasons for the discharges.  The neutral member of the Appeals Committee may, in his or her sole discretion: (1) require the applicant to obtain further training from the JATC before again being eligible for referral; (2) disqualify the applicant for referral for a period of four weeks, or longer, depending on the seriousness of the conduct and/or repetitive nature of the conduct; (3) refer the applicant to an employee assistance program, if available, for evaluation and recommended action; or (4) restore the applicant to his/her appropriate place on the referral list.

**SECTION 4.15** The only exception which shall be allowed in this order of referral is as follows:
(a). When the Employer states bona fide requirements for special skills and abilities in his request for applicants, the Business Manager shall refer the first applicant on the register possessing such skills and abilities.

(b). The age ratio clause in the Agreement calls for the employment of an additional employee or employees on the basis of age. Therefore, the Business Manager shall refer the first applicant on the register satisfying the applicable age requirements provided, however, that all names in higher priority Groups, if any, shall first be exhausted before such overage reference can be made.

**SECTION 4.16** An Appeals Committee is hereby established composed of one member appointed by the Union, one member appointed by the Employer or by the Association, as the case may be, and a Public Member appointed by both these members.

**SECTION 4.17** It shall be the function of the Appeals Committee to consider any complaint of any Employee or applicant for employment arising out of the administration by the Local Union of Section 4.04 through 4.14 of this Agreement. The Appeals Committee shall have the power to make a final and binding decision on any such complaint which shall be complied with by the Local Union.

The Appeals Committee is authorized to issue procedural rules for the conduct of its business, but it is not authorized to add to, subtract from, or modify any of the provisions of this Agreement and its decisions shall be in accordance with Agreement.

**SECTION 4.18** A representative of the Employer or of the Association, as the case may be, designated to the Union in writing, shall be permitted to inspect the Referral Procedure records at any time during normal business hours.

**SECTION 4.19** A copy of the Referral Procedure set forth in this Agreement shall be posted on the Bulletin Board in the offices of the Local Union and in the offices of the Employers who are parties to this Agreement.

**SECTION 4.20** Apprentices shall be hired and transferred in accordance with the Apprenticeship Provisions of the Agreement between the parties.

## ARTICLE V

## APPRENTICESHIP AND TRAINING

**SECTION 5.01** There shall be a local Joint Apprenticeship and Training Committee (JATC) consisting of a total of either 6 or 8 members who shall also serve as Trustees to the local apprenticeship and training trust. An equal number of members (either 3 or 4) shall be appointed, in writing, by the local chapter of the National Electrical Contractors Association (NECA) and the local union of the International Brotherhood of Electrical Workers (IBEW).

The local apprenticeship standards shall be in conformance with national guideline standards and industry policies to ensure that each apprentice has satisfactorily completed the NJATC required hours and course of study. All apprenticeship standards shall be registered with the NJATC before being submitted to the appropriate registration agency.

The JATC shall be responsible for the training of apprentices, journeymen, installers, technicians, and all others (unindentured, intermediate journeymen, etc.).

**SECTION 5.02** All JATC member appointments, reappointments and acceptance of appointments shall be in writing. Each member shall be appointed for a three (3) year term, unless being appointed for a lesser period of time to complete an unexpired term. The terms shall be staggered, with one (1) term from each side expiring each year. JATC members shall complete their appointed term unless removed for cause by the party they represent or they voluntarily resign. All vacancies shall be filled immediately.

The JATC shall select from its membership, but not both from the same party, a Chairman and a Secretary who shall retain voting privileges. The JATC will maintain one (1) set of minutes for the JATC committee meetings and a separate set of minutes for Trust meetings.

The JATC should meet on a monthly basis, and also upon the call of the Chairman.

**SECTION 5.03** Any issue concerning an apprentice or an apprenticeship matter shall be referred to the JATC for its review, evaluation, and resolve; as per standards and policies. If the JATC deadlocks on any issue, the matter shall be referred to the Labor-Management Committee for resolution as outlined in Article I of this Agreement; except for trust fund matters, which shall be resolved as stipulated in the local trust fund instrument.

**SECTION 5.04** There shall be only one (1) JATC and one (1) local apprenticeship and training trust. The JATC may, however, establish joint subcommittees to meet specific needs, such as residential or telecommunication apprenticeship. The JATC may also establish a subcommittee to oversee an apprenticeship program within a specified area of the jurisdiction covered by this Agreement.

All subcommittee members shall be appointed, in writing, by the party they represent. A subcommittee member may or may not be a member of the JATC.

**SECTION 5.05** The JATC may select and employ a part-time or a full-time Training Director and other support staff, as it deems necessary. In considering the qualifications, duties, and responsibilities of the Training Director, the JATC should review the Training Director's Job Description provided by the NJATC. All employees of the JATC shall serve at the pleasure and discretion of the JATC.

**SECTION 5.06** To help insure diversity of training, provide reasonable continuous employment opportunities, and comply with apprenticeship rules and regulations, the JATC, as the program sponsor, shall have full authority for issuing all job training assignments and for transferring apprentices from one employer to another. The employer shall cooperate in providing apprentices with needed work

experiences. The local union referral office shall be notified, in writing, of all job training assignments. If the employer is unable to provide reasonable continuous employment for apprentices, the JATC is to be so notified.

**SECTION 5.07** All apprentices shall enter the program through the JATC as provided for in the registered apprenticeship standards and selection procedures.

An apprentice may have their indenture canceled by the JATC at any time prior to completion as stipulated in the registered standards. Time worked and accumulated in apprenticeship shall not be considered for local union referral purposes until the apprentice has satisfied all conditions of apprenticeship. Individuals terminated from apprenticeship shall not be assigned to any job in any classification, or participate in any related training, unless they are reinstated in apprenticeship as per the standards, or they qualify through means other than apprenticeship, at some time in the future, but no sooner that two years after their class has completed apprenticeship, and they have gained related knowledge and job skills to warrant such classification.

**SECTION 5.08** The JATC shall select and indenture a sufficient number of apprentices to meet local manpower needs. The JATC is authorized to indenture the number of apprentices necessary to meet the job site ratio as per Section 5.12.

**SECTION 5.09** Though the JATC cannot guarantee any number of apprentices; if a qualified employer requests an apprentice, the JATC shall make every effort to honor the request. If unable to fill the request within ten (10) working days, the JATC shall select and indenture the next available person from the active list of qualified applicants. An active list of qualified applicants shall be maintained by the JATC as per the selection procedures.

**SECTION 5.10** To accommodate short-term needs when apprentices are unavailable, the JATC shall assign unindentured workers who meet basic qualification for apprenticeship. Unindentured workers shall not remain employed if apprentices become available for OJT assignment. Unindentured workers shall be used to meet site ratios except on wage and hour (prevailing wage) job sites.

Before being employed, the unindentured person must sign a letter of understanding with the JATC and the employer - agreeing that they are not to accumulate more than two thousand (2,000) hours as an unindentured, that they are subject to replacement by indentured apprentices and that they are not to work on wage and hour (prevailing wage) job sites.

Should an unindentured worker be selected for apprenticeship, the JATC will determine, as provided for in the apprenticeship standards, if some credit hours worked as an unindentured will be applied toward the minimum OJT hours of apprenticeship.

The JATC may elect to offer voluntary related training to unindentured; such as Math Review, English, Safety, Orientation/Awareness, and Introduction to OSHA, First-Aid and CPR. Participation shall be voluntary.

**SECTION 5.11** The employer shall contribute to the local health and welfare plans and to the National Electrical Benefit Fund (NEBF) on behalf of all apprentices and unindentured. Contributions to other benefit plans may be addressed in other sections of this agreement.

**SECTION 5.12** Each job site shall be allowed a ratio of two (2) apprentices for every three (3) Journeyman Wiremen (man).

| Number of Journeymen | Maximum Number of Apprentices/Unindentured |
|---|---|
| 1 to 3 | 2 |
| 4 to 6 | 4 |
| etc. | etc. |

The first person assigned to any job site shall be a Journeyman Wireman.

A job site is considered to be the physical location where employees report for their work assignments. The employer's shop (service center) is considered to be a separate, single job site. All other physical locations where workers report for work are each considered to be a single, separate job site.

**SECTION 5.13** An apprentice is to be under the supervision of a Journeyman Wireman at all times. This does not imply that the apprentice must always be in sight of a Journeyman. Journeymen are not required to constantly watch the apprentice. Supervision will not be of a nature that prevents the development of responsibility and initiative. Work may be laid out by the employer's designated supervisor or journeyman based on their evaluation of the apprentice's skills and ability to perform the job tasks. Apprentices shall be permitted to perform job tasks in order to develop job skills and trade competencies. Journeymen are permitted to leave the immediate work area without being accompanied by the apprentice.

Apprentices who have satisfactorily completed the first four years of related classroom training using the NJATC curriculum and accumulated a minimum of 6500 hours of OJT with satisfactory performance shall be permitted to work alone on any job site and receive work assignments in the same manner as a Journeyman Wireman. An apprentice shall not be the first person assigned to a job site and apprentices shall not supervise the work of others.

**SECTION 5.14** Upon satisfactory completion of apprenticeship, the JATC shall issue all graduating apprentices an appropriate diploma from the NJATC. The JATC shall encourage each graduating apprentice to apply for college credit through the NJATC. The JATC may also require each apprentice to acquire any electrical license required for journeymen to work in the jurisdiction covered by this agreement.

**SECTION 5.15** The parties to the Agreement shall be bound by the Local Joint Apprenticeship and Training Trust Fund Agreement which shall conform to Section 302 of the Labor Management Relations Act of 1947 as amended, ERISA, and other applicable regulations.

The Trustees authorized under this Trust Agreement are hereby empowered to determine the reasonable value of any facilities, materials or services furnished by either party. All funds shall be handled and disbursed in accordance with the Trust Agreement.

**SECTION 5.16** All Employers subject to the terms of this agreement shall contribute the amount of funds specified by the party's signatory to the local apprenticeship and training trust agreement. The current rate is referenced in Section 3.05. This sum shall be due the Trust Fund by the same date as their payment to the NEBF under the terms of the Restated Employees Benefit Agreement and Trust.

## ARTICLE VI

### FRINGE BENEFITS AND DEDUCTIONS

**SECTION 6.01**   It is agreed that in accord with the Employees Benefit Agreement of the National Electrical Benefit Fund ("NEBF"), as entered into between the National Electrical Contractors Association and the International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the NEBF, the individual Employer will forward monthly to the NEBF's designated local collection agent an amount equal to 3% of his gross monthly labor payroll paid to, or accrued by, the employees in this bargaining unit, and a completed payroll report prescribed by the NEBF.  The payment shall be made by check or draft and shall constitute a debt due and owing to the NEBF on the last day of each calendar month, which may be recovered by suit initiated by the NEBF or its assignee.  The payment and the payroll report shall be mailed to reach the office of the appropriate local collection agent not later than fifteen (15) calendar days following the end of each calendar month.

The individual Employer hereby accepts, and agrees to be bound by, the Restated Employees Benefit Agreement and Trust.

An individual Employer who fails to remit as provided above shall be additionally subject to having his agreement terminated upon seventy-two (72) hours notice, in writing, being served by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been paid to the local collection agent.

The failure of an individual Employer to comply with the applicable provisions of the Restated Employees Benefit Agreement and Trust shall also constitute a breach of this labor agreement.

**SECTION 6.02** The individual Employer shall contribute and forward monthly to the Local Union Health & Welfare Trust Fund a contribution amount as specified in Article III, Section 3.05 per hour paid.  Travel time hours, over time hours, high time hours, hazardous hours, and bonus differentials shall also be calculated and paid as additional hours worked.  The payment and payroll report shall be mailed to reach the Trustees or their designated agent not later than fifteen (15) calendar days following the end of each calendar month.

All Contractors signatory to this Agreement shall be bound by the terms and conditions of the Electrical Workers Area Long Term Disability Trust Plan.

**SECTION 6.03** San Luis Obispo County Electrical Joint Apprenticeship and Training Fund:  Employer contribution equal to the amount specified in Article III, Section 3.05 per hour paid.

The payment and payroll report shall be mailed to reach the Trustees or their designated agent not later than fifteen (15) calendar days following the end of each calendar month.

**SECTION 6.04** The individual Employer shall contribute and forward monthly to the Central California IBEW-NECA Pension Trust Fund a contribution as specified in Article III, Section 3.05 per hour paid. (Overtime hours and bonus differentials shall also be calculated and paid as additional hours worked). The payment and payroll report shall be mailed to reach the Trustees or their designated agent not later than fifteen (15) calendar days following the end of each calendar month.

**SECTION 6.05** The individual Employer shall contribute and forward monthly to the San Luis Obispo Labor Management Cooperative Fund a contribution amount as specified in Article III, Section 3.05 per hours paid.  The payment and payroll report shall be mailed to reach the Trustees or their designated agent not later than fifteen (15) calendar days following the end of each calendar month.

**SECTION 6.06** The Employer shall make all legal payroll withholdings for Income Tax, Social Security, Unemployment Insurance, etc., from the total wages.

23

A.  The monthly transmittal shall cover every Employee subject to this Agreement on the payroll for all payroll weeks ending within the calendar month.

B.  On the monthly transmittal form as provided form in Article IV, the following information concerning each Employee shall be set forth in separate columns:  (1) Social Security Number, (2) Name of Employee, (3) the number of hours worked, and (4) the gross earnings. The total of these amounts shall be given together with the check number and date of payment.

C.  The employer agrees to be bound by all the terms and conditions of the Agreement and the Declaration of Trust of the following Trusts:  Health and Welfare, Electrical Apprentice and Manpower Training Fund, National Electrical Benefit Fund, and Central California IBEW-NECA Pension Trust Fund, and agrees further to be bound by all of the obligations imposed there under and any modifications or changes therein.

**SECTION 6.07**  Individual Employers who fail to remit as provided for in Sections 6.02, 6.03, 6.04, 6.05, and 6.06 shall be additionally subject to having this Agreement terminated upon seventy-two (72) hours notice, in writing, being served by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been made.

**SECTION 6.08**

A.  Failure of an individual Employer to comply with the provisions of Sections 6.02, 6.03, 6.04, 6.05, 6.06 and 6.07 shall also constitute a breach of this Labor Agreement.  As a remedy for such a violation, the Labor-Management Committee and/or the Council on Industrial Relations for the Electrical Contracting Industry, as the case may be, are empowered, at the request of the Union, to require an Employer to pay into the affected Joint Trust Funds established under this Agreement any delinquent contributions to such funds which have resulted from the violation.

B.  If, as a result of violations of this Section, it is necessary for the Union and/or Trustees of the Joint Trust Funds to institute court action to enforce an award rendered in accordance with subsection A, above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants and attorneys fees incurred by the Union and/or fund Trustees, plus the cost of the litigation, which have resulted from the bringing of such court action.

C.  All payments required by Article V, Section 5.11 and 5.16, and Article VI, Sections 6.02, 6.03, 6.04, 6.05, and 6.06 shall be forwarded to the depository not later than the fifteenth (15th) day of the following month.  If these payments and reports are not mailed to the depository by the 20th day of the following month, liquidated damages equal to 10% of the amount owed will become immediately due and owing.  If suit is brought to collect said unpaid contributions, liquidated damages equal to 20% of the amount owed will immediately become due and owing.

**SECTION 6.09**

The Employer agrees to deduct and transmit to IBEW-COPE an amount of five cents ($0.05) per hour from the wages of each Employee who voluntarily authorizes such contributions on the forms provided for that purpose by IBEW-COPE.  These transmittals shall occur monthly and shall be accompanied by a list of names of those Employees for whom such deductions have been made and the amount deducted for each such Employee.

24

## ARTICLE VII

### NATIONAL ELECTRICAL INDUSTRY FUND (NEIF)

**SECTION 7.01** Each individual Employer shall contribute an amount not to exceed one percent (1%) nor less than .2 of 1% of the productive electrical payroll, as determined by each local Chapter and approved by the Trustees, with the following exclusions:

  A.   Twenty-five percent (25%) of all productive electrical payroll in excess of 75,000 man-hours paid for electrical work in any one Chapter area during any one calendar year, but not exceeding 150,000 man-hours.

  B.   One hundred percent (100%) of all productive electrical payroll in excess of 150,000 man-hours paid for electrical work in any one Chapter area during any one calendar year.

(Productive electrical payroll is defined as the total wages, including overtime, paid with respect to all hours worked by all classes of electrical labor for which a wage is established in the prevailing labor area where the business is transacted.)

Payment shall be forwarded monthly to the National Electrical Industry Fund in a form and manner prescribed by the Trustees no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. Failure to do so will be considered a breach of this Agreement on the part of the individual Employer.

## ARTICLE VIII

### SAFETY

**SECTION 8.01** There shall be a Joint Safety Committee consisting of three members representing the Employer and three members representing the Union. The duties of this Committee shall be to develop and recommend safe work rules that are equal to or greater than the Standards of Construction as established by the Occupational Safety and Health Act of 1970, or other applicable Federal or State laws. Such rules, and other safety rules provided in the Article, are minimum rules and not intended to imply that the Union objects to the establishment and imposition by the Employers of additional or more stringent safety rules to protect the health and safety of the Employees.

**SECTION 8.02** It shall also be a function of this Committee to study these safe work rules and recommend their update to the parties to this Agreement for possible inclusion in this Agreement. This Committee shall meet at least once each quarter and also when called by the Chairman or when called by a majority of the current Committee members.

**SECTION 8.03** Members of the Joint Safety Committee shall be selected by the party they represent. Their term of office shall be three (3) years unless removed by the party they represent. The term of one (1) Employer and one (1) Union representative shall expire each year with successors to be determined in the same manner as the original appointments were made. A Committee member is eligible to succeed himself.

**SECTION 8.04** Two (2) Journeymen shall work together on all energized circuits of 440 volts AC or 250 volts DC, or respective higher voltages. Journeymen shall be used in assisting a Journeyman Wireman while splicing cable.

**SECTION 8.05** Journeyman Wireman, while splicing cable shall not be required to work on wires or cables when the difference in potentials is over 240 volts between any two conductors or between any

conductor and ground, unless assisted by one (1) Journeyman.  In no case shall Journeyman Wiremen, while splicing, be required to work on energized cables carrying in excess of 480-volt circuits.

SECTION 8.06  No Employees shall be compelled to use a powder-actuated tool.  Only qualified Employees shall be permitted to use powder-actuated tools.

SECTION 8.07  The Employer shall furnish hard hats when such are required and shall also furnish proper individual protective gear to workmen engaged in burning and welding operations.

SECTION 8.08  The safe practices that are in effect on utility company property which are more stringent than those in this Agreement shall apply to work which is performed on that property under the terms of this Agreement.

SECTION 8.09  It is the Employer's exclusive responsibility to ensure the safety of its Employees and their compliance with these safety rules and standards.

SECTION 8.10  Adequate safety and protective devices shall be supplied workmen by the Employer on all hazardous work in accord with the Safety Orders of the Industrial Accident Commission and the rules of the Union.  They shall also observe instructions of the Employer in matters of safety, provided such instructions are not in conflict with safety orders of the Industrial Accident Commission as recognized practices in the Trade.

Contractors shall furnish the Local Union Business Manager a copy of each accident report made to the Compensation Insurance Carrier as a result of injury to any workman employed under the terms of the Agreement.  In the event of a fatal injury, the Employer shall immediately inform the Local Business Manager by telephone and all available information shall be given to him.

The Employer shall be responsible for furnishing First Aid Kits, sanitary facilities, and drinking water on all jobs.

The Steward shall support the Employer's Safety Procedures.

## ARTICLE IX

## LOCAL LABOR-MANAGEMENT COOPERATIVE COMMITTEE (LMCC)

SECTION 9.01  The parties agree to participate in a Labor Management Cooperation Fund under the authority of Section 6(b) of the Labor Management Cooperative Act of 1978, 29 U.S.C. §175(a) and Section 302(c)(9) of the Labor Management Relations Act, 29 U.S.C. §186(c)(9).  The purposes of this Fund shall include the following:

1. to improve communications between representatives of Labor and Management;

2. to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness;

3. to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

4. to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;

5. to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and industry;

6.   to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production;

7.   to engage in public education and other programs to expand the economic development of the electrical construction industry;

8.   to enhance the involvement of workers in making decisions that affect their working lives; and,

9.   to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

**SECTION 9.02** The Fund shall function in accordance with, and as provided in, it's Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents. Each Employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the LMCC, as provided in said Agreement and Declaration of Trust.

**SECTION 9.03** Each employer shall contribute the amount as specified in Article III, Section 3.05 per hour paid under the Agreement on a monthly basis. Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. The California Central Coast Chapter, NECA, or its designee, shall be the collection agent for this fund.

**SECTION 9.04** If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance. In the event the Employer is in default, the Employer shall be liable for a sum equal to 15% of the delinquent payment, but not less than the sum of twenty dollars ($20), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments. Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid. The Employer shall also be liable for all costs of collecting the payment together with attorneys' fees.

## ARTICLE X

## NATIONAL LABOR-MANAGEMENT COOPERATIVE COMMITTEE (NLMCC)

**SECTION 10.01**   The parties agree to participate in the NECA-IBEW National Labor-Management Cooperation Fund, under authority of Section 6(b) of the Labor Management Cooperation Act of 1978, 29 U.S.C. §175(a) and Section 302(c)(9) of the Labor Management Relations Act, 29 U.S.C. §186(c)(9). The purposes of this Fund include the following:

1.   to improve communication between representatives of labor and management;

2.   to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organization effectiveness;

3.   to assist worker and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

4.   to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;

5.  to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and the industry;

6.  to encourage and support the initiation and operation of similarly constituted local labor-management cooperation committees;

7.  to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations and new methods of improved production;

8.  to engage in public education and other programs to expand the economic development of the electrical construction industry;

9.  to enhance the involvement of workers in making decisions that affect their working lives; and

10. to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

**SECTION 10.02** The Fund shall function in accordance with, and as provided in, it's Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents. Each employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the NLMCC, as provided in said Agreement and Declaration of Trust.

**SECTION 10.03** Each employer shall contribute one cent ($0.01) per hour worked under this Agreement up to a maximum of 150,000 hours per year. Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which labor was performed. The California Central Coast Chapter, NECA, or its designee, shall be the collection agent for this fund.

**SECTION 10.04** If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance. In the event the Employer is in default, the Employer shall be liable for a sum equal to fifteen percent (15%) of the delinquent payment, but not less than the sum of twenty dollars ($20.00), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments. Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid. The Employer shall also be liable for all costs of collecting the payment together with attorney's fees.

**SECTION 10.05** The one cent ($0.01) per hour contribution for the National LMCC is to be paid from the local LMCC Fund. There will be no increase in the wage/fringe benefit package for this contribution.

## ARTICLE XI

## SUBSTANCE ABUSE

**SECTION 11.01**

The dangers and costs that alcohol and other chemical abuses can create in the electrical contracting industry in terms of safety and productivity are significant.  The parties to this Agreement resolve to combat chemical abuse in any form and agree that, to be effective, programs to eliminate substance abuse and impairment should contain a strong rehabilitation component.  The local parties recognize that the implementation of a drug and alcohol policy and program must be subject to all applicable federal, state, and local laws and regulations.  Such policies and programs must also be administered in accordance with accepted scientific principles, and must incorporate procedural safeguards to ensure fairness in application and protection of legitimate interests of privacy and confidentiality.  To provide a drug-free workforce for the Electrical Construction Industry, each IBEW local union and NECA chapter shall implement an area-wide Substance Abuse Testing Policy.  The policy shall include minimum standards as required by the IBEW and NECA.  Should any of the required minimum standards fail to comply with federal, state, and/or local laws and regulations, they shall be modified by the local union and chapter to meet the requirements of those laws and regulations.

## ARTICLE XII

## CODE OF EXCELLENCE

**SECTION 12.01**

The parties to this Agreement recognize that to meet the needs of our customers, both employer and employee must meet the highest levels of performance, professionalism and productivity.  The Code of Excellence has proven to be a vital element in meeting the customer's expectations.  Therefore each IBEW local union and NECA chapter shall implement a Code of Excellence Program.  The program shall include minimum standards as designed by the IBEW and NECA.

## ARTICLE XIII

## ADMINISTRATIVE MAINTENANCE FUND

**SECTION 13.01** All employers signatory to this labor agreement with the California Central Coast Chapter, NECA designated as their collective bargaining agent shall contribute the amount specified in Article III, Section 3.05 for each hour paid by each employee covered by this labor agreement to the Administrative Maintenance Fund.  The moneys are for the purpose of administration of the collective bargaining agreement, grievance handling, and all other management duties and responsibilities of this agreement.  The fund is to be administered solely by the Chapter.  Enforcement for delinquent payments to the fund shall be the sole responsibility of the fund or the Chapter and not the Local Union.  No part of the funds collected under this trust shall be used for any purpose which is held to be in conflict with the interests of the International Brotherhood of Electrical Workers and its local unions.

## SEPARABILITY CLAUSE

Should any provision of the Agreement be declared illegal by any court of competent jurisdiction, such provisions shall immediately become null and void, leaving the remainder of the Agreement in full force and effect and the parties shall, thereupon, seek to negotiate substitute provisions which are in conformity with the applicable laws.

## GENDER LANGUAGE

Whenever the male gender is used in this Agreement, the female gender is also intended.

**SUBJECT TO THE APPROVAL OF THE INTERNATIONAL PRESIDENT, IBEW.**

Signed:
Title:      JON R. TREDER, CHAIRMAN
SAN LUIS OBISPO DIVISION, CALIFORNIA CENTRAL COAST CHAPTER
NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION

Signed:
Title:      JERRI L. CHAMPLIN, CHAPTER MANAGER
SAN LUIS OBISPO DIVISION, CALIFORNIA CENTRAL COAST CHAPTER
NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION

Signed:
Title:      DAN MILLER, PRESIDENT
LOCAL UNION 639, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

Signed:
Title:      HANK LEWIS, BUSINESS MANAGER
LOCAL UNION 639, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

APPROVED
INTERNATIONAL OFFICE - I. B. E. W.

JUN 1 7 2009

Edwin D. Hill, President
This approval does not make the
International a party to this agreement.

Exhibit 2

# INSIDE AGREEMENT

## Between

## LOCAL UNION 639

## of the

## INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, SAN LUIS OBISPO, CALIFORNIA

## and

## CALIFORNIA CENTRAL COAST CHAPTER

## NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION

## AMENDED JUNE 1, 2012

CSI 0056

## TABLE OF CONTENTS

| ARTICLE | | SECTION | PAGE | CATEGORY |
|---|---|---|---|---|
| **ASSENT LANGUAGE** | | | 1 | Category 1 |
| **ARTICLE I** | | | | |
| | CIR Language | 1.01-1.10 | 1 | Category 1 |
| **ARTICLE II** | | | | |
| | Employer Qualifications | 2.01 | 3 | |
| | Management Rights Clause | 2.02 | 3 | Category 1 |
| | Foreman Call Out | 2.03 | 3 | |
| | Workers' Compensation | 2.04 | 3 | |
| | Surety Bond | 2.05 | 3 | |
| | Joint Venture Clause | 2.06 | 4 | |
| | Favored Nations Clause | 2.07 | 4 | Category 1 |
| | Recognition | 2.08 | 4 | |
| | Work Preservation | 2.09 | 4 | Category 2 |
| | Traveling Employer | 2.10 | 5 | Category 1 |
| | Working Member | 2.11 | 5 | |
| | Transfer of Employees | 2.12 | 5 | |
| | Employee Contractor | 2.13 | 5 | |
| | Workmanship | 2.14 | 5 | |
| | Improper Workmanship | 2.15 | 5 | |
| | Appointment of Steward | 2.16 | 6 | |
| | Union Right to Discipline Members | 2.17 | 6 | |
| | Access to Job or Shop | 2.18 | 6 | |
| | Picket Language | 2.19 | 6 | |
| | Proper Tools | 2.20 | 6 | |
| | Tool List | 2.21 | 7 | |
| | Storage of Tools | 2.22 | 7 | |
| | Union Label | 2.23 | 8 | |
| | Union Security | 2.24 | 8 | |
| | Annulment Subcontract Clause | 2.25 | 8 | Category 1 |
| | Union Recognition/Authorization | 2.26 | 8 | |
| | JW Training | 2.27 | 8 | |
| **ARTICLE III** | | | | |
| | Hours (Workday/Workweek) | 3.01 | 9 | |
| | Overtime and Penalty Clauses | 3.02 | 9 | |
| | Labor Day | 3.03 | 9 | |
| | Wages Withheld | 3.04 | 9 | |
| | Classifications/Wages/Fringes | 3.05 | 10 | Category 1 |
| | Union Working Dues Deduction | 3.06 | 11 | Category 2 |
| | Higher Classification | 3.07 | 11 | |
| | High Time and Hazard Area | 3.08 | 11 | |
| | Cable Splicing | 3.09 | 12 | |
| | Weather Conditions | 3.10 | 12 | |
| | Bomb Threats | 3.11 | 12 | |
| | Work Outside Jurisdiction | 3.12 | 12 | |
| | Shift Work | 3.13 | 12 | Category 1 |
| | Tools and Materials | 3.14 | 13 | |
| | Radioactive Materials and Exposure | 3.15 | 13 | |
| | Scope of Work | 3.16 | 13 | |
| | Cutting and Threading | 3.17 | 13 | |

CSI 0057

|  | | | | |
|---|---|---|---|---|
| Ratio of Foreman to Journeymen | | 3.18 | 14 | |
| Travel | | 3.19 | 14 | |
| Overtime Scope | | 3.20 | 15 | |
| Rebates of Wages | | 3.21 | 15 | |
| Underground Work | | 3.22 | 15 | |
| Tunnels | | 3.23 | 15 | |
| Off Shore Work | | 3.24 | 16 | |
| Make up Time | | 3.25 | 16 | |
| **ARTICLE IV** | | | | |
| Referral Procedures | | 4.01-4.20 | 17 | Category 1 |
| **ARTICLE V** | | | | |
| Apprenticeship Training | | 5.01-5.16 | 20 | Category 1 |
| **ARTICLE VI** | | | | |
| NEBF (Monthly) | | 6.01 | 23 | Category 1 |
| Health and Welfare | | 6.02 | 23 | |
| Apprenticeship | | 6.03 | 23 | |
| Pension | | 6.04 | 23 | |
| Labor Management Fund | | 6.05 | 23 | |
| Withholdings | | 6.06 | 23 | |
| Termination | | 6.07 | 24 | |
| Fringe Benefit Remedies | | 6.08 | 24 | |
| COPE | | 6.09 | 24 | |
| **ARTICLE VII** | | | | |
| National Electrical Industry Fund (NEIF) | | 7.01 | 25 | Category 1 |
| **ARTICLE VIII** | | | | |
| Safety | | 8.01-8.10 | 25 | |
| **ARTICLE IX** | | | | |
| SLO Labor Management Coop Fund | | 9.01-9.04 | 26 | Category 1 |
| **ARTICLE X** | | | | |
| National Labor Management Coop Fund | | 10.01-10.05 | 27 | Category 1 |
| **ARTICLE XI** | | | | Category 1 |
| Substance Abuse | | 11.01 | 29 | |
| **ARTICLE XII** | | | | |
| Code of Excellence | | 12.01 | 29 | Category 1 |
| **ARTICLE XIII** | | | | |
| Administrative Maintenance Fund | | 13.01 | 29 | |
| **SEPARABILITY CLAUSE** | | | 30 | Category 1 |
| **SIGNATURE PAGE** | | | 30 | |

CSI 0058

## INSIDE AGREEMENT

Agreement by and between the San Luis Obispo Division of the California Central Coast Chapter, National Electrical Contractors Association, Inc., and Local Union No. 639, International Brotherhood of Electrical Workers.

It shall apply to all firms who sign a Letter of Assent to be bound by the terms of this agreement.

As used hereinafter in the Agreement, the term "Chapter" shall mean the California Central Coast Chapter, National Electrical Contractors Association and the term "Union" shall mean Local Union No. 639, International Brotherhood of Electrical Workers.

The term "Employer" shall mean an individual firm who has been recognized by an Assent to this Agreement.

## BASIC PRINCIPLES

The Employer and the Union have a common and sympathetic interest in the Electrical Industry. Therefore, a working system and harmonious relations are necessary to improve the relationship between the Employer, the Union, and the Public.  Progress in Industry demands a mutuality of confidence between the Employer and the Union.  All will benefit by continuous peace and by adjusting any differences by rational, common sense methods.  Now, therefore, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I

### EFFECTIVE DATE – CHANGES – GRIEVANCES – DISPUTES

**SECTION 1.01** This agreement shall take effect June 1, 2012 and shall remain in effect until May 31, 2015, unless otherwise specifically provided for herein.  It shall continue in effect from year to year thereafter, from June 1 through May 31 of each year, unless changed or terminated in the way later provided herein.

**SECTION 1.02**

    A.  Either party or an Employer withdrawing representation from the Chapter or not represented by the Chapter, desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of the Agreement of any anniversary date occurring thereafter.

    B.  Whenever notice is given for changes, the nature of the changes desired must be specified in the notice, or no later than the first negotiating meeting unless mutually agreed otherwise.

    C.  The existing provisions of the Agreement, including this Article, shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

    D.  Unresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement that remain on the 20th of month preceding the next regular meeting of the Council on Industrial Relations may be submitted jointly or unilaterally to the Council for adjudication.  Such unresolved issues of disputes shall be submitted not later than the next regular meeting of the Council following the expiration date of this agreement or any subsequent anniversary date.  The Council's decision shall be final and binding.

1

CSI 0059

E.   When a case has been submitted to the Council, it shall be the responsibility of the Negotiating Committee to continue to meet weekly in an effort to reach a settlement on the local level prior to the meeting of the Council.

F.   Notice by either party of a desire to terminate this Agreement shall be handled in the same manner as a proposed change.

**SECTION 1.03** This agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto.  Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, the same as this Agreement.

**SECTION 1.04** There shall be no stoppage of work by strike or lockout because of any proposed changes in this Agreement or dispute over matters relating to this Agreement.  All such matters must be handled as stated herein.

**SECTION 1.05** There shall be a Labor-Management Committee of three representing the Union and three representing the Employers.  It shall meet regularly at such stated time as it may decide.  However, it shall also meet within forty-eight (48) hours when notice is given by either party.  It shall select its own Chairman and Secretary.  The Local Union shall select the Union representatives and the Chapter shall select the management representatives.

**SECTION 1.06** All grievances or questions in dispute shall be adjusted by the duly authorized representative of each of the parties to this Agreement.  In the event that these two are unable to adjust any matter within forty-eight (48) hours, they shall refer the same to the Labor-Management Committee.

**SECTION 1.07** All matters coming before the Labor-Management Committee shall be decided by a majority vote.  Four members of the Committee, two from each of the parties hereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.

**SECTION 1.08** Should the Labor-Management Committee fail to agree or to adjust any matter, such shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication.  The Council's decisions shall be final and binding.

**SECTION 1.09** When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matters arose shall not be changed or abrogated until agreement has been reached or a ruling has been made.

**SECTION 1.10** No complaint, dispute, or grievance shall be considered unless written notice is delivered by the aggrieved party to the Union and Chapter within thirty (30) consecutive days from the date on which the alleged complaint, dispute, or grievance first occurred, except in cases involving fringe benefit payments.

CSI 0060

## ARTICLE II

### EMPLOYER RIGHTS – UNION RIGHTS

**SECTION 2.01** Certain qualifications, knowledge, experience, and proof of financial responsibility are required of everyone desiring to be an Employer in the Electrical Industry. Therefore, "Employer" as used is defined to mean a person, firm, or corporation having these qualifications: A licensed Electrical Contractor maintaining a place of business for the conducting of an electrical construction and/or maintenance business with a business telephone, open to the public during normal business hours. A place of business shall mean an established location, the address of which is affixed to the Letter of Assent accompanying this Agreement, where the Employer or his representative can be reached by personal call, where he transacts his business with the public and solicits electrical work.

The Employer shall display a sign announcing the name and character of his business and shall maintain on said premises proper books, accounts, and records incidental to the conduct of said business. The Employer shall provide a place where the workmen under this Agreement may change their clothing, wash up, and store their belongings (tools and work clothes) for which the Employer is responsible. Trailers, portable buildings, or an answering service shall not meet these requirements. All Employers shall display permanent Company signs on both sides of their trucks in letters three (3) inches high.

All recognized Electrical Employers not having a place of business in San Luis Obispo shall be considered as having their temporary headquarters in the City of San Luis Obispo and they shall have the same privileges (same working conditions and wages) as Employers in the City of San Luis Obispo. This same condition shall apply to Joint Venture Contractors.

**SECTION 2.02** The Union understands the Employer is responsible to perform the work required by the owner. The Employer shall, therefore, have no restrictions except those specifically provided for in the Collective Bargaining Agreement, in planning, directing, and controlling the operation of all his work, in deciding the number and kind of Employees to properly perform the work, in hiring and laying off Employees, in transferring Employees from job to job within the Local Union's geographical jurisdiction, in determining the need and number as well as the person who will act as Foreman, in requiring all Employees to observe the Employer's and/or owner's rules and regulations not inconsistent with this Agreement, in requiring all Employees to observe all safety regulations and in discharging Employees for proper cause.

**SECTION 2.03** The Employer shall be permitted to request, by name, any applicant the Employer desires to employ as Foreman. The Union shall refer such applicant to the Employer if the applicants name appears on the referral register, provided all other eligible applicants in higher referral groups have first been referred. The Employer shall immediately, upon employment of said applicant, classify said applicant (Employee) as Foreman and pay said applicant (Employee) Foreman wages as established in this Agreement for the duration of employment.

**SECTION 2.04** For all Employees covered by this agreement, the Employer shall carry Workmen's Compensation Insurance with a company authorized to do business in the State, social security, and other such insurance as may be required by the laws of the State in which the work is performed. He shall also make voluntary contributions to the State Unemployment Compensation Commission regardless of the number of Employees.

**SECTION 2.05**

    A. Each Employer shall furnish a surety bond in the amount to secure payment of all amounts due on account of payroll and fund deduction, contribution, and reporting obligations of the Employer required by this agreement. The bond shall provide that it may not be terminated without fifteen (15) days prior written notice to the Employer and the Local Union. Any employer who has had twelve (12) months of good standing without a default in the payment

3

CSI 0061

of fringe benefits will not have to post a surety bond unless he defaults in his payments. Any defaulting Employer and all others who do not meet these requirements will have to post a surety bond as follows: Any shop or project employing zero to five (0-5) employees will have to post a $5,000.00 bond or cash; any shop or project employing five (5-10) employees will have to post a $7,500.00 bond or cash; any shop or project employing ten to fifteen (10-15) employees will have to post a $10,000.00 bond or cash; any shop or project employing fifteen to twenty (15-20) employees will have to post a $12,500.00 ...etc bond or cash for employees covered by this agreement. Any Employer required to post a bond shall maintain the bond until the Employer has established performance satisfactory to the parties, but in no case for more than twelve (12) months nor longer than the Employer employs Employees under this Agreement. Said bond shall be in a form acceptable to the parties and guarantee payment of fringe benefits provided for in this agreement.

B. The Labor-Management Committee and/or the Council on Industrial Relations, as the case may be, shall have full power to determine the amount of money due, if any, and shall direct payments of delinquent wages from the bond directly to the affected Employees and direct payments of delinquent fund contributions from the bond directly to the Trustees of the affected funds or to their designated agents.

C. It is agreed that the Union retains the right to withhold the services of its members from a contractor who fails to make timely payments to the Union's benefits plans, or fails to pay its weekly payroll, in accordance with its agreements with the Union; provided however that the Union shall give three days written notice to NECA prior to withholding the services of its members.

**SECTION 2.06** Employers engaged in joint-venture jobs shall be considered as a new and separate individual Employer, with all rights herein as apply to an individual participating Employer. There shall be no transfer of workmen between a joint-venture and any or all of the Employers comprising the joint-venture.

**SECTION 2.07** The Union agrees that if, during the life of this Agreement, it grants to any other Employer in the Electrical Contracting Industry on work covered by this Agreement, any better terms or conditions than those set forth in this Agreement, such better terms or conditions shall be made available to the Employer under this Agreement and the Union shall immediately notify the Employer of any such concession.

**SECTION 2.08**

A. The Employer recognizes the Union as the sole and exclusive representative of all its Employees performing work within the jurisdiction of the Union for the purpose of Collective Bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment.

B. The Employer understands that the Local Union's Jurisdiction, both trade and territorial, is not a subject for negotiations, but rather is determined solely within the IBEW by the International President and, therefore, agrees to recognize and be bound by such determinations.

**SECTION 2.09**

A. In order to protect and preserve, for the Employees covered by this Agreement, all work heretofore performed by them and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any on-site construction work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint-venture, wherein the Employer, through its

4

officers, directors, partners, or stockholders, exercises either directly or indirectly, management, control, or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work. All charges of violations of this Section shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

B.   As a remedy for violations of this Section, the Labor-Management Committee, the Council on Industrial Relations for the Electrical Contracting Industry, and/or an independent arbitrator, as the case may be, are empowered, in their discretion and at the request of the Union, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations; and (2) pay into the affected joint trust funds established under this Agreement any delinquent contributions to such funds which have resulted from the violations. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section; nor does it make the same or other remedies unavailable to the Union for violations of other Sections or other Articles of this Agreement.

C.   If, as a result of violations of this Section, it is necessary for the Union and/or the trustees of the joint trust funds to institute court action to enforce an award in accordance with subsection (b) above, or to defend an action which seeks to vacate such award, the Employer shall pay and accountants' and attorneys' fees incurred by the Union and/or fund trustees, plus the cost of the litigation, which have resulted from the bringing of such court action.

**SECTION 2.10** An Employer signatory to a Collective Bargaining Agreements or to a Letter of Assent to an agreement with another IBEW Local Union, who signs an assent to this Agreement, may bring up to four (4) bargaining unit employees employed in the Local Union's jurisdiction into this Local's jurisdiction and up to two (2) bargaining unit employees per job from that Local's jurisdiction to this Local's jurisdiction for specialty or service and maintenance work. All charges of violations of this section shall be considered as a dispute and shall be processed in accordance with the provisions of this agreement for the handling of grievances with the exception than any decision of a local labor-management committee that may be contrary to the intent of the parties to the National Agreement on Employee Portability, upon recommendation of either or both the appropriate IBEW International Vice President or NECA Regional Executive Director, is subject to review, modification, or rescission by the Council on Industrial Relations.

**SECTION 2.11** Only two (2) members of a firm (Employer) shall be permitted to work with the tools on work covered by this Agreement.

**SECTION 2.12** Employers shall not loan their Employees to another Employer without first securing the permission of the Business Manager.

**SECTION 2.13** No applicant or Employee while he remains subject to employment by Employers operating under this Agreement shall be recognized as a contractor for the performance of any electrical work.

**SECTION 2.14** Journeyman Wireman shall install all electrical work in a safe and workmanlike manner and in accordance with applicable code and contract specifications. When necessary to use temporary light and/or power on any foundation or building work, such temporary work shall be installed in a safe manner under the terms of this Agreement.

**SECTION 2.15** A Journeyman Wireman shall be required to make corrections on improper workmanship, for which he is responsible, on his own time and during regular working hours, unless errors were made

CSI 0063

by orders of the Employer or the Employer's representative.  Correction of workmanship to be made only after a fair investigation by the employer and the Business Manager of the Union.

If the Journeyman is no longer employed, employer may assign a Journeyman to make corrections on employer's time and during regular working hours.  The Employer may submit a "claim" to the LMCC for reimbursement of the cost of labor to make the correction. Reimbursement is to be made only after a fair investigation by the LMCC.

**SECTION 2.16** The Union shall have the right to appoint a Steward at any shop or any job where workmen are employed under the terms of this Agreement.  Such Steward shall comply with the recognized duties of a Steward.  He shall be allowed sufficient time to perform these duties during regular working hours.

Under no circumstances shall the Employer dismiss or otherwise discriminate against an Employee for making a complaint or giving evidence with respect to an alleged violation of any provision of this Agreement.

The Steward shall have the following duties:  to insure that the Agreement, IBEW Constitution, and IBEW Local Union No. 639 By-laws are adhered to; to work cooperatively with the Contractor, resolve any perceived problem by either the Employee or Employer; to insure harmonious relations between the Employer and Employees.

The Business Manager shall notify the Employer in writing of the appointment of a Steward.

Whenever an Employer wishes to layoff or discharge a Steward, he shall contact the Business Manager of the Local Union not less than forty-eight (48) hours previous to taking such action.  However, the Steward shall not be terminated except for just cause, and in such case, shall be handled as a grievance under Article I of this Agreement.

The Steward shall be allowed to work when overtime is worked when more than one (1) man works. Stewards shall be notified not less than four (4) hours in advance of all changes, layoffs, discharges, reductions in force, and referrals to the job.

**SECTION 2.17** The Union reserves the right to discipline its members for violation of its laws, rules, and agreements.

**SECTION 2.18** The Representative of the Union shall be allowed access to any shop or job at any reasonable time where workmen are employed under the terms of this Agreement.

**SECTION 2.19**

    A.  It shall not be a violation of this Agreement, and it shall not be a cause for discharge or any other disciplinary action by the Employer against any Employee, for an Employee to refuse to cross a lawfully established primary picket line, whether at the premises of another Employer or the Employee's own Employer.

    B.  Any Employee exercising such right shall carefully put away all tools, materials, equipment, or any other property of the Employer in a safe manner.  Each Employee will be responsible for any loss to the Employer for neglect in carrying out this provision, but only when a safe place is provided for by the Employer.

**SECTION 2.20** There shall be no limit on production of workmen or restriction on the safe use of proper tools or equipment and there shall not be any task or piece work.

CSI 0064

**SECTION 2.21** Journeyman shall provide themselves with the following tools:

Tool Box -- 20" x 8 ½ "x 9" minimum with lock
Pliers:
Wire Strippers
Side cutters, 8" or 9" Klein Type   Diagonal Cutters (2 allowed)   Long Nose
Combination Wrench-Set, 3/8 – 3/4   Pump (Channel Lock) (2 allowed)  Stake-On
Crescent Wrenches – 6" and 12" (one of each)
Box Wrench -- For knock-out punch set
Allen Wrenches – Small set not over 7/16"
Spin-Tite Wrench Set – Up to ½ "
Tap Wrench – Up to ¼ "
Chisels: Wood, 1" maximum, Cold ½ "maximum
Center Punch
Awl
Plumb Bob, 8 ounce
Tri-Square
Level – (1) 18" maximum
Chalk Line Box
Tin Snips – (1) 10" Airplane Shears
Knife
Rules – 30" maximum
Screwdrivers:
Stubby (2), 1 Blade and 1 Phillips   Offset (2), 1 Blade and 1 Phillips   Blade (3), 6", 8" and 12"
Phillips (2), 6" and 8"
Hacksaw Frame
Keyhole Saw
Hammer – Claw
Tester – Voltage Square "D", Knopf, or equal
Tool Pouch (Optional)
One-Piece Flashlight (1)
Current NEC Code Book
Cordless Screwdriver, Charger, and Batteries (Optional) (not a battery operated drill motor) [Note: see
  Section 2.22 for further reference]

Journeyman may provide themselves with additional personal hand tools necessary to perform the normal classification of work, not requiring the use of what are generally classified as "shop tools".

IBEW Local 639 will not tolerate the theft of any tools that are furnished by the employer and will aid the employer in recovering such items from any employee not returning company tools.

The Employer will furnish necessary locked storage to reasonably protect tools from the weather and vandalism and will replace such tools as listed above when tools are damaged on the job or stolen from the locked storage.

**SECTION 2.22** The Employer shall furnish all other necessary tools or equipment. Workmen will be held responsible for tools or equipment issued to them provided the Employer furnishes the necessary lockers, tool boxes, or other safe place of storage. Tools must be taken out and put away during work hours.

The Employer shall provide hard hats. Employees will sign out hard hats from Employers; if hard hat is lost, Employee shall be responsible for replacement.

If the Contractor provides cordless screwdriver (including charger and batteries), Employer will sign out tools; if lost or damaged, Employee shall be responsible for replacement.

7

CSI 0065

**SECTION 2.23**   The refusal by an individual Employee to install, service, or perform work on any sign, fixture, or other equipment which does not bear an IBEW Local Union Label, will not be cause for discipline or discharge of such Employee by his Employer, nor shall the Union be deemed to have breached this Agreement thereby.

**SECTION 2.24**   All Employees covered by the terms of this Agreement shall be required to become and remain members of the Union as a condition of employment from and after the eighth day following the date of their employment or the effective date of this agreement, whichever is later.

**SECTION 2.25**   The Local Union is a part of the International Brotherhood of Electrical Workers and any violation or annulment by an individual Employer of the approved Agreement of this or any other Local Union of the IBEW, other than violations of Paragraph 2 of this section, will be sufficient cause for the cancellation of his Agreement by the Local Union, after a finding has been made by the International President of the Union that such a violation or annulment has occurred.

The subletting, assigning, or transfer by an individual Employer of any work in connection with electrical work to any person, firm, or corporation not recognizing the IBEW or one of its Local Unions as the Collective Bargaining Representative of his Employees on any electrical work in the jurisdiction of this or any other Local Union to be performed at the site of the construction, alteration, painting, or repair of a building, structure, or other work, will be deemed a material breach of this Agreement.

The charges of violations of Paragraph 2 of this Section shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

**SECTION 2.26**   The Employer agrees that, if it has not previously done so, it will recognize the Union as the exclusive bargaining agent for all Employees performing electrical work within the jurisdiction of the Union on all present and future jobsites, if and when a majority of the Employer's Employees authorizes the Union to represent them in Collective Bargaining.

**SECTION 2.27**   Journeyman shall comply with the State of California requirement of 32 hours of continuing education in a three (3) year period. The employer shall not be required to pay wages and benefits for journeyman to obtain such training.

CSI 0066

## ARTICLE III

### WAGES – HOURS – WORKING CONDITIONS

**SECTION 3.01** Eight (8) hours work between the hours of 8:00 a.m. and 4:30 p.m., with thirty (30) minutes for lunch period (between Noon and 12:30 p.m.) shall constitute a workday.

By mutual agreement between the Employer and the Union, the starting and quitting time may be varied by not more than two (2) hours. Five (5) such work days, Monday through Friday inclusive, shall constitute a work week. A workman required to work during his regular lunch period shall receive the established overtime rate for lunch period and shall thereafter be allowed a reasonable opportunity to eat his lunch on the Employer's time. He shall not be required to work for more than six (6) consecutive hours without at least a thirty (30) minute lunch period on the Employer's time. A four ten-hour work day shall be permissible when mutually agreed upon between the Employer and the Union.

When time clocks, brass etc. are required by the employer, employees shall punch such time clocks, brass etc. on the employer's time.

If the Employer does not provide employment for five (5) consecutive regular working days, unless on approved leave, the Employee shall be terminated.

There shall be two (2) ten-minute (10) rest and nutrition breaks in each work day.

**SECTION 3.02** All work performed in excess of a regular eight (8) hour day, Monday through Friday, shall be paid at 1½ times the regular straight time rate of pay, and the first eight (8) hours on Saturday shall be paid at 1½ times the regular straight time rate of pay. All work performed in excess of ten (10) hours a day, Monday through Friday, and all work performed on Saturday in excess of eight (8) hours a day or on Sunday or on any of the following holidays – New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Veteran's Day, Thanksgiving Day, the day following Thanksgiving Day, Christmas Day, or days celebrated as such Holidays – shall be paid at double (2) times the regular straight time rate of pay, subject to the following exceptions: Holidays falling on Saturday will be observed the previous Friday in lieu thereof. Holidays falling on Sunday will be observed the following Monday in lieu thereof.

When workmen are called out for maintenance work outside of regular scheduled working hours, as defined in this Article, they shall be paid from the time they leave home until they return at one and one half (1½) times the regular straight time rate of pay, with a minimum of one (1) hour's time. This shall be in addition to regular, established mileage payments when the workman uses his own transportation. Sunday and legal holidays shall be paid at double (2) times the straight time rate of pay.

The above time-and-a-half (1½) clause shall not apply on the construction projects where there is a regular maintenance crew performing maintenance work on temporary facilities until after completion of said project.

**SECTION 3.03** No work shall be performed on Labor Day, except in case of emergency to save life or property. Such work shall be reported within twenty-four (24) hours to the Business Manager by men and Contractors performing work.

**SECTION 3.04** Wages shall be paid weekly in cash or by check on or before quitting time on the payday of each week. Employees may voluntarily allow for direct electronic deposit of wages on a weekly basis to the bank or credit union of the employee's choice. This manner of payment, once adopted, may not be changed except upon 30-day advance written notification between the employee and Employer with notification copied to the Union. Employees using direct electronic deposit shall receive an accounting of payroll and deductions no later than five (5) days of deposit. This option shall be voluntary on the part of the Employer and Employee".

9

In the event an Employer fails (a) to pay a worker his wages, either in the form of cash, check draft or direct electronic deposit by quitting time on pay day; (b) in the event a worker does not receive his pay on the established pay day, waiting time at the regular straight time rate of pay shall be charged until payment is made. However, waiting time shall not exceed eight (8) hours in any one twenty-four (24) hour period. When an Employee's paycheck is short by ten (10) percent or less, the Employer has until their next established pay day to correct the error in full or the previous penalty will be enforced from that next established payday.

In the event unusual circumstances cause payroll not to be met, the Labor-Management Committee shall rule.

The Employer shall pay a workman 20% of the amount of any payroll check that is returned to the bank for lack of funds, as an inconvenience payment to the Employee. This amount must be paid on or before the next regular payroll period. This shall not apply if evidence can be shown that it was not the fault of the Employer.

Any workman laid off or discharged by the Employer shall be paid for all of his wages immediately. Any workman laid off in the afternoon shall be paid the full day. Any time spent waiting for pay after 4:30 p.m. shall be charged at the straight time rate of pay per hour until payment is made. The workman shall continue working if so directed by the Employer. Any workman laid off shall have one (1) hour notice at any time in order to gather his tools and personal belongings. Any workman discharged for cause shall have sufficient time to gather his belongings, not to exceed thirty (30) minutes. Such wages shall include applicable travel time and mileage.

Any workman being terminated for any reason will be given a "termination slip" clearly setting forth the reason for termination and eligibility for rehire. Termination slips will be furnished to the employer by the union.

**SECTION 3.05** Effective June 1, 2012, the minimum rate of wages shall be as follows (fringes are not included in base rate). It is mutually agreed, upon sixty (60) days written notification to the Employer, any portion of the agreed wage settlement may be applied to any fringe benefit that exists, as stipulated by the membership of IBEW Local Union 639:

**Effective June 1, 2012**

Wages:

| | | | | | |
|---|---|---|---|---|---|
| Journeyman Wireman | | $35.70 | 1st Period Apprentice | (40%) | $14.28 |
| Foreman | 110% of JW Rate | $39.27 | 2nd Period Apprentice | (45%) | $16.07 |
| General Foreman | 120% of JW Rate | $42.84 | 3rd Period Apprentice | (55%) | $19.64 |
| JW Splicing | 110% of JW Rate | $39.27 | 4th Period Apprentice | (65%) | $23.21 |
| JW Welding | 105% of JW Rate | $37.49 | 5th Period Apprentice | (75%) | $26.78 |
| JW Welding-Certified | 110% of JW Rate | $39.27 | 6th Period Apprentice | (90%) | $32.13 |
| JW Technician | 100% of JW Rate | $35.70 | | | |

| Fringes: | | Deductions: | |
|---|---|---|---|
| Health & Welfare (JW) | $10.40 | Working Assessment | 6% |
| Health & Welfare (Apprentice) | $ 4.00* | Labor/Mgmt Co-op | $0.10 |
| Local Pension | $ 4.90 | COPE (Optional) | $0.05 |
| Apprenticeship Fund | $ 0.78 | 401K (Optional)  $0.00, $1.50, $3.00, $5.00, $6.00, | |
| NEBF | 3% | $7.50 | |
| NEIF | 1% | | |
| Labor/Mgt Co-op Fund | $ 0.10 | | |
| Administrative Maintenance Fund | .9% | | |

*Once the Union and Chapter adopt the NECA/IBEW Family Medical Care Plan for Apprentices, this rate will increase by $0.15 per hour paid

CSI 0068

**Effective January 1, 2013**

> The Journeyman Wireman package increases $1.50 per hour paid to be distributed per the Union at that time; Apprentice rates will change appropriately.

**Effective January 1, 2014**

> The Journeyman Wireman package increases $1.50 per hour paid to be distributed per the Union at that time.   Apprentice rates will change appropriately.

**Effective January 1, 2015**

> The Journeyman Wireman package increases $1.25 per hour paid to be distributed per the Union at that time.  Apprentice rates will change appropriately.

**NOTE!!!!!**

All starting Apprentices indentured and employed under the terms of this Agreement on or after July 1, 1980 shall have Pension Contributions made in their behalf directly proportionate to the percentage of the Journeyman rate they receive.  Said percentage payment shall increase with each incremental raise and be directly proportionate thereto, until the 100% contribution level is attained.

All Apprentices indentured and employed under the terms of this Agreement on or after June 1, 2006 shall have:

> 1. Pension A only Contributions made in their behalf directly proportionate to the percentage of the Journeyman rate they receive.   Said percentage payment shall increase with each incremental raise and be directly proportionate thereto, until the 100% contribution level is attained.

> 2. Apprentice only Health and Welfare Contributions made in their behalf at the listed rate.

The only benefit plans in which first year Apprentice and unindentured must participate are local health and welfare plans and the National Electrical Benefit Fund.

**SECTION 3.06** The Employer agrees to deduct and forward to the Financial Secretary of the Local Union, upon receipt of voluntary written authorization, the additional working dues from the pay of each IBEW member.

The amount to be deducted shall be the amount specified in the approved Local Union Bylaws.  Such amount shall be certified to the Employer by the Local Union upon request by the Employer.

**SECTION 3.07** Any workman at a higher classification shall receive the higher rate of pay for a minimum of four (4) hours.  If he works beyond the four (4) hours, he shall receive the higher rate of pay for the entire day.

**SECTION 3.08**  On jobs where workmen are required to work from trusses, swinging scaffolds, open ladders, scaffolds, boson chairs, stacks, or towers where subject to a direct fall from the ground floor or support structure from a distance of fifty (50) feet to ninety (90) feet, the rate shall be time-and-a-half (1½).  Over ninety (90) feet, the rate shall be double (2) the regular straight time rate of pay.

Where workmen are required to work under compressed air or in areas where injurious gases, dust, or fumes are present in amounts necessitating use of gas masks or self-contained breathing apparatus (particle masks are not considered self-contained breathing apparatus) or where workmen work on poles at a distance of seventy-five (75) feet or more from the ground, they shall be paid a bonus of straight time pay.  This shall be at a minimum of one hour, and thereafter, each succeeding hour or fraction thereof shall constitute an hour at the bonus rate.  Foreman to receive bonus pay calculated by the same formula.

CSI 0069

**SECTION 3.09** Journeyman Wireman when splicing cable: All work of joining, splicing, and insulating and placing flameproof covering, where wiped lead joints are necessary, shall be performed by Journeyman Wireman only. Journeyman Wireman when splicing cable shall not be required to work on wires or cables when the difference in potentials is over 300 volts between any two conductors or between any conductor and ground unless assisted by another Journeyman. In no case shall Journeyman Wiremen when splicing cable be required to work on energized cables in excess of 480 volts. When using stress cones and shields with all synthetic cables regardless of voltage when shielded and when certification is required by the owner or general contractor, splicing and connecting thereto will be done at the Cable Splicer's rate set forth in this Agreement only when splicing.

Journeyman Wireman when splicing cables shall furnish hand tools, but shall be permitted to rent splicing tools, other than hand tools, to the Employer at a minimum rate of $25.00 per day worked.

**SECTION 3.10** When workmen are directed to report to a job and do not start work on the job due to weather conditions, lack of material or other causes beyond their control, they shall receive two (2) hours pay plus the applicable travel time and mileage unless notified at least one-half (½) hour before show-up time that morning, if workmen can be reached by telephone.

Workmen shall remain available for work, under shelter during this two (2) hour period. If the men are put to work during this two (2) hour period and work beyond their show-up time, they shall receive four (4) hours pay. If they start to work after lunch, they shall receive eight (8) hours pay, plus all applicable travel time and mileage.

Employers directing workmen to work in the rain or under other adverse conditions shall furnish the appropriate protective clothing.

**SECTION 3.11** In the event there is a bomb threat on any job or project before the regular starting time, all workmen shall receive two (2) hours pay at the straight time rate and applicable travel time and mileage or subsistence. If any workman chooses to leave the job or project prior to the end of the two (2) hour period, he shall receive pay at the straight time rate only for the time he remained on the job or project plus the applicable time and mileage or subsistence.

If there is a bomb threat after the start of the regular work shift and after the first two (2) hour period, all workmen shall be paid actual time worked plus applicable travel time, and mileage or subsistence. Time spent in holding areas as directed by the Employer shall be considered as time worked and paid accordingly.

**SECTION 3.12** When workmen are required to perform work outside the jurisdiction of the Union, where a higher wage rate prevails, they shall be paid the higher scale.

**SECTION 3.13** SHIFT WORK

When so elected by the Contractor, multiple shifts of at least five (5) days duration may be worked. When two (2) or three (3) shifts are worked:

The first shift (day shift) shall be worked between the hours of 8:00 a.m. and 4:30 p.m. Workmen on the "day shift" shall receive eight (8) hours pay at the regular hourly rate for eight (8) hours work.

The second shift (swing shift) shall be worked between the hours of 4:30 p.m. and 12:30 a.m. Workmen on the "swing shift" shall receive eight (8) hours pay at the regular hourly rate plus 10% for seven-and-one-half (7½) hours work.

The third shift (graveyard shift) shall be worked between the hours of 12:30 a.m. and 8:00 a.m. Workmen on the "graveyard shift" shall receive eight (8) hours pay at the regular rate plus 15% for seven (7) hours work.

CSI 0070

A lunch period of thirty (30) minutes shall be allowed on each shift. All overtime work required after the completion of a regular shift shall be paid at one-and-one-half times the "shift" hourly rate.

There shall be no pyramiding of overtime rates and double the straight time rate shall be the maximum compensation for any hour worked.

There shall be no requirement for a day shift when either the second or the third shift is worked.

**SECTION 3.14** Carrying tools or materials to and from the job is considered working. No workman shall carry tools or material outside of working hours except when using Employer's vehicle for Employee's own convenience.

**SECTION 3.15** On any job where workmen are exposed to radioactive materials and/or radiation in excess of one-tenth of the maximum possible limits (MPL), as established by the International Commission on Radiation Protection, the Employer shall employ a qualified Journeyman Radiation Monitor working under the terms of this Agreement.

Such radiation monitors shall determine the location of hazardous zones and shall be responsible for the radiation hazards therein. He shall maintain permanent and accurate time checks on all workmen entering and leaving such zones, including radiation dosages of all personnel emerging from the radiation zone. He shall also be in charge of a decontamination of personnel, their tools, material, or equipment. The radiation monitor shall report to and be subject to the Steward and the supervising electrician on the job. Film badges and test equipment to be supplied by the Employer.

**SECTION 3.16** Workmen employed under the terms of this Agreement shall do all electrical construction and installation of electrical and electronic work and all electrical maintenance thereon. This shall include the setting, processing, welding, cutting, burning, handling, and moving of all electrical materials, electrical equipment, and electrical apparatus, and the making of the final running test and the installation of all underground raceways. This shall also include the installation of all electrical lighting, heating and power equipment, photovoltaic systems, solar systems, fuel cells, all power generating green technology systems, electronic equipment, telemetering equipment, or any other electrical instrumental equipment, with the installation of all related wiring, control wiring, fixtures, instruments, and devices. All conduit shall be cut, threaded, and bent, other than 6" and less nipples and factory 45-degree and 90-degree bends. The drilling, chasing, and channeling necessary to complete electrical installation shall be performed by workmen employed under the terms of this Agreement. After material used in electrical work has reached a job site, it shall from thereon, be handled only by workmen employed under the terms of this Agreement. This shall not preclude the Union from furnishing workmen to other Employers for completion of electrical installation which are not included by the electrical contract.

It shall be understood that the scope of work covered by this Agreement does include the installation of telephone or communication work and the installation of all electronics or instrumentation equipment and related wiring.

**SECTION 3.17** The cutting and threading of all conduit and nipples shall be performed by workmen under the terms of this Agreement.

**SECTION 3.18** A Foreman shall be designated on all jobs having five (5) or more workmen of any classification covered by this Agreement and shall be paid per hour worked in this classification. No job Forman shall be allowed to supervise more than one (1) project at a time where workmen are in continuous employment on these projects. A job Foreman may work with the tools until seven (7) workmen exclusive of Foreman who is on the job, then he shall act in a supervisory capacity only and then for not more than ten (10) workmen. He shall be permitted to drive a vehicle containing workmen and/or material. Foreman or General Foremen will be allowed and shall not be precluded from incidental handling of materials or accessing enclosures for inspection.

CSI 0071

In cases where workmen are not readily available to handle and transport hand tools, the Foreman shall be permitted to perform this work. On all jobs requiring three (3) or more Foremen or in excess of twenty (20) workmen, a General Foreman shall be required. A General Foreman shall not supervise more than four (4) Foremen and shall be of the same classification as the Foreman.

On all jobs having Foremen, workmen, except in an emergency, are not to take orders or accept the layout of work from anyone except their assigned Foreman. Likewise, on a job having a General Foreman. Foremen are not to accept orders, except in an emergency, from anyone but their assigned General Foreman. General Foreman shall give orders only to his assigned Foreman, except in case of an emergency.

On all jobs requiring more than four (4) Cable Splicers, a Cable Splicer Foreman shall be placed in charge of this work and receive General Foreman pay.

In any shop where the owner is acting as shop Foreman, he shall not act as job Foreman on jobs normally requiring such, under the terms of the Agreement, unless he employs only one (1) Journeyman Electrician in his shop.

Also, a working partner (as defined) under the terms of this Agreement shall not act as the shop Foreman in any shop employing less than eight (8) Journeymen. In all shops where the working partner is shop Foreman, he shall not, in any instance, act as job Foreman. Non-working Foreman does not apply to Residential work.

## SECTION 3.19 TRAVEL

The Union will refer to all Electrical Employers at their recognized place of business as shown on their Letter of Assent at no expense to the Employer. Therefore, the Employer has the following options:

A.  All Employers may request workmen to report direct to a job within a free zone to include everything west of ten (10) miles east of Highway 101, as the crow flies, and ten (10) miles north and south of Highway 46, as the crow flies, to the junction of Highway 41 and Highway 46. Everything outside this area shall be paid at full subsistence provided said job is of five (5) days duration or more and provided there is storage on the job for the Employee's tools. The Employer will be responsible for loss of tools under such circumstances. (Road: The most direct route on a surfaced road.)

B.  On all jobs or projects outside the free zone, as stated in "A" above, Employees may be required to report to the job site in their own transportation at the regular starting time and remain on the job site until the regular quitting time and these shall be paid at fifty dollars ($50.00) per day or fifty-one cents ($0.51) per mile for each road mile from shop to job and job to shop (round trip). (Day worked shall mean at least four (4) hours on the job unless sent home on account of weather, emergency, sickness, or injury.)

C.  The Employer shall pay for traveling time and furnish transportation from shop to job, job to job, and job to shop. Travel time shall be at the appropriate rate of pay for that day of the week. (Monday through Friday, straight time; Saturday and Sunday, double time.)

## SECTION 3.20 Overtime is to be worked only in an emergency or for short durations, or on jobs of unusual circumstances, which make sustained overtime appropriate. The Employer and workmen contemplating scheduled overtime work shall first notify the Business Manager. In cases of emergency, such as the preservation of life or property, or to complete a job or project, such work shall be reported to the Business Manager not later that the next regular working day.

Insofar as practical, all overtime in a shop or on the job shall be divided equally among the workmen regularly employed there. Under no circumstances shall the workman not employed on the job during

14

regular working hours be placed on overtime work while any of the regular crew is not working, if they desire to work on such overtime.

**SECTION 3.21** The Employer of workmen, or their agents, shall not give or accept directly or indirectly any rebate on wages. The Employer shall not directly or indirectly, or by any subterfuge, sublet or contract with any workman, any or all of the labor services required by such contract of the Employer. If the Employer is found violating this provision, he shall be subject to having this Agreement terminated upon written notice being given by the Union after the facts have been determined by the International Office.

**SECTION 3.22** UNDERGROUND DUCT WORK

Shall include the installation of all types of underground ducts or raceways used as enclosure for electrical conductors (either power, control, communication). It shall include all cutting and rodding of same and the installation of "Fish or Pull" wires and accompanying ground wires. The handling of all material from the first point of delivery on the job site to the final installation of the ducts shall be covered under the Agreement, as well as the supervision of pouring the concrete envelope.

**SECTION 3.23** TUNNELS

A. The minimum rate of pay for tunnel work shall be paid at the time-and-one-quarter (1¼) hourly rate. Whenever there is electrical construction, maintenance, or temporary work of either power, lighting, or communication to be performed in or about a tunnel shaft or adit, it shall be done by workmen employed under the terms of this Agreement. This shall also be interpreted to include all electrical maintenance or repair work and battery charging and charging on battery-operated electrical motors.

B. Whenever a shift crew, or a major portion thereof, or two (2) other crafts, one (1) working in a tunnel where there is electrical light or power, at least one Journeyman Wireman shall be employed to maintain and perform the electrical installation for that crew.

C. When more than one (1) heading is worked from one (1) adit or shaft, a wireman shall be assigned to each crew or shift, and one (1) to each heading unless both headings are readily available to that one (1) wireman.

D. Workmen shall not be required to enter the heading after a blast until all the requirements of the State Safety Codes have been fully complied with.

E. All electrical work being performed under the terms of this supplement shall be governed by Tunnel Safety Orders issued by Industrial Safety; Electrical Safety Orders issued by the Division of Industrial Safety; and, when applicable, General Order No. 95, issued by the State Public Utilities Commission.

F. The daily reporting, or starting, point shall be the electrical shop of tunnel entrance, if adjacent to a suitable, available parking lot, otherwise from such parking lot. The workmen's daily pay shall start and end at this reporting place. However, workmen shall receive a daily compensation for clothing change time and for travel time in and out of tunnel with regular tunnel crew, before and after regular shift hour as follows.

G. Workmen shall not be required to work more than five (5) hours without a meal, and if workmen do, they will receive one-half (½) hour bonus at the tunnel rate of pay.

H. The Employer shall furnish workmen with rubber boots, raincoats, protective helmets, and clothing without charge where required and needed in and about tunnel. The Employee shall

CSI 0073

be responsible for these items and shall return them to the Employer at the time of termination.

## SECTION 3.24 OFF-SHORES WORK

An additional 18% per hour in pay shall be paid to all Employees for work on all off-shore installations away from the mainland when the Employees are required to remain away from home overnight, plus room and board.  The Contractor shall also furnish towels, soap, and linens daily.  Clean, sterilized blankets shall be furnished at the beginning of each job and every thirty (30) days thereafter.  All Employees will be furnished with a locker, lock, and at least one-hundred (100) square feet of living quarters, which shall comply with the California State Housing Code.

When practical, Employees working under the terms of the Agreement shall be housed together.  When working under the terms of this Agreement, Employees shall eat their meals in the facilities provided them by a civilian catering service when available.

Also, when working on off-shore installations and the workmen are required to remain overnight, no workman shall receive less than eight (8) hours pay each day. The point of embarkation for all off-shore facilities shall be considered job site for the purpose of establishing working hours and/or daily travel expense.  The Employer is to be responsible for belongings left at the point of embarkation.

## SECTION 3.25 MAKE-UP TIME

If an employer approves a written request of an employee to make up work time that is or would be lost as a result of a personal obligation of the employee, the hours of that makeup work time, if performed in the same workweek which the work time was lost, will not be counted toward computing the total number of hours worked in a day for purposes of the overtime requirements, except for hours in excess of 8 hours worked in one day or 40 hours worked in one workweek. An employee shall provide a signed written request for each occasion that the employee makes a request to makeup work time pursuant to this section.  The Employer shall forward a copy of the request to the union hall. If an employee knows in advance that he will be requesting makeup time for a personal obligation that will recur at a fixed time over a succession of weeks, the employee may request to makeup work time for up to four weeks in advance; provided, however, the makeup work must be performed in the same week that the work time was lost.

CSI 0074

## ARTICLE IV

## REFERRAL PROCEDURE

**SECTION 4.01** In the interest of maintaining an efficient system of production in the industry, providing for an orderly procedure of referral of applicants for employment, preserving the legitimate interest of Employees in their employment status within the area and of eliminating discrimination in employment because of membership or non-membership in the Union, the parties hereto agree to the following system of referral of applicants for employment.

**SECTION 4.02** The Union shall be the sole and exclusive source of referral of applicants for employment.

**SECTION 4.03** The Employer shall have the right to reject any applicant for employment.

**SECTION 4.04** The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions, or any other aspect or obligation of Union membership policies or requirements. All such selection and referral shall be in accord with the following procedure.

**SECTION 4.05** The Union shall maintain a register of applicants for employment established on the basis of the Groups listed below. Each applicant for employment shall be registered in the highest priority group for which he qualifies.

### JOURNEYMAN WIREMAN – JOURNEYMAN TECHNICIAN

**GROUP I**      All applicants for employment who have four or more years experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee and who have been employed in the trade for a period of at least one year in the last four years in the geographical area covered by the collective bargaining agreement. Group I status shall be limited to one Local Union at a time. An applicant who qualifies for Group I in a local union shall be so registered electronically and remain on Group I in that local union unless and until the applicant designates another local union as his or her Group I local union. If an applicant qualifies for Group I status in a local union other than his or her home local union and designates that as his or her Group I local union, the business manager of the new Group I status local union shall by electronic means notify the business manager of the applicant's former Group I status local union.

**GROUP II**      All applicants for employment who have four or more years experience in the trade and who have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee.

**GROUP III**      All applicants for employment who have two or more years experience in the trade are residents of the geographical area constituting the normal construction labor market and who have been employed in the trade for at least six months in the last three years in the geographical area covered by the collective bargaining agreement.

**GROUP IV**      All applicants for employment who have worked at the trade for more than one year.

**SECTION 4.06** If the registration list is exhausted and the Local Union is unable to refer applicants for employment to the Employer within forty-eight (48) hours from the time of receiving the Employer's request, Saturdays, Sundays, and Holidays excepted, the Employer shall be free to secure applicants

CSI 0075

without using the Referral Procedure, but such applicants, if hired, shall have the status of "Temporary Employees."

**SECTION 4.07** The Employer shall notify the Business Manager promptly of the names and Social Security numbers of such "Temporary Employees" and shall replace such "Temporary Employees" as soon as registered applicants for employment are available under the Referral Procedure.

**SECTION 4.08** "Normal construction labor market" is defined to mean the following geographical area plus the commuting distance adjacent hereto which includes the area from which the normal labor market is secured:

SAN LUIS OBISPO COUNTY, CALIFORNIA

The above geographical area is agreed upon by the parties to include the areas defined by the Secretary of Labor to be the appropriate prevailing wage areas under the Davis-Bacon Act to which this Agreement applies.

**SECTION 4.09** "Resident" means a person who has maintained his permanent home in the above-defined geographical area for a period of not less than one year or who, having had a permanent home in this area, has temporarily left with the intention of returning to this area as his permanent home.

**SECTION 4.10** An "examination" shall include experience rating tests if such examinations shall have been given prior to the date of this procedure, but from and after the date of this procedure, shall include only written and/or practical examinations given by a duly constituted Inside Construction Local Union of the I.B.E.W.  Reasonable intervals of time for examinations are specified as ninety days.  An applicant shall be eligible for examination if he has had four years experience in the trade.

**SECTION 4.11** The Union shall maintain an "Out of Work List" which shall list the applicants within each Group in chronological order of the dates they register their availability for employment.

**SECTION 4.13**  An applicant who is hired and who receives, through no fault of his own, work of forty (40) hours or less shall, upon re-registration, be restored to his appropriate place within his Group.

**SECTION 4.14(a)** Employers shall advise Business Manager of the Local Union of the number of applicants needed.  The Business Manager shall refer applicants to the Employer by first referring applicants in Group I in the order of their place on the "Out of Work List" and then referring applicants in the same manner successively from the "Out of Work List" in Group II, then Group III, and then Group IV.  Any applicant who is rejected by the Employer shall be returned to his appropriate place within his Group and shall be referred to other employment in accordance with the position of his Group and his place within his Group.

**SECTION 4.14(b)**  An applicant who is discharged for cause two times within a 12-month period shall be referred to the neutral member of the Appeals Committee for a determination as to the applicant's continued eligibility for referral.  The neutral member of the Appeals Committee shall, within three business days, review the qualifications of the applicant and the reasons for the discharges.  The neutral member of the Appeals Committee may, in his or her sole discretion: (1) require the applicant to obtain further training from the JATC before again being eligible for referral; (2) disqualify the applicant for referral for a period of four weeks, or longer, depending on the seriousness of the conduct and/or repetitive nature of the conduct; (3) refer the applicant to an employee assistance program, if available, for evaluation and recommended action; or (4) restore the applicant to his/her appropriate place on the referral list.

**SECTION 4.15** The only exception which shall be allowed in this order of referral is as follows:
(a). When the Employer states bona fide requirements for special skills and abilities in his request for applicants, the Business Manager shall refer the first applicant on the register possessing such skills and abilities.

18

CSI 0076

(b).The age ratio clause in the Agreement calls for the employment of an additional employee or employees on the basis of age. Therefore, the Business Manager shall refer the first applicant on the register satisfying the applicable age requirements provided, however, that all names in higher priority Groups, if any, shall first be exhausted before such overage reference can be made.

**SECTION 4.16** An Appeals Committee is hereby established composed of one member appointed by the Union, one member appointed by the Employer or by the Association, as the case may be, and a Public Member appointed by both these members.

**SECTION 4.17** It shall be the function of the Appeals Committee to consider any complaint of any Employee or applicant for employment arising out of the administration by the Local Union of Section 4.04 through 4.14 of this Agreement. The Appeals Committee shall have the power to make a final and binding decision on any such complaint which shall be complied with by the Local Union.

The Appeals Committee is authorized to issue procedural rules for the conduct of its business, but it is not authorized to add to, subtract from, or modify any of the provisions of this Agreement and its decisions shall be in accordance with Agreement.

**SECTION 4.18** A representative of the Employer or of the Association, as the case may be, designated to the Union in writing, shall be permitted to inspect the Referral Procedure records at any time during normal business hours.

**SECTION 4.19** A copy of the Referral Procedure set forth in this Agreement shall be posted on the Bulletin Board in the offices of the Local Union and in the offices of the Employers who are parties to this Agreement.

**SECTION 4.20** Apprentices shall be hired and transferred in accordance with the Apprenticeship Provisions of the Agreement between the parties.

CSI 0077

## ARTICLE V

## APPRENTICESHIP AND TRAINING

**SECTION 5.01** There shall be a local Joint Apprenticeship and Training Committee (JATC) consisting of a total of either 6 or 8 members who shall also serve as Trustees to the local apprenticeship and training trust. An equal number of members (either 3 or 4) shall be appointed, in writing, by the local chapter of the National Electrical Contractors Association (NECA) and the local union of the International Brotherhood of Electrical Workers (IBEW).

The local apprenticeship standards shall be in conformance with national guideline standards and industry policies to ensure that each apprentice has satisfactorily completed the NJATC required hours and course of study. All apprenticeship standards shall be registered with the NJATC before being submitted to the appropriate registration agency.

The JATC shall be responsible for the training of apprentices, journeymen, installers, technicians, and all others (unindentured, intermediate journeymen, etc.)

**SECTION 5.02** All JATC member appointments, reappointments and acceptance of appointments shall be in writing. Each member shall be appointed for a three (3) year term, unless being appointed for a lesser period of time to complete an unexpired term. The terms shall be staggered, with one (1) term from each side expiring each year. JATC members shall complete their appointed term unless removed for cause by the party they represent or they voluntarily resign. All vacancies shall be filled immediately.

The JATC shall select from its membership, but not both from the same party, a Chairman and a Secretary who shall retain voting privileges. The JATC will maintain one (1) set of minutes for the JATC committee meetings and a separate set of minutes for
Trust meetings.

The JATC should meet on a monthly basis, and also upon the call of the Chairman.

**SECTION 5.03** Any issue concerning an apprentice or an apprenticeship matter shall be referred to the JATC for its review, evaluation, and resolve; as per standards and policies. If the JATC deadlocks on any issue, the matter shall be referred to the Labor-Management Committee for resolution as outlined in Article I of this Agreement; except for trust fund matters, which shall be resolved as stipulated in the local trust fund instrument.

**SECTION 5.04** There shall be only one (1) JATC and one (1) local apprenticeship and training trust. The JATC may, however, establish joint subcommittees to meet specific needs, such as residential or telecommunication apprenticeship. The JATC may also establish a subcommittee to oversee an apprenticeship program within a specified area of the jurisdiction covered by this Agreement.

All subcommittee members shall be appointed, in writing, by the party they represent. A subcommittee member may or may not be a member of the JATC.

**SECTION 5.05** The JATC may select and employ a part-time or a full-time Training Director and other support staff, as it deems necessary. In considering the qualifications, duties, and responsibilities of the Training Director, the JATC should review the Training Director's Job Description provided by the NJATC. All employees of the JATC shall serve at the pleasure and discretion of the JATC.

**SECTION 5.06** To help insure diversity of training, provide reasonable continuous employment opportunities, and comply with apprenticeship rules and regulations, the JATC, as the program sponsor, shall have full authority for issuing all job training assignments and for transferring apprentices from one employer to another. The employer shall cooperate in providing apprentices with needed work

20

CSI 0078

experiences. The local union referral office shall be notified, in writing, of all job training assignments. If the employer is unable to provide reasonable continuous employment for apprentices, the JATC is to be so notified.

**SECTION 5.07** All apprentices shall enter the program through the JATC as provided for in the registered apprenticeship standards and selection procedures.

An apprentice may have their indenture canceled by the JATC at any time prior to completion as stipulated in the registered standards. Time worked and accumulated in apprenticeship shall not be considered for local union referral purposes until the apprentice has satisfied all conditions of apprenticeship. Individuals terminated from apprenticeship shall not be assigned to any job in any classification, or participate in any related training, unless they are reinstated in apprenticeship as per the standards, or they qualify through means other than apprenticeship, at some time in the future, but no sooner that two years after their class has completed apprenticeship, and they have gained related knowledge and job skills to warrant such classification.

**SECTION 5.08** The JATC shall select and indenture a sufficient number of apprentices to meet local manpower needs. The JATC is authorized to indenture the number of apprentices necessary to meet the job site ratio as per Section 5.12.

**SECTION 5.09** Though the JATC cannot guarantee any number of apprentices; if a qualified employer requests an apprentice, the JATC shall make every effort to honor the request. If unable to fill the request within ten (10) working days, the JATC shall select and indenture the next available person from the active list of qualified applicants. An active list of qualified applicants shall be maintained by the JATC as per the selection procedures.

**SECTION 5.10** To accommodate short-term needs when apprentices are unavailable, the JATC shall assign unindentured workers who meet basic qualification for apprenticeship. Unindentured workers shall not remain employed if apprentices become available for OJT assignment. Unindentured workers shall be used to meet site ratios except on wage and hour (prevailing wage) job sites.

Before being employed, the unindentured person must sign a letter of understanding with the JATC and the employer - agreeing that they are not to accumulate more than two thousand (2,000) hours as an unindentured, that they are subject to replacement by indentured apprentices and that they are not to work on wage and hour (prevailing wage) job sites.

Should an unindentured worker be selected for apprenticeship, the JATC will determine, as provided for in the apprenticeship standards, if some credit hours worked as an unindentured will be applied toward the minimum OJT hours of apprenticeship.

The JATC may elect to offer voluntary related training to unindentured; such as Math Review, English, Safety, Orientation/Awareness, and Introduction to OSHA, First-Aid and CPR. Participation shall be voluntary.

**SECTION 5.11** The employer shall contribute to the local health and welfare plans and to the National Electrical Benefit Fund (NEBF) on behalf of all apprentices and unindentured. Contributions to other benefit plans may be addressed in other sections of this agreement.

**SECTION 5.12** Each job site shall be allowed a ratio of two (2) apprentices for every three (3) Journeyman Wiremen (man).

| Number of Journeymen | Maximum Number of Apprentices/Unindentured |
|---|---|
| 1 to 3 | 2 |
| 4 to 6 | 4 |
| etc. | etc. |

CSI 0079

The first person assigned to any job site shall be a Journeyman Wireman.
A job site is considered to be the physical location where employees report for their work assignments. The employer's shop (service center) is considered to be a separate, single job site. All other physical locations where workers report for work are each considered to be a single, separate job site.

**SECTION 5.13** An apprentice is to be under the supervision of a Journeyman Wireman at all times. This does not imply that the apprentice must always be in sight of a Journeyman. Journeymen are not required to constantly watch the apprentice. Supervision will not be of a nature that prevents the development of responsibility and initiative. Work may be laid out by the employer's designated supervisor or journeyman based on their evaluation of the apprentice's skills and ability to perform the job tasks. Apprentices shall be permitted to perform job tasks in order to develop job skills and trade competencies. Journeymen are permitted to leave the immediate work area without being accompanied by the apprentice.

Apprentices who have satisfactorily completed the first four years of related classroom training using the NJATC curriculum and accumulated a minimum of 6500 hours of OJT with satisfactory performance shall be permitted to work alone on any job site and receive work assignments in the same manner as a Journeyman Wireman. An apprentice shall not be the first person assigned to a job site and apprentices shall not supervise the work of others.

**SECTION 5.14** Upon satisfactory completion of apprenticeship, the JATC shall issue all graduating apprentices an appropriate diploma from the NJATC. The JATC shall encourage each graduating apprentice to apply for college credit through the NJATC. The JATC may also require each apprentice to acquire any electrical license required for journeymen to work in the jurisdiction covered by this agreement.

**SECTION 5.15** The parties to the Agreement shall be bound by the Local Joint Apprenticeship and Training Trust Fund Agreement which shall conform to Section 302 of the Labor Management Relations Act of 1947 as amended, ERISA, and other applicable regulations.

The Trustees authorized under this Trust Agreement are hereby empowered to determine the reasonable value of any facilities, materials or services furnished by either party. All funds shall be handled and disbursed in accordance with the Trust Agreement.

**SECTION 5.16** All Employers subject to the terms of this agreement shall contribute the amount of funds specified by the party's signatory to the local apprenticeship and training trust agreement. The current rate is referenced in Section 3.05. This sum shall be due the Trust Fund by the same date as their payment to the NEBF under the terms of the Restated Employees Benefit Agreement and Trust.

CSI 0080

## ARTICLE VI

## FRINGE BENEFITS AND DEDUCTIONS

**SECTION 6.01**  It is agreed that in accord with the Employees Benefit Agreement of the National Electrical Benefit Fund ("NEBF"), as entered into between the National Electrical Contractors Association and the International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the NEBF, the individual Employer will forward monthly to the NEBF's designated local collection agent an amount equal to 3% of his gross monthly labor payroll paid to, or accrued by, the employees in this bargaining unit, and a completed payroll report prescribed by the NEBF.  The payment shall be made by check or draft and shall constitute a debt due and owing to the NEBF on the last day of each calendar month, which may be recovered by suit initiated by the NEBF or its assignee.  The payment and the payroll report shall be mailed to reach the office of the appropriate local collection agent not later than fifteen (15) calendar days following the end of each calendar month.

The individual Employer hereby accepts, and agrees to be bound by, the Restated Employees Benefit Agreement and Trust.

An individual Employer who fails to remit as provided above shall be additionally subject to having his agreement terminated upon seventy-two (72) hours notice, in writing, being served by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been paid to the local collection agent.

The failure of an individual Employer to comply with the applicable provisions of the Restated Employees Benefit Agreement and Trust shall also constitute a breach of this labor agreement.

**SECTION 6.02** The individual Employer shall contribute and forward monthly to the Local Union Health & Welfare Trust Fund a contribution amount as specified in Article III, Section 3.05 per hour paid.  Travel time hours, over time hours, high time hours, hazardous hours, and bonus differentials shall also be calculated and paid as additional hours worked.  The payment and payroll report shall be mailed to reach the Trustees or their designated agent not later than fifteen (15) calendar days following the end of each calendar month.

All Contractors signatory to this Agreement shall be bound by the terms and conditions of the Electrical Workers Area Long Term Disability Trust Plan.

**SECTION 6.03** San Luis Obispo County Electrical Joint Apprenticeship and Training Fund:  Employer contribution equal to the amount specified in Article III, Section 3.05 per hour paid.

The payment and payroll report shall be mailed to reach the Trustees or their designated agent not later than fifteen (15) calendar days following the end of each calendar month.

**SECTION 6.04** The individual Employer shall contribute and forward monthly to the Central California IBEW-NECA Pension Trust Fund a contribution as specified in Article III, Section 3.05 per hour paid. (Overtime hours and bonus differentials shall also be calculated and paid as additional hours worked). The payment and payroll report shall be mailed to reach the Trustees or their designated agent not later than fifteen (15) calendar days following the end of each calendar month.

**SECTION 6.05** The individual Employer shall contribute and forward monthly to the San Luis Obispo Labor Management Cooperative Fund a contribution amount as specified in Article III, Section 3.05 per hours paid.  The payment and payroll report shall be mailed to reach the Trustees or their designated agent not later than fifteen (15) calendar days following the end of each calendar month.

**SECTION 6.06** The Employer shall make all legal payroll withholdings for Income Tax, Social Security, Unemployment Insurance, etc., from the total wages.

CSI 0081

A.   The monthly transmittal shall cover every Employee subject to this Agreement on the payroll for all payroll weeks ending within the calendar month.

B.   On the monthly transmittal form as provided form in Article IV, the following information concerning each Employee shall be set forth in separate columns:   (1) Social Security Number, (2) Name of Employee, (3) the number of hours worked, and (4) the gross earnings. The total of these amounts shall be given together with the check number and date of payment.

C.   The employer agrees to be bound by all the terms and conditions of the Agreement and the Declaration of Trust of the following Trusts:   Health and Welfare, Electrical Apprentice and Manpower Training Fund, National Electrical Benefit Fund, and Central California IBEW-NECA Pension Trust Fund, and agrees further to be bound by all of the obligations imposed there under and any modifications or changes therein.

**SECTION 6.07**   Individual Employers who fail to remit as provided for in Sections 6.02, 6.03, 6.04, 6.05, and 6.06 shall be additionally subject to having this Agreement terminated upon seventy-two (72) hours notice, in writing, being served by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been made.

**SECTION 6.08**

A.   Failure of an individual Employer to comply with the provisions of Sections 6.02, 6.03, 6.04, 6.05, 6.06 and 6.07 shall also constitute a breach of this Labor Agreement.   As a remedy for such a violation, the Labor-Management Committee and/or the Council on Industrial Relations for the Electrical Contracting Industry, as the case may be, are empowered, at the request of the Union, to require an Employer to pay into the affected Joint Trust Funds established under this Agreement any delinquent contributions to such funds which have resulted from the violation.

B.   If, as a result of violations of this Section, it is necessary for the Union and/or Trustees of the Joint Trust Funds to institute court action to enforce an award rendered in accordance with subsection A, above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants and attorneys fees incurred by the Union and/or fund Trustees, plus the cost of the litigation, which have resulted from the bringing of such court action.

C.   All payments required by Article V, Section 5.11 and 5.16, and Article VI, Sections 6.02, 6.03, 6.04, 6.05, and 6.06 shall be forwarded to the depository not later than the fifteenth (15th) day of the following month.   If these payments and reports are not mailed to the depository by the 20th day of the following month, liquidated damages equal to 10% of the amount owed will become immediately due and owing.   If suit is brought to collect said unpaid contributions, liquidated damages equal to 20% of the amount owed will immediately become due and owing.

**SECTION 6.09**

The Employer agrees to deduct and transmit to IBEW-COPE an amount of five cents ($0.05) per hour from the wages of each Employee who voluntarily authorizes such contributions on the forms provided for that purpose by IBEW-COPE.   These transmittals shall occur monthly and shall be accompanied by a list of names of those Employees for whom such deductions have been made and the amount deducted for each such Employee.

CSI 0082

## ARTICLE VII

## NATIONAL ELECTRICAL INDUSTRY FUND (NEIF)

**SECTION 7.01** Each individual Employer shall contribute an amount not to exceed one percent (1%) nor less than .2 of 1% of the productive electrical payroll, as determined by each local Chapter and approved by the Trustees, with the following exclusions:

    A.   Twenty-five percent (25%) of all productive electrical payroll in excess of 75,000 man-hours paid for electrical work in any one Chapter area during any one calendar year, but not exceeding 150,000 man-hours.

    B.   One hundred percent (100%) of all productive electrical payroll in excess of 150,000 man-hours paid for electrical work in any one Chapter area during any one calendar year.

(Productive electrical payroll is defined as the total wages, including overtime, paid with respect to all hours worked by all classes of electrical labor for which a wage is established in the prevailing labor area where the business is transacted.)

Payment shall be forwarded monthly to the National Electrical Industry Fund in a form and manner prescribed by the Trustees no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. Failure to do so will be considered a breach of this Agreement on the part of the individual Employer.

## ARTICLE VIII

## SAFETY

**SECTION 8.01** There shall be a Joint Safety Committee consisting of three members representing the Employer and three members representing the Union. The duties of this Committee shall be to develop and recommend safe work rules that are equal to or greater than the Standards of Construction as established by the Occupational Safety and Health Act of 1970, or other applicable Federal or State laws. Such rules, and other safety rules provided in the Article, are minimum rules and not intended to imply that the Union objects to the establishment and imposition by the Employers of additional or more stringent safety rules to protect the health and safety of the Employees.

**SECTION 8.02** It shall also be a function of this Committee to study these safe work rules and recommend their update to the parties to this Agreement for possible inclusion in this Agreement. This Committee shall meet at least once each quarter and also when called by the Chairman or when called by a majority of the current Committee members.

**SECTION 8.03** Members of the Joint Safety Committee shall be selected by the party they represent. Their term of office shall be three (3) years unless removed by the party they represent. The term of one (1) Employer and one (1) Union representative shall expire each year with successors to be determined in the same manner as the original appointments were made. A Committee member is eligible to succeed himself.

**SECTION 8.04** Two (2) Journeymen shall work together on all energized circuits of 440 volts AC or 250 volts DC, or respective higher voltages. Journeymen shall be used in assisting a Journeyman Wireman while splicing cable.

**SECTION 8.05** Journeyman Wireman, while splicing cable shall not be required to work on wires or cables when the difference in potentials is over 240 volts between any two conductors or between any

25

conductor and ground, unless assisted by one (1) Journeyman. In no case shall Journeyman Wiremen, while splicing, be required to work on energized cables carrying in excess of 480-volt circuits.

**SECTION 8.06** No Employees shall be compelled to use a powder-actuated tool. Only qualified Employees shall be permitted to use powder-actuated tools.

**SECTION 8.07** The Employer shall furnish hard hats when such are required and shall also furnish proper individual protective gear to workmen engaged in burning and welding operations.

**SECTION 8.08** The safe practices that are in effect on utility company property which are more stringent than those in this Agreement shall apply to work which is performed on that property under the terms of this Agreement.

**SECTION 8.09** It is the Employer's exclusive responsibility to ensure the safety of its Employees and their compliance with these safety rules and standards.

**SECTION 8.10** Adequate safety and protective devices shall be supplied workmen by the Employer on all hazardous work in accord with the Safety Orders of the Industrial Accident Commission and the rules of the Union. They shall also observe instructions of the Employer in matters of safety, provided such instructions are not in conflict with safety orders of the Industrial Accident Commission as recognized practices in the Trade.

Contractors shall furnish the Local Union Business Manager a copy of each accident report made to the Compensation Insurance Carrier as a result of injury to any workman employed under the terms of the Agreement. In the event of a fatal injury, the Employer shall immediately inform the Local Business Manager by telephone and all available information shall be given to him.

The Employer shall be responsible for furnishing First Aid Kits, sanitary facilities, and drinking water on all jobs.

The Steward shall support the Employer's Safety Procedures.

## ARTICLE IX

### LOCAL LABOR-MANAGEMENT COOPERATIVE COMMITTEE (LMCC)

**SECTION 9.01** The parties agree to participate in a Labor Management Cooperation Fund under the authority of Section 6(b) of the Labor Management Cooperative Act of 1978, 29 U.S.C. §175(a) and Section 302(c)(9) of the Labor Management Relations Act, 29 U.S.C. §186(c)(9). The purposes of this Fund shall include the following:

1. to improve communications between representatives of Labor and Management;

2. to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness;

3. to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

4. to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;

5. to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and industry;

CSI 0084

6.  to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production;

7.  to engage in public education and other programs to expand the economic development of the electrical construction industry;

8.  to enhance the involvement of workers in making decisions that affect their working lives; and,

9.  to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

**SECTION 9.02** The Fund shall function in accordance with, and as provided in, it's Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents.  Each Employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the LMCC, as provided in said Agreement and Declaration of Trust.

**SECTION 9.03** Each employer shall contribute the amount as specified in Article III, Section 3.05 per hour paid under the Agreement on a monthly basis.  Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which the labor was performed.  The California Central Coast Chapter, NECA, or its designee, shall be the collection agent for this fund.

**SECTION 9.04** If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance. In the event the Employer is in default, the Employer shall be liable for a sum equal to 15% of the delinquent payment, but not less than the sum of twenty dollars ($20), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments. Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid. The Employer shall also be liable for all costs of collecting the payment together with attorneys' fees.

## ARTICLE X

## NATIONAL LABOR-MANAGEMENT COOPERATIVE COMMITTEE (NLMCC)

**SECTION 10.01**   The parties agree to participate in the NECA-IBEW National Labor-Management Cooperation Fund, under authority of Section 6(b) of the Labor Management Cooperation Act of 1978, 29 U.S.C. §175(a) and Section 302(c)(9) of the Labor Management Relations Act, 29 U.S.C. §186(c)(9).  The purposes of this Fund include the following:

1.  to improve communication between representatives of labor and management;

2.  to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organization effectiveness;

3.  to assist worker and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

4.  to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;

27

CSI 0085

5.  to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and the industry;

6.  to encourage and support the initiation and operation of similarly constituted local labor-management cooperation committees;

7.  to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations and new methods of improved production;

8.  to engage in public education and other programs to expand the economic development of the electrical construction industry;

9.  to enhance the involvement of workers in making decisions that affect their working lives; and

10.  to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

**SECTION 10.02** The Fund shall function in accordance with, and as provided in, it's Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents. Each employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the NLMCC, as provided in said Agreement and Declaration of Trust.

**SECTION 10.03** Each employer shall contribute one cent ($0.01) per hour worked under this Agreement up to a maximum of 150,000 hours per year. Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which labor was performed. The California Central Coast Chapter, NECA, or its designee, shall be the collection agent for this fund.

**SECTION 10.04** If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance. In the event the Employer is in default, the Employer shall be liable for a sum equal to fifteen percent (15%) of the delinquent payment, but not less than the sum of twenty dollars ($20.00), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments. Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid. The Employer shall also be liable for all costs of collecting the payment together with attorney's fees.

**SECTION 10.05** The one cent ($0.01) per hour contribution for the National LMCC is to be paid from the local LMCC Fund. There will be no increase in the wage/fringe benefit package for this contribution.

CSI 0086

# ARTICLE XI

## SUBSTANCE ABUSE

**SECTION 11.01**
The dangers and costs that alcohol and other chemical abuses can create in the electrical contracting industry in terms of safety and productivity are significant. The parties to this Agreement resolve to combat chemical abuse in any form and agree that, to be effective, programs to eliminate substance abuse and impairment should contain a strong rehabilitation component. The local parties recognize that the implementation of a drug and alcohol policy and program must be subject to all applicable federal, state, and local laws and regulations. Such policies and programs must also be administered in accordance with accepted scientific principles, and must incorporate procedural safeguards to ensure fairness in application and protection of legitimate interests of privacy and confidentiality. To provide a drug-free workforce for the Electrical Construction Industry, each IBEW local union and NECA chapter shall implement an area-wide Substance Abuse Testing Policy. The policy shall include minimum standards as required by the IBEW and NECA. Should any of the required minimum standards fail to comply with federal, state, and/or local laws and regulations, they shall be modified by the local union and chapter to meet the requirements of those laws and regulations.

# ARTICLE XII

## CODE OF EXCELLENCE

**SECTION 12.01**
The parties to this Agreement recognize that to meet the needs of our customers, both employer and employee must meet the highest levels of performance, professionalism and productivity. The Code of Excellence has proven to be a vital element in meeting the customer's expectations. Therefore each IBEW local union and NECA chapter shall implement a Code of Excellence Program. The program shall include minimum standards as designed by the IBEW and NECA.

# ARTICLE XIII

## ADMINISTRATIVE MAINTENANCE FUND

**SECTION 13.01** All employers signatory to this labor agreement with the California Central Coast Chapter, NECA designated as their collective bargaining agent shall contribute the amount specified in Article III, Section 3.05 for each hour paid by each employee covered by this labor agreement to the Administrative Maintenance Fund. The moneys are for the purpose of administration of the collective bargaining agreement, grievance handling, and all other management duties and responsibilities of this agreement. The fund is to be administered solely by the Chapter. Enforcement for delinquent payments to the fund shall be the sole responsibility of the fund or the Chapter and not the Local Union. No part of the funds collected under this trust shall be used for any purpose which is held to be in conflict with the interests of the International Brotherhood of Electrical Workers and its local unions.

CSI 0087

## SEPARABILITY CLAUSE

Should any provision of the Agreement be declared illegal by any court of competent jurisdiction, such provisions shall immediately become null and void, leaving the remainder of the Agreement in full force and effect and the parties shall, thereupon, seek to negotiate substitute provisions which are in conformity with the applicable laws.

## GENDER LANGUAGE

Whenever the male gender is used in this Agreement, the female gender is also intended.

**SUBJECT TO THE APPROVAL OF THE INTERNATIONAL PRESIDENT, IBEW.**

Signed:
Title:      JOHN W TREDER, CHAIRMAN
SAN LUIS OBISPO DIVISION, CALIFORNIA CENTRAL COAST CHAPTER
NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION

Signed:
Title:      SHARI J BRUNNER, EXECUTIVE MANAGER
SAN LUIS OBISPO DIVISION, CALIFORNIA CENTRAL COAST CHAPTER
NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION

Signed:
Title:      JOHN M SATTERFIELD, PRESIDENT
LOCAL UNION 639, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

Signed:
Title:      MARK D SIMONIN, BUSINESS MANAGER
LOCAL UNION 639, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

APPROVED
INTERNATIONAL OFFICE-I.B.E.W.

JUL 1 2 2012

Edwin D. Hill, President
This approval does not make the
International a party to this agreement.

CSI 0088

Exhibit 3